**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **FRANK THOMPSON, JOEL STROUT,** | ) |
| **JASON LORD, CHRISTOPHER SMITH,** and | ) |
| **JACK CUNNINGHAM,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| **v.** | )     **Docket No.** |
| | ) |
| **PATRICK KELIHER,** in his official capacity as | )     **Emergency Injunctive Relief** |
| **COMMISSIONER, MAINE DEPARTMENT** | )     **Requested** |
| **MARINE RESOURCES,** | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**NOW COME**, the Plaintiffs Frank Thompson, Joel Strout, Jason Lord, Christopher Smith, and Jack Cunningham (the "Plaintiffs"), by and through their undersigned attorneys, and in support of this Complaint for Declaratory and Injunctive Relief against Patrick Keliher, in his official capacity as Commissioner of the Maine Department of Marine Resources, state as follows:

**INTRODUCTION**

1.      The American Lobster fishery is one of the nation's most valuable fisheries. In 2016 alone, approximately 159 million pounds of lobster were landed within the fishery, over 97% of which were landed in the Gulf of Maine and Georges Bank (far offshore between Massachusetts and Nova Scotia).

2.      In addition to the roughly 4,800 lobster license holders in the State of Maine and 1,100 student license holders, a great number of lobster dealers, processors, sternmen, bait dealers, trap builders, boat mechanics, shipyards, and local coastal merchants all depend on the Maine lobster fishery for their very survival. Maine's lobster supply chain contributes $1 billion to the State's economy each year, in addition to the value of its actual lobster landings.

1

3.     By virtue of custom and practice over generations of lobstering men and women, the placement of lobster traps and trip routes are coveted as individual trade secrets used by lobstermen to optimize their harvest.  Accordingly, these trade secrets have substantial economic value to each lobster fisherman.

4.     The regulation of Atlantic coast fisheries is shared by federal and state regulators. Waters within three nautical miles of shore are regulated by the individual states, while waters extending 200 nautical miles from the inner boundary of state waters (known as the "EEZ") are federal waters regulated by the National Marine Fisheries Service ("NMFS"), a sub-agency of the National Oceanic and Atmospheric Administration ("NOAA").  Both the federal and state governments regulate lobster fishing in U.S. waters through the Atlantic States Marine Fisheries Commission ("ASMFC").  The ASMFC is comprised of members from the 15 Atlantic Coast states who are tasked with the management of fisheries along the Atlantic coast.

5.     The ASMFC is a multi-state collaborative organization through which Atlantic Coast states coordinate their conservation efforts and share the management of migratory fisheries within their state waters.  The Atlantic Coastal Fisheries Cooperative Management Act ("ACA") encourages this shared responsibility by requiring the Atlantic States Commission to draft interstate "fisheries management plans" ("FMPs"), pursuant to which each of the member-states regulates that portion of the migratory fishery falling within their individual waters.  16 U.S.C. § 5104(a).  The ACA further requires states to adopt and enforce fishery plans promulgated by the ASMFC. The Maine Department of Marine Resources ("MDMR" or the "Defendant") regulates lobster fishing in Maine's state waters pursuant to an FMP.  *See* 12 M.R.S. §§ 6421-6482; 13 C.M.R. 188, ch. 25.  FMPs are not subject to federal judicial review.

6.     Once the ASMFC drafts FMPs containing regulations and enforcement guidelines,

it specifies the requirements for state compliance. The states then draft their own rules, which in the case of the State of Maine are drafted by MDMR. Should a member state fail to timely enact rules adopting the ASMFC's fishery plan, the Secretary of Commerce is authorized to order a moratorium on fishing by the offending state. 16 U.S.C.A. § 5106.

7.      Meanwhile, fishing within the EEZ is governed by the Magnuson-Stevens Act ("MSA"). The MSA authorizes the NMFS to regulate fishing in federal waters by approving or disapproving of species-specific FMPs developed by regional councils. *See* 16 U.S.C. § 1854. These federal FMPs may include complementary measures recommended by state FMPs. 16 U.S.C. § 5103(b). Lobster fishing in federal waters is governed by 50 C.F.R Part 697.

8.      In March 2022, the ASMFC published an addendum to an existing fishery management plan entitled "*Addendum XXIX to Amendment 3 to the American Lobster Fishery Plan; Addendum IV to the Jonah Crab Fishery Management Plan*" (the "Addendum" or "Addendum XXIX"), attached hereto as Exhibit A. The primary purpose of the Addendum is to support risk reduction efforts promulgated in NMFS's 2021 Atlantic Large Whale Take Reduction Plan, which is designed to reduce the risk to North Atlantic right whales of entanglement in fishing lines. NMFS's 2021 Atlantic Large Whale Take Reduction Plan does not contain a vessel tracking requirement.

9.      In addition to protecting the North Atlantic right whale, the Addendum identifies three secondary objectives for its "24/7" tracking requirement: 1) to improve information available to fishery managers and stock assessment scientists; 2) to support the development of offshore renewable energy and the conservation of U.S. waters; and 3) to promote improved fishery management and offshore enforcement of federal lobster fisheries in the EEZ.

10.     The Addendum requires states to issue rules requiring federally permitted lobster vessels to install an electronic tracking device on board the vessel that will transmit their spatial data using a Global Positioning System ("GPS").  According to the Addendum, the "vessel tracker must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished or target species."  The device may be deactivated only with prior notice to and permission from MDMR.  The Addendum mandated compliance with the tracking program by December 15, 2023.

11.     Pursuant to the ACA, MDMR enforced the Addendum by publishing a final rule entitled "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders" (the "MDMR Rule") on September 13, 2023 that mirrored the ASMFC Addendum's requirement that the tracking device stay minimally powered and transmitting at all times.  *See* 13 C.M.R. 188, ch. 25, § 98.  The MDMR Rule applies to all Maine lobster fishermen who hold federal lobster permits.

12.     By and through this Complaint, the Plaintiffs now challenge the MDMR Rule adopting and enforcing the Addendum on three grounds:

A)     The MDMR Rule's requirement of a twenty-four hour a day vessel tracker is an unreasonable search and seizure and a violation of due process under the Fourth and Fourteenth Amendments to the United States Constitution.

B)     The MDMR Rule, as currently constructed, is a violation of the Plaintiffs' equal protection rights as guaranteed by Articles V and XIV of the United States Constitution and by Article I, § 6-A of the Maine Constitution, which apply to the conduct and actions of the Defendant and his officials and employees, in that the Rule is void for

vagueness by failing to describe any of the conditions under which it will be enforced and the penalties for noncompliance.

        C)    The MDMR Rule is both arbitrary and capricious under the Maine Administrative Procedure Act, 5 M.R.S. §§ 8001 *et seq.* (the "Maine APA") and contrary to law, in that the Rule violates the Consolidated Appropriations Act, 2023. Pub. L. No. 117-328, Div. JJ, 136 Stat. 4459, 6089-92 (2022) (the "CAA"), which includes a provision that specifies that NMFS's Atlantic Large Whale Take Reduction Plan is "sufficient to ensure that the continued Federal and State authorizations of the American Lobster and Jonah Crab fisheries are in full compliance with" both the Marine Mammal Protection Act and the Endangered Species Act until December 31, 2028.

## THE PARTIES

13.    Plaintiff Frank Thompson is an individual residing in Vinalhaven, Maine and, together with his spouse Jean Thompson, is the co-owner of Fox Island Lobster Company LLC (FILCO).  Mr. Thompson is a federally permitted fisherman who fishes 800 traps in federal waters and has received a vessel tracker from MDMR that he was required to install on his vessel by December 15, 2023.

14.    Plaintiff Joel Strout is an individual residing in Harrington, Maine and the President of the District 4 Lodge of the International Association of Machinist and Aerospace Workers, Local Lodge 207, *f/k/a* IAMAW Maine Lobstering Union – Local 207 (the "MLU"), whose members all hold active Maine commercial lobster and crab fishing licenses.  Mr. Strout is a federally permitted lobster fisherman who fishes 800 traps in federal waters and has received a vessel tracker from MDMR that he was required to install on his vessel by December 15, 2023.

15.     Plaintiff Jason Lord is an individual residing in Pemaquid, Maine.  Mr. Lord is a federally permitted lobster fisherman who fishes 800 traps in federal waters and has received a vessel tracker from MDMR that he was required to install on his vessel by December 15, 2023.

16.     Plaintiff Christopher Smith is an individual residing in Jonesport, Maine.  Mr. Smith is a federally permitted lobster fisherman who fishes 800 traps in federal waters and has received a vessel tracker from MDMR that he was required to install on his vessel by December 15, 2023.

17.     Plaintiff Jack Cunningham is an individual residing in Bar Harbor, Maine.  Mr. Cunningham is a federally permitted lobster fisherman who fishes 800 traps in federal waters and has received a vessel tracker from MDMR that he was required to install on his vessel by December 15, 2023.

18.     Defendant Patrick Keliher is the Commissioner of the Maine Department of Marine resources and is named as a Defendant in his official capacity.  Commissioner Keliher is also a member of the ASMFC.  In  his official role, Commissioner Keliher supervises and directs all business conducted by the MDMR and is responsible for ensuring that the actions, decisions, and rules of that agency comply with all applicable laws and regulations.

**JURISDICTION AND VENUE**

19.     The United States District Court for the District of Maine has jurisdiction over this matter under 28 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, specifically Articles V and XIV and the Fourth and Fourteenth Amendments to the United States Constitution, as well as the CAA.  This Court has supplemental jurisdiction over the Plaintiffs' claims under the Maine APA pursuant to 28 U.S.C. § 1367(a) because the Plaintiffs' state law claims are so related to their federal claims in this action that they form part of the same

case or controversy.  An actual, justiciable controversy exists between the Plaintiffs and the Defendant, and the requested relief is proper under 28 U.S.C. §§ 2201-2202.

20.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Plaintiffs' principal places of business are in this District, the MDMR Rule is to be implemented in this District, and a substantial part of the events or omissions giving rise to the Plaintiffs' claim occurred, or a substantial part of property that is the subject of the action is situated, in this District.

## LEGAL BACKGROUND

### *The United States Constitution*

21.     The Fourth Amendment to the United States Constitution protects people from unreasonable search and seizures.  U.S. Const. amend. IV.  An unreasonable search and seizure occurs when the government trespasses into personal property, without a warrant, in violation of a reasonable expectation of privacy.  U.S. Const. amend. IV.

22.     The Fourteenth Amendment to the United States Constitution protects people from deprivations of life, liberty, and property without due process of law.  U.S. Const. amend. XIV. Use of information or evidence obtained through an unconstitutional search and seizure is a violation of due process under the Fourteenth Amendment.

23.     The Supreme Court has recognized a reasonable expectation of privacy in physical movements captured by GPS monitoring.  "Whether the Government employs its own surveillance technology … or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements." *Carpenter v. United States*, 138 S. Ct. 2206, 2217, 201 L. Ed. 2d 507 (2018).  For example, long-term "GPS monitoring of even a vehicle traveling on public streets constitutes a search" by the Government. *Id.*

24.     The protections of the Fourth and Fourteenth Amendments also extend to an individual's right to conduct a business free from government incursion.  Businesspeople "ha[ve] a constitutional right to go about [their] business free from unreasonable official entries upon [their] private commercial property." *See, e.g., Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 487–88 (S.D.N.Y. 2019).  To be constitutional, an administrative search of a business must have a limited scope, a relevant purpose, specificity in its demands, and a neutral arbiter.

### *The Atlantic Coastal Fisheries Co-Operative Management Act*

25.     The ACA authorizes the states to regulate commercial fisheries in state waters.  "The responsibility for managing Atlantic Coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the Atlantic States Marine Fisheries Commission.  It is the responsibility of the Federal Government to support such cooperative interstate management of coastal fishery resources."  16 U.S.C.A. § 5101.

26.     With respect to federal waters, the ACA empowers the Secretary of the ASMFC to "implement regulations to govern fishing in the exclusive economic zone (EEZ) that are (A) compatible with the effective implementation of a coastal fishery management plan; and (B) consistent with the national standards set forth in section 301 of the Magnuson-Stevens Fishery Conservation and Management Act."  16 U.S.C.A. § 5103.

27.     However, if a fishery "is located in both State waters and the exclusive economic zone ("EEZ"), the Commission shall consult with appropriate Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans."  16 U.S.C.A. § 5104(a)(1).

*The Magnuson-Stevens Act*

28.     Recognizing the economic importance of commercial and recreational fishing, the MSA was adopted to protect, manage, and grow the United States' fishery resources.  To achieve these goals, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. *See* 16 U.S.C. §§ 1801 *et seq.*

29.     The MSA grants the Department of Commerce the ability to exercise "sovereign rights" to conserve and manage fisheries resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the EEZ.  *See* 16 U.S.C. §§ 1801(b)(1), 1811(a).  Generally, the EEZ extends from the seaward boundary of each of the coastal States to 200 nautical miles offshore.  *See* 16 U.S.C. § 1802(11).

30.     The MSA created eight Regional Fishery Management Councils. The Council relevant to Maine is the New England Council, which consists of representatives from Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut.   The New England Council collectively has authority over fisheries in the Atlantic Ocean seaward from those states.   16 U.S.C.A. § 1852(a)(1).  The MSA empowers both the regional councils and the Secretary of Commerce to prepare FMPs.  Those plans must be "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C.A. § 1853.

31.     FMPs implemented by any of the NOAA councils, or the Secretary of Commerce under the MSA, supersede any conflicting regulation issued by the ASMFC.  16 U.S.C.A. § 5103.

32.      The MSA does not authorize or permit any collection of information on vessel movements when the vessel is not fishing under its permit.  To the contrary, the MSA only permits

the collection of information that is beneficial for developing, implementing, or revising FMPs. *See* 18 U.S.C. § 1881a(a)(1).  If a Regional Fishery Management Council determines information collection is necessary in order to prepare an FMP, it may request that the Secretary implement such collection.  *See* 18 U.S.C. § 1881a(a)(1).  Only where the Secretary has determined that the collection is justified does he or she have a duty to promulgate regulations implementing the collection program.  *Id.*  If deemed necessary, the Secretary may also initiate an information collection program.  *See* 18 U.S.C. § 1881a(a)(2).

33.     Section 301 of the MSA lists 10 "National Standards" that all FMPs are required to follow, including NOAA council and ASMFC plans.  At least six standards are implicated by the Addendum:

A)     National Standard One, which requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).

B)     National Standard Two, which requires that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).

C)     National Standard Four, which requires that all agency measures that "allocate or assign fishing privileges among various . . . fisherman" should be "fair and equitable" and "reasonably calculated to promote conservation."  16 U.S.C. § 1851(a)(4).  Furthermore, "[n]o particular individual, corporation, or other entity [should] acquire[] an excessive share of such privileges."  *Id.*

D)     National Standard Six, which requires that "[c]onservation and

10

management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

     E)    National Standard Seven, which requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7).

     F)    National Standard Eight, which requires that "[c]onservation and management measures shall, consistent with the conservation requirements …, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

34.    The MSA does not require lobster boats to have a vessel tracker nor does it mention or contemplate 24-hour location and movement surveillance of any vessel, whether by GPS or otherwise, regardless of whether that vessel is being used to fish in federal waters under a federal permit or is being used for other unregulated purposes.

35.    The Secretary of Commerce, NOAA, NMFS, ASMFC, the Regional Fishery Management Councils, and the individual state marine agencies all work in conjunction with one another in the drafting, rulemaking, and enforcement of FMPs. Authority to supersede a particular rule lies first with NOAA and the Secretary of Commerce's regulatory authority over the ASMFC and the individual states.

36.    While the ASMFC is empowered by the ACA to draft regulations that govern the EEZ (provided that they are compatible with the standards set out in the MSA), it cannot supplant regulations issued by NOAA, NMFS or the Secretary of Commerce.

### The Consolidated Appropriations Act

37.    In 2021, NMFS promulgated a Biological Opinion ("2021 BiOp") pursuant to the Endangered Species Act and Marine Mammal Protection Act, along with amendments to the 2021 Atlantic Large Whale Take Reduction Plan ("ALWTRP"), ostensibly designed to protect the North Atlantic right whale.

38.    That 2021 BiOp and the ALWTRP amendments were challenged in *Maine Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 626 F. Supp. 3d 46 (D.D.C. 2022), rev'd and remanded sub nom., *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023), with the United States Court for the District of Columbia ultimately ruling in favor of NMFS.

39.    This decision was ultimately reversed and remanded by the D.C. Circuit in *Maine Lobstermen's Assn v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023), which found the 2021 BiOp to be in violation of the federal Administrative Procedures Act ("APA") for, *inter alia¸* failure to use the best science and apply the same to outcomes reasonably likely to occur.  The D.C. Circuit then vacated the 2021 BiOp and remanded the 2021 ALWTRP amendments to NMFS.

40.    Prior to the D.C. Circuit's opinion, however, Congress passed the CAA in response to the District of D.C.'s ruling in *Maine Lobstermen's Association.*

41.    Section § 101 of the CAA included a mandate that the 2021 amendments to the ALWTRP "shall be deemed sufficient to ensure that the continued Federal and State authorizations

of the American lobster and Jonah crab fisheries are in full compliance with" both the Marine Mammal Protection Act and the Endangered Species Act until December 31, 2028.

42.     Section 101(a)(1) of the CAA also requires NMFS to "promulgate new regulations for the American lobster and Jonah crab fisheries consistent with the [MMPA] and the [ESA] that take effect by December 31, 2028, utilizing existing and innovative gear technologies, as appropriate."

43.     However, Section 101(b) of the CAA provides that the provisions of subsection (a) "shall not apply to an existing emergency rule, or any action taken to extend or make final an emergency rule that is in place on the date of enactment of this Act, affecting lobster and Jonah crab."

44.     There was no emergency rule in place requiring the installation of any electronic vessel tracker at the time of the CAA's enactment.

### The Maine Administrative Procedure Act

45.     The Maine APA sets forth the process for Maine administrative agency rulemaking and specifies areas appropriate for judicial review.  *See* 5 M.R.S. § 8052.

46.     The Maine APA requires that, "[a]t the time that an agency is preparing a rule, the agency shall consider the goals and objectives for which the rule is being proposed, possible alternatives to achieve the goals and objectives and the estimated impact of the rule.  The agency's estimation of the impact of the rule must be based on the information available to the agency and any analyses conducted by the agency or at the request of the agency.  The agency shall establish a fact sheet that provides the citation of the statutory authority of the rule."  5 M.R.S. § 8057-A(1).

47.     Under Section 8057-A(1) of the Maine APA, "the agency, to the best of its ability, shall also include in the fact sheet a) [t]he principal reasons for the rule; b) [a] comprehensive but

concise description of the rule that accurately reflects the purposes and operation of the rule; c) [a]n estimate of the fiscal impact of the rule; and d) [a] brief summary of the relevant information considered during the development of the rule."

48.     The Maine APA also requires a written statement by agencies engaged in rulemaking that explains the factual and policy basis for proposed rules and identifies persons commenting on proposed rules, as well as the organizations they represent and summaries of their comments.  Agencies are also obligated to publish their rationale for adopting, or failing to adopt, any changes to proposed rules, or when they draw findings and recommendations different from those expressed by commentators.  5 M.R.S. § 8052(5).

49.     Rules promulgated by a Maine administrative agency can be challenged on procedural and substantive grounds and are subject to judicial review.  5 M.R.S. § 8058(1).  A court's substantive review of agency rulemaking is to "to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  *Id.*

50.     Federal review of state administrative actions or rules is generally inappropriate when a federal court is asked to answer questions specific to state law concerns and administration.  This determination is subject to a two-pronged analysis based on  (1) whether there exist "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 29 (1st Cir. 2011).

51.     This so-called *Burford* abstention doctrine, however, is narrowly tailored to situations where deference to state administrative processes is appropriate because the rule or

action involved pertains *only* to state-law issues that serve a significant local interest. *Chico Serv. Station, Inc.*, 633 F.3d at 29. Accordingly, "*Burford* abstention must only apply in unusual circumstances, when federal review risks having the district court become the regulatory decision-making center." *Id.* at 30 (internal quotation marks omitted) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 473 (1st Cir. 2009).

52.     Accordingly, federal court abstention policy in the context of state rulemaking "is limited to narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal-court review inappropriate." *Chico Serv. Station, Inc.*, 633 F.3d at 30 (internal quotation marks omitted) (quoting *Fragoso v. Lopez*, 991 F.2d 878, 882 (1st Cir. 1993)). "[T]he *Burford* doctrine does not require abstention merely because the federal action may impair operation of a state administrative scheme or overturn state policy." *Id.*

## STATEMENT OF FACTS

### *The Addendum In Historic Perspective*

53.     When the ASMFC published the Addendum to the existing American Lobster and Jonah Crab FMP in March of 2022, it gave no indication that it had consulted with any Regional Fishery Management Council during the drafting process.

54.     The Addendum was initiated from what the American Lobster Management Board characterized as a "critical need for high resolution spatial and temporal data." The Board's reference to a need for more spatial data, however, was previously addressed in a prior addendum published in February of 2018 ("Addendum XXVI"). Addendum XXVI, which is attached hereto as Exhibit B, initiated a pilot program for electronic tracking of vessels that required all federally

permitted vessels to self-report harvester data either electronically or manually.  These measures were also meant to address a "lack of spatial information."

55.    Addendum XXVI called for mandatory self-reporting of the following data points: a) a unique trip identification number; b) a vessel identification number; c) the trip start date; d) the location (by NMFS Statistical Area) of the trip; e) the lobster management area; f) a 10-minute square level; g) the number of traps hauled on the trip; h) the number of traps set on the trip; i) the species harvested; j) the quantity (in pounds) of the harvest; k) the length of the trip; l) the number of traps employed per trawl; m) the number of buoy lines employed; and n) the soak time of the traps.

56.    At the end of Addendum XXVI's 1-year pilot program, the ASMFC was to assess the effectiveness of different tracking technologies and consider whether the adoption of an electronic vessel tracking requirement was appropriate.

### *The Addendum At Issue*

57.    The ASMFC formally adopted the vessel tracking program that was piloted under Addendum XXVI when it issued the Addendum now at issue.  The Addendum requires federally permitted lobster Maine fishermen to install and activate an electronic tracking device on their vessels by December 15, 2023.  The device must be installed directly on the vessel and remain activated so that it can continually transmit location data at all times, even when the vessel is not in use (i.e., when it is docked) or is not fishing in federal waters (i.e., when the vessel is being operated by a fisherman for personal use).  The electronic tracking data is in addition to data that lobster fishermen are already required to self-report about their location.

58.    The Addendum requires the electronic tracker to have a "ping rate" of once per minute, meaning that the device will "ping" or collect the device's longitude, latitude,

corresponding vessel identifier and date once per minute. The device must also be accurate up to 100 meters of the vessel's location.

59.     According to the Addendum, "[t]o date, the majority of spatial analyses of lobster and Jonah crab fishery data have been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds. The application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists. In particular, a number of challenges the fishery is currently facing pose a critical need for electronic tracking data in the offshore fishery."

60.     The Addendum then lists four goals of the electronic tracking requirement:

A)      To improve spatial information data concerning the location of where the majority of fishing effort occurs by collecting spatial data more frequently and with more accurate precision;

B)      To improve risk reduction efforts under the Atlantic Large Whale Take Reduction Plan that are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution;

C)      To promote and prioritize the development of offshore renewable energy and the conservation of federal waters, including wind energy, aquaculture, and marine protected areas that may all create marine spatial planning challenges for the lobster and Jonah crab fisheries; and

D)      To combat difficulties associated with locating gear for compliance checks and to increase the efficiency and efficacy of enforcement efforts in offshore federal management areas.

61.     The Addendum further addresses the ASMFC's offshore enforcement goals by enabling the ASMFC to use this newly available data to identify subjects for investigations into potential illegal fishing practices.  To that end, the Addendum states, in part, that:

> Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear.  Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels.  Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

62.     After the data is collected from the electronic tracking devices, it then will be shared and managed by the Atlantic Coastal Cooperative Statistics Program ("ACCSP").  The ACCSP maintains a database referred to as the Standard Atlantic Fisheries Information System ("SAFIS").  SAFIS currently holds self-reported data from lobster fishermen as required by Addendum XXVI in the form of so-called "SAFIS reports" or "trip tickets."  SAFIS will be the repository of both self-reported trip data (known as "eVTR data") and the new electronic monitoring data collected by the vessel trackers.

63.     ACCSP is responsible for data quality and matching the two sources of trip data.  The Addendum states that the two sources of data will then be matched by ACCSP by means of trip identification numbers and other vessel registration information.

64.     The Addendum contains little to no information on how this data will be protected from unauthorized use and disclosure.  There are no references to encryption, and there is no data governance policy detailing what the specific intended use of the  data is.  Indeed, the Addendum as written gives the ASMFC and MDMR broad discretion on how they can use the data collected, without assurances that the data will be immune from third party subpoena or how access by third parties will be limited, even though ACCSP data has been subject to subpoenas in the past.

65.    Importantly, and unlike electronic devices or tracking applications available in the private marketplace, the Addendum provides fishermen with no ability to view the reporting dashboards associated with the trackers or to agree to terms of service that describe how the data from the tracking device on their vessels will be collected, transmitted, stored and used.

66.    The Addendum provides no limits regarding how and in what format the data can be used.  It also does not place any upward limits on how sophisticated the data collection can be, i.e., whether the data collected is limited to spatial data or whether other types of data such as voice, speed, and other data categories can be collected.

67.    The Addendum only lists two exceptions to the tracking requirement.  The requirement does not apply to vessels in Trap Area 6, which covers state waters off the coast of New York and Connecticut, because a federal permit is not required to lobster in that area.  Similarly, the Addendum also exempts holders of state-only lobster permits without a federal commercial trap gear area permit.

68.    The Addendum further provides that "[t]he Atlantic States Marine Fisheries Commission recommends that the federal government promulgate all necessary regulations in Section 3.0 to implement complementary measures to those approved in this addendum.  The Commission requests that NOAA Fisheries publish the final rule on vessel tracking by May 1, 2023, with implementation no later than December 15, 2023."  To date, no such final federal rule has been published by NOAA fisheries, much less implemented.

### *The MDMR Rule*

69.    MDMR is responsible for enforcing ASMFC's amendments in the state of Maine.  On September 13, 2023, MDMR published a rule entitled "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders."  *See* 13 C.M.R.

188, ch. 25, § 98.  The MDMR Rule adopts the Addendum XXIX and lists five new actions that MDMR declares to be unlawful:

> A)      It is unlawful for a federally permitted lobster and crab fishing license holder to fish for, take, possess, or land lobster or Jonah crab taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

> B)      It is unlawful for a federally permitted lobster and crab fishing license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the Department of Marine Resources.

> C)      It is unlawful for a federally permitted lobster and crab fishing license holder to allow the permitted vessel listed on their license to be operated in the coastal waters of the State without the approved tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth.

> D)      The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The license holder shall notify the Department of Marine Resources prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

> E)      It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering with

an approved tracking device is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the Department of Marine Resources.

70.    The MDMR Rule mirrors Addendum XXIX and requires all federally permitted lobster license holders to have an approved tracking device installed on their boats prior to December 15, 2023.

71.    The MDMR does not list specific punishments for failure to comply with the MDMR Rule.  Rather, the MDMR Rule simply states that individuals will not be punished for a device malfunction if the fisherman notifies MDMR of the issue and makes efforts to restore it to operation in an unspecified "timely manner."  Because the Rule does not specify how enforcement will be handled in any other exigent circumstances, it remains unclear what responsibilities and repercussions will be applied to fishermen unaware of a malfunction of their electronic tracking device, a particular concern given that fishermen are not given access to the settings on the device itself, or if the fisherman is unable to repair the device.  Additionally, it is unclear if fishermen are entitled to appeal any fines, penalties, or other enforcement actions levied against them regarding the MDMR Rule.

72.    As with the Addendum, the MDMR Rule requires continuous tracking and monitoring of lobster fishermen even when they are not fishing in federal waters, despite the fact that lobster fishermen use their vessels in other commercial capacities (such as scallop, tuna and menhaden fishing) as well as recreationally. Their movements will be tracked on a minute-by-minute basis even during emergency search and rescue operations.

73.    Upon information and belief, the scope of potential privacy and security intrusions associated with the MDMR Rule far exceed those of any other vessel (or motor vehicle) tracking

requirement ever implemented in this State.  The existing scallop tracking requirement, for example, mandates that a tracker be active only when the vessel is entering the federal scallop fishery.  The scallop tracker also only "pings" at a rate of once per hour instead of the once-per-minute that the MDMR Rule requires. Moreover, scallop fishing is distinguishable from lobster fishing in that the scallop fishery operates a quota fulfillment system.

### *The Particle TrackerOne Device*

74.      In November of 2023, MDMR began sending federally permitted lobster fishermen the electronic trackers required by the MDMR Rule.  MDMR received funding for the electronic trackers, and the associated data plans, through a NOAA and National Fish and Wildlife Grant, which was funded in part by the Shell Oil Company.  MDMR represents that it will pay for the associated data plans for the first three years of the program.  It is unclear who will fund the data plan beyond that period.

75.      MDMR used the grant funds to select and purchase one of the many available electronic trackers meeting the specifications called for by the Addendum.  The tracking device selected is the "TrackerOne," an electronic tracker distributed by Particle, a U.S. based company. Particle intends to store the data on their U.S. based servers and offers so-called "dashboards" that allow users visibility into the data being collected by the TrackerOne device in real time. The TrackerOne is manufactured in China based on Particle's design.

76.      In the materials that accompany each device, which are attached hereto as Exhibit C, MDMR demands that the TrackerOne be installed directly on fishing vessel either via a USB port or by hardwiring the tracker to the vessel itself.  The fisherman is then responsible for ensuring that the tracker remains activated at all times, either by running a generator or by using the vessel's house batteries.

77.    MDMR did not provide fishermen with any of the manufacturer's specifications, privacy agreements, dashboard access, or other information associated with the tracker.  As a result, fishermen are unaware of what data will be collected, how that data will be used, or the circumstances under which that data can be shared.  This is particularly worrisome given that, in addition to determining a user's GPS coordinates, the TrackerOne appears to be Bluetooth compatible, may be adapted in order to collect audio information, and employs a predictive algorithm that can anticipate vessel movements.

### *The Sustainable Maine Fishing Foundation*

78.    In the fall of 2023, the Plaintiffs voiced their concerns to the Sustainable Maine Fishing Foundation ("SMFF"). SMFF is a non-profit entity established to support efforts to sustain the lobster fishery and protect the rights of the fishing communities that depend on the lobster industry.

79.    In response to the confidentiality, privacy, and enforcement concerns voiced by many affected fishermen, SMFF corresponded with Defendant MDMR Commissioner Keliher on December 13, 2023 to detail their concerns and request further information on the TrackerOne and how its data would be collected, stored, maintained, and protected.  *See Dec. 13, 2023 Correspondence*, attached hereto as Exhibit D. SMFF also requested an extension of the December 15, 2023 implementation date.  As of its filing of this Complaint, SMFF has not received a formal response to its correspondence.  However, Commissioner Keliher has informed a member of the MLU that the tracking requirement was "out of his hands."

**Count I**
**Violation of Right to Privacy and Due Process**
**(U.S. Const. amend. IV; U.S. Const. amend. XIV)**

80.     The Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 79 above.

81.     The Plaintiffs have a reasonable expectation of privacy in the movements of their fishing vessels and the precise location of their lobster traps such that they have the constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

82.     Through their responsibility for installing, activating, and maintaining the TrackerOne device, the Plaintiffs also have a reasonable expectation of privacy in the data produced by the tracker itself.

83.     The Plaintiffs also have a right to be free from unreasonable official entries upon private commercial property when acting in a business capacity.

84.     The electronic vessel tracking requirement set forth in the Addendum and the MDMR Rule constitutes a search within the meaning and contemplation of the Fourth Amendment to the United States Constitution, insofar as the Defendant, without a warrant, is tracking the Plaintiffs' movements while conducting business activities within federally regulated waters, as well as their personal movements while in state-controlled waters.

85.     Additionally, neither the ASMC nor MDMR have articulated the limited scope, relevant purpose, and specificity required to otherwise obtain this satellite tracking data through a constitutional administrative search.

86.     Because ASMFC and MDMR intend to use the tracker's surveillance data in connection with offshore enforcement efforts, the information being collected without warrant

from the Plaintiffs, and potentially used punitively against them, violates their right to be free from the deprivation of life, liberty, and property without due process of law under the Fourteenth Amendment to the United States Constitution.

## Count II
### Violation of Equal Protection
### (U.S. Const. Art. V and XIV, Me. Const.  Art. I, Section 6-A)

87.     The Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 86 above.

88.     The guarantee of equal protection under the law as provided by Articles V and XIV of the United States Constitution and by Article I, § 6-A of the Maine Constitution applies to the conduct and action of the Defendant and its officials and employees.

89.     Plaintiffs have a constitutionally protected right to equal protection under the law when the government regulates their private property, movements, and business activities.

90.     Accordingly, lobster fishermen are entitled to equal protection under policies and rules that regulate their fishing licenses and commercial fishing operations.

91.     The MDMR Rule does not provide this constitutionally required protection and is void for vagueness in that it is designed to enforce criminal and regulatory offenses without defining the contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

92.     By way of example, the MDMR Rule does not list the penalties for noncompliance, indicate what offenses can be prosecuted based on the data that is collected, what enforcement efforts can be used in connection with the tracking device, or whether any non-compliance has implications on their fishing licensure.

93.     The MDMR Rule also does not state what penalties, if any, may be imposed for unintentional, as opposed to intentional, violations of the Rule or what appellate rights the Plaintiffs have to challenge allegations of any such violations.  Nor does the MDMR Rule state whether fishermen will be subject to the same penalties applicable to an intentional violation where a fisherman is simply unaware of a malfunction of his or her tracker.  The Rule also does not state whether MDMR will make efforts to distinguish server-side errors from fisherman error.

94.     Given the lack of clarity on how MDMR intends to incorporate the "offshore enforcement" efforts called for by the Addendum, and the fact that there are no detailed penalties in the MDMR rule for noncompliance, the MDMR Rule is void for vagueness in that it violates the equal protection guarantees provided by both the United States and Maine constitutions.

**<u>Count III</u>**
**Violation of the Maine Administrative Procedure Act**
**(5 M.R.S. § 8058)**

95.     The Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 94 above.

96.     Pursuant to Section 8058 of the Maine APA, the Court must set aside an agency rule that 1) does not contain the written statement required by Section 8057-A; 2) involves a procedural error that is substantial and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not occurred; or 3) is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

97.     The MDMR Rule fails to satisfy the Maine APA's requirement of a written statement in that it does not specify the operation, fiscal impact, or information considered by MDMR in its promulgation of the Rule, including without limitation 1) specification of the Rule's

enforcement provisions or a data governance policy, 2) specification of the fiscal implications to fisherman once the grant funding for the trackers expires, or 3) specification as to how MDMR arrived at a required ping rate or determined a need for the tracking of licensees beyond the scope of their lobster fishing activities.

98.    The MDMR Rule is arbitrary and capricious in that the Rule is inconsistent with the goals of the MSA because the Rule:

A)    Does not contain an adequate explanation for why minute-by-minute surveillance (as opposed to the hourly surveillance called for by the scallop tracking program) of federally permitted lobster fishing vessels is required to protect, conserve, grow or manage the American lobster fishery;

B)    Authorizes the tracking of lobster vessels in state waters, when the vessel is being used for other commercial purposes unrelated to lobster fishing, and/or when the vessel is being used recreationally;

C)    Calls for a substantial increase in surveillance without an explanation as to why the self-reported spatial information that fishermen have gathered since 2018 under Addendum XXVI is insufficient information for purposes of MSA compliance and/or does not violate National Standard 7, which specifically states that any fishery plan shall "avoid unnecessary duplication";

D)    Risks exposing the Plaintiffs' trade secrets to third-parties without any explanation of what efforts, if any, are being taken to encrypt and protect that information from such third-parties, including whether third parties will be able to subpoena this information or whether this information will be available as part of the administrative record in challenges to other agency actions;

E)      States that the information collected will be shared with "appropriate state or federal agencies" without defining those agencies that MDMR deems to be appropriate, limit what these agencies can subsequently do with that information, or state whether this information will be available to other agencies or private parties interested in developing wind energy projects in lobster fishing grounds;

F)      Has a stated purpose of furthering renewable energy projects, including wind energy, that is well beyond the goals of FMPs authorized by the MSA;

G)      Requires a tracker that can be Bluetooth enabled and is capable of collecting nonspatial data; and

H)      Is more expensive and intrusive than necessary to achieve the Addendum's stated goals.

99.    The MDMR Rule is contrary to law in that:

A)      The Rule violates the CAA because it is not an extension of an emergency rule existing at the time of the CAA's passage, but rather is a new regulation or administrative action designed to bring the lobster industry into compliance with the Endangered Species and Marine Mammal Protection Act in violation of the CAA's express provision that the existing amendments to the ALWTRP are to be deemed sufficient for compliance until December of 2028;

B)      Section § 101 creates field preemption over regulations of federally licensed lobster and Jonah Crab fisheries such that MDMR has no authority to create state regulations affecting them; and

C)      Although the ACA expressly states that any rules promulgated by the ASMFC must be consistent with the National Standards articulated in the MSA, the

Addendum and the MDMR Rule adopting the Addendum are inconsistent with those National Standards.

100.    A challenge to the MDMR Rule does not involve questions specific to Maine state law because the MDMR Rule adopts the federal policy contained in the ASMFC Addendum that MDMR is required to adopt under federal law.  At bottom, MDMR is tasked with implementing rules that are consistent with the MSA's national standards.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Frank Thompson, Joel Strout, Christopher Smith, Jason Lord and Jack Cunningham respectfully request that the Court:

A)    Declare that the MDMR Rule violates the Fourth and Fourteenth Amendment to the United States Constitution;

B)    Declare that the MDMR Rule is void for vagueness and violates due process under Articles V and XIV of the United States Constitution and Article I, § 6-A of the Maine Constitution;

C)    Declare that the MDMR Rule is arbitrary and capricious and contrary to law under the Maine Administrative Procedures Act;

D)    Restrain the Defendant from enforcing the MDMR Rule as presently formulated;

E)    Award the Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

F)    Such other relief as the Court deems just and proper.

Dated at Portland, Maine this 2nd day of January, 2024.

/s/    <u>Thimi R. Mina</u>
Thimi R. Mina

/s/    <u>Alfred C. Frawley IV</u>
Alfred C. Frawley IV

MCCLOSKEY, MINA, CUNNIFF & FRAWLEY, LLC
12 City Center

Portland, Maine 04101
207.772.6805
207.879.9375
tmina@lawmmc.com
afrawley@lawmmc.com

*Attorneys for Plaintiffs Frank Thompson,*
*Joel Strout, Jason Lord, Chris Smith and*
*Jack Cunningham*