UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **FRANK THOMPSON, JOEL STROUT,** | ) | |
| **JASON LORD, CHRISTOPHER SMITH,** and | ) | |
| **JACK CUNNINGHAM,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | **Docket No. 1:24-cv-00001-JAW** |
| | ) | |
| **PATRICK KELIHER,** in his official capacity as | ) | |
| **COMMISSIONER, MAINE DEPARTMENT** | ) | |
| **MARINE RESOURCES,** | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………………………1

II.     STATUTORY FRAMEWORK FOR REGULATING ATLANTIC FISHERIES……………….1

      A.    *State Waters: The Atlantic Coast Fisheries Cooperative Management Act*…………….2

      B.    *Federal Waters: The Magnuson-Stevens Act*……………………………………………2

      C.    *The Consolidated Appropriations Act, 2023*……...…………………………………...3

III.    THE ELECTRONIC TRACKING REQUIREMENT………………………………………….4

      A.    *Addendum XXIX to the American Lobster Fishery FMP*…………………………….4

      B.    *The MDMR Rule Implementing Addendum XXIX*………………………………………6

      C.    *The Particle TrackerOne Device*……………………………………………………...8

IV.     LEGAL STANDARD………………………………………………………………………9

V.      ARGUMENT………………………………………………………………………………9

      A.    *The Plaintiffs Can Demonstrate a Likelihood of Success on the Merits*……………….10

            1.    The MDMR Rule Violates the Fourth Amendment……………………………11

                 a.    *The MDMR Rule is an Unconstitutional Search of an Effect*…………..11

                 b.    *The MDMR Rule is an Unconstitutional Invasion of Privacy*………….12

                       i.    The Plaintiffs Have a Reasonable Expectation
                          of Privacy in the Movements of Their Fishing Vessels………..12

                       ii.   The MDMR Rule Violates Reasonable Expectations
                          of Privacy…………………………………………………………13

            2.    The MDMR Rule Violates Equal Protection…………………………………...16

                 a.    *The MDMR Rule Treats Similarly Situated Individuals
                    Differently*………………………………………………………………16

                 b.    *The MDMR Rule is Void for Vagueness*………………………………...18

            3.    The MDMR Rule Violates the Maine Administrative Procedures Act………...19

B.    *The Plaintiffs Have Demonstrated a Likelihood of Irreparable Harm*………………………………………………………………………22

C.    *The Balance of Hardships Weigh in the Plaintiffs' Favor*……………………..……...23

D.    *The Public Interest Lies in Favor of an Injunction*…..…………………………………24

VI.    CONCLUSION………………………………………………………………………...25

# TABLE OF AUTHORITIES

## Constitutional Provisions

Pages(s)

U.S. Const. amend. IV .................................................................................................... 11

U.S. Const. Art. V .......................................................................................................... 16

U.S. Const. Art. XIV ...................................................................................................... 16

## Cases

*Acosta v. Pablo Restrepo*,
470 F. Supp. 3d 161 (D.R.I. 2020) .......................................................................... 24

*Airbnb, Inc. v. City of New York*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...................................................................... 14

*Am. Civ. Liberties Union Fund of Michigan v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) .................................................................................... 24

*Arizona v. Gant*,
556 U.S. 332 (2009) .................................................................................................. 11

*Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010) ...................................................................................... 22

*Camara v. Municipal Court of City and Cnty. of San Francisco*,
387 U.S. 523 (1967) .................................................................................................. 11

*Carpenter v. United States*,
138 S. Ct. 2206 (2018) ................................................................................... 11, 12,13

*Carroll v. United States*,
267 U.S. 132 (1925) .................................................................................................. 12

*Cent. Me. Power Co. v. Waterville Urb. Renewal Auth.*,
281 A.2d 233 (Me. 1971) .......................................................................................... 20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .................................................................................................. 17

*City of Los Angeles, Calif. v. Patel*,
576 U.S. 409 (2015) ............................................................................................ 12, 15

*Condon v. Andino, Inc.*,
    961 F. Supp. 323 (D. Me. 1997) ........................................................................... 23, 25

*Corp. Techs., Inc. v. Harnett*,
    731 F.3d 6 (1st Cir. 2013) ............................................................................................ 10

*Diaz-Carrasquillo v. Garcia-Padilla*,
    750 F.3d 7 (1st Cir. 2014) .............................................................................................. 9

*Esso Stand. Oil Co. (Puerto Rico) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006) .......................................................................................... 23

*Florida v. Jardines*,
    569 U.S. 1 (2013) ......................................................................................................... 11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................................ 18, 19

*Katz v. United States*,
    389 U.S. 347 (1967) ..................................................................................................... 11

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ..................................................................................................... 18

*Leaders of a Beautiful Struggle, et al. v. Baltimore Police Dept.*,
    2 F.4th 330 (4th Cir. 2021) .......................................................................................... 13

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................................... 25

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*,
    651 F. Supp. 3d 444 (D.N.H. 2023) ............................................................................ 19

*Macone v. Town of Wakefield*,
    277 F.3d 1 (1st Cir. 2002) ............................................................................................ 17

*Me. Educ. Ass'n Benefits Trust v. Cioppa*,
    842 F. Supp. 2d 386 (D. Me. 2012) ............................................................................. 22

*Me. Forest Products Council v. Cormier*,
    586 F. Supp. 3d 22 (D. Me. 2022) ............................................................................... 22

*Me. Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*,
    626 F. Supp. 3d 46 (D.D.C. 2022), *rev'd and remanded sub nom.*,
    70 F.4th 582 (D.C. Cir. 2023) ........................................................................................ 3

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ..............................................................................*passim*

*New York v. Burger*,
    482 U.S. 691 (1987)....................................................................................... 14, 15

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................. 9

*Portland Pipe Line Corp. v. City of S. Portland*,
    288 F. Supp. 3d 321 (D. Me. 2017) .................................................................. 17

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984).......................................................................................... 14

*Tapalian v. Tusino*,
    377 F.3d 1 (1st Cir. 2004)................................................................................ 17

*Taylor v. City of Saginaw*,
    922 F.3d 328 (6th Cir. 2019)............................................................................ 11

*Together Emps. v. Mass Gen. Brigham Inc.*,
    32 F.4th 82 (1st Cir. 2022)................................................................................. 9

*United States v. Di Re*,
    332 U.S. 581 (1948).......................................................................................... 12

*United States v. Jones*,
    565 U.S. 400 (2012).......................................................................................... 11

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004).............................................................................. 19

*United States v. Nieves-Castano*,
    480 F.3d 597 (1st Cir. 2007) ........................................................................... 19

*United States v. Raub*,
    637 F.2d 1205 (9th Cir. 1980)……………………………..………………………….12

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011) ............................................................................... 18

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ........................................................................... 22

*Woodhouse v. Me. Comm'n on Gov't Ethics & Election Practices*,
    40 F. Supp. 3d 186 (D. Me. 2014)………………………………………………...…10

**Statutes**

5 M.R.S. § 8052(5-A) ................................................................................................ 20

5 M.R.S. § 8057-A(1) ................................................................................................ 19

5 M.R.S. § 8057-A(1)(C) ........................................................................................... 20

5 M.R.S. § 8058(1) .................................................................................................... 19

5 M.R.S. § 8001 ........................................................................................................ 10

12 M.R.S. §§ 6421-6482 ............................................................................................. 2

16 U.S.C. § 1801 ......................................................................................................... 2

16 U.S.C. § 1802(11) ................................................................................................... 2

16 U.S.C. § 1811(a) ..................................................................................................... 2

16 U.S.C. § 1851 ........................................................................................................ 21

16 U.S.C. § 1851(8) ................................................................................................... 23

16 U.S.C. § 1851(a)(1) ................................................................................................. 3

16 U.S.C. § 1851(a)(4) ................................................................................................. 3

16 U.S.C. § 1851(a)(6) ................................................................................................. 3

16 U.S.C. § 1851(a)(7) ............................................................................................... 24

16 U.S.C. § 1851(a)(8) ................................................................................................. 3

16 U.S.C. § 1852(a)(1) ................................................................................................. 2

16 U.S.C. § 1853 .......................................................................................................... 4

16 U.S.C. § 1853(a)(1)(A) ........................................................................................... 2

16 U.S.C. § 1854 .......................................................................................................... 2

16 U.S.C. § 1855(d) ..................................................................................................... 2

16 U.S.C. § 1881(a)(1) ................................................................................................. 3

16 U.S.C. § 5104(a) ..................................................................................................... 2

16 U.S.C. § 5106(c) ..................................................................................................... 2

## Regulations

50 C.F.R. 697 ................................................................................................................... 2

50 C.F.R. 648 ................................................................................................................. 15

13 C.M.R. 188, ch. 25, § 98 ....................................................................................... *passim*

## Other Authorities

Atlantic Coastal Fisheries Cooperative Management Act
    Pub. L. No. 77-539, 56 Stat. 267 (1942) ........................................................... 2

Consolidated Appropriations Act, 2023
    Pub. L. No. 117-328, Div. JJ, 136 Stat. 4459 (2022)……………………………………….3

Dec. 27, 2019 Ltr. from Commissioner Keliher to NMFS
    *Me. Lobstermen's Ass'n, Inc. v. NMFS*, D.D.C. Docket No. 1:21-cv-02509-JEB………………1

NMFS 2021 Biological Opinion
    *MLU v. Raimondo*, D. Me. Docket No. 1:21-cv-00275-LEW………………………...……........24

Particle Tracking System Website
    https://www.particle.io/particle-tracking-system/...........................................................8

## TABLE OF ACRONYMS

| | |
|---|---|
| ACA | Atlantic Coastal Fisheries Cooperative Management Act |
| ACCSP | Atlantic Coastal Cooperative Statistics Program |
| ALWTRP | Atlantic Large Whale Take Reduction Plan |
| ASMFC | Atlantic States Marine Fisheries Commission |
| APA | Administrative Procedures Act |
| BiOP | Biological Opinion |
| CAA | Consolidated Appropriations Act |
| EEZ | Exclusive Economic Zone |
| ESA | Endangered Species Act |
| FMP | Fishery Management Plan |
| GPS | Global Positioning System |
| MDMR | Maine Department of Marine Resources |
| MMPA | Marine Mammal Protection Act |
| MSA | Magnuson-Stevens Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| SAFIS | Standard Atlantic Fisheries Information System |
| SMS | SAFIS Management System |

**NOW COME,** Plaintiffs Frank Thompson, Joel Strout, Jason Lord, Chris Smith, and Jack Cunningham (the "Plaintiffs"), and hereby move the Court to preliminarily enjoin the Maine Department of Marine Resources ("MDMR") from enforcing the so-called "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab Holders" promulgated pursuant to the Atlantic States Marine Fisheries Commission's "Addendum XXIX to Amendment 3 of the American Lobster Fishery Management Plan; Addendum IV to the Jonah Crab Fishery Management Plan."

## I.    INTRODUCTION

Before the Court is an unprecedented regulation that, if permitted to stand, would require federally permitted Maine lobster fishermen to install a tracking device on their fishing vessels that would monitor their movements on a minute-by-minute basis (and every six hours when the vessel is moored) "regardless of landing state, trip type, location fished or target species."  *See ECF No.* 1-1 at Appendix B.  As MDMR itself has acknowledged, the lobster fishery "has been a model of conservation, not only in the management of the lobster resource, but also in its two-decade participation in regulations aimed at protecting large whales."[1]  Now, without adequate explanation, Maine lobster fishermen suddenly are subject to limitless data collection through a rule that is a veritable intelligence free-for-all for government agencies and law enforcement to use in support of whatever purpose they fancy.  Because these fishermen have not surrendered their constitutional rights simply by earning a living harvesting lobster in the Gulf of Maine, the Court must enjoin enforcement of the electronic tracking requirement.

## II.    STATUTORY FRAMEWORK FOR REGULATING ATLANTIC FISHERIES

The regulation of the Atlantic Coast's fisheries is shared by the federal government and the coastal states.  Waters within three nautical miles of shore are regulated by the individual states, while waters extending 200 nautical miles from the inner boundary of state waters (known as the "Exclusive Economic Zone" or "EEZ") are federal waters regulated by the National Marine Fisheries Service

---

[1] *See Dec. 27, 2019 Ltr. from Commissioner Keliher to NMFS* at 1, *available at* ECF No. 61-1 at 19, *Me. Lobstermen's Ass'n, Inc. v. NMFS*, D.D.C. Docket No. 1:21-cv-02509-JEB.

("NMFS").  16 U.S.C. §§ 1802(11), 1811(a), 1854, 1855(d).

### A.    State Waters: The Atlantic Coast Fisheries Cooperative Management Act.

States along the Atlantic coast have established a compact known as the Atlantic States Marine Fisheries Commission ("ASMFC") to coordinate their conservation efforts and share the management of migratory fisheries in their state waters.  Pub. L. No. 77-539, 56 Stat. 267 (1942).  Commissioner Keliher is on the ASMFC.  The Atlantic Coastal Fisheries Cooperative Management Act ("ACA") encourages this shared responsibility by requiring the ASMFC to draft interstate fisheries management plans ("FMPs"), which the states then must adopt and enforce through administrative rulemaking in the portion of the migratory fishery falling within their waters.  16 U.S.C. § 5104(a).  Should a member state fail to timely enact rules adopting the ASMFC's FMP, the Secretary of Commerce is authorized to order a moratorium on fishing by the noncompliant state. 16 U.S.C. § 5106(c).  MDMR regulates lobstering in Maine's state waters pursuant to an FMP.  *See* 12 M.R.S. §§ 6421-6482; 13 C.M.R. 188, ch. 25.

### B.    Federal Waters: The Magnuson-Stevens Act.

Fishing within the EEZ is governed by the Magnuson-Stevens Act ("MSA").  *See* 16 U.S.C. §§ 1801 *et seq*.  The MSA authorizes NMFS to regulate fishing in federal waters by approving or disapproving species-specific FMPs developed by regional councils.  *See* 16 U.S.C. § 1854.  The New England Council – consisting of representatives from Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut – collectively has authority over fisheries in the Atlantic Ocean seaward from those states.  16 U.S.C.A. § 1852(a)(1).  Lobster fishing in federal waters is governed by 50 C.F.R. 697.  Federal FMPs must be "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A).  The MSA only permits the collection of information that is beneficial for developing, implementing, or revising FMPs.  *See* 16 U.S.C. § 1881(a)(1).  If a Regional Fishery Management Council determines information collection is needed in

order to prepare an FMP, it may request that the Secretary of Commerce implement a complementary collection program. *Id.* Only where the Secretary determines that the collection is justified may regulations be promulgated that implement that collection program. *Id.* "It is undisputed that no provision [of the MSA] explicitly allows the Government to demand reporting of GPS information." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 964 (5th Cir. 2023).

Section 301 of the MSA lists 10 "National Standards" that all FMPs – state and federal – are required to follow, including:

A)    That "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1);

B)    That [a]ll agency measures that "allocate or assign fishing privileges among various . . . fisherman" should be "fair and equitable" and "reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4);

C)    That "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6); and

D)    That "[c]onservation and management measures shall . . . take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

### C.    *The Consolidated Appropriations Act, 2023.*

In 2021, NMFS promulgated a Biological Opinion (the "2021 BiOp") and amendments to its Atlantic Large Whale Take Reduction Plan ("ALWTRP") under the Endangered Species Act ("ESA") and the Marine Mammal Protection Act ("MMPA") that were ostensibly designed to protect the North Atlantic right whale. In the midst of litigation that ultimately resulted in the D.C. Circuit's vacating the 2021 BiOp and remanding the 2021 ALWTRP amendments for, *inter alia¸* failing to apply the best available science to scenarios reasonably likely to occur, *see generally Me. Lobstermen's Ass'n, Inc. v. NMFS,* 626 F. Supp. 3d 46 (D.D.C. 2022), *rev'd and remanded sub nom.*, 70 F.4th 582 (D.C. Cir. 2023), Congress passed the Consolidated Appropriations Act, 2023 (the "CAA"). *See* Pub. L. No. 117-328, Div. JJ, 136 Stat. 4459, 6089-92 (2022). Section § 101 of the CAA included a mandate that the 2021 amendments to the ALWTRP "shall be deemed sufficient to ensure that the continued Federal and State

authorizations of the American lobster and Jonah crab fisheries are in full compliance with" both the ESA and the MMPA until December 31, 2028.[2]

## III.    THE ELECTRONIC TRACKING REQUIREMENT

In March of 2022, the ASMFC published Addendum XXIX to its existing FMP for the American lobster fishery for the purpose of supporting the risk reduction efforts promulgated in NMFS's 2021 ALWTRP.  *See generally* "*Addendum XXIX to Amendment 3 to the American Lobster Fishery Plan; Addendum IV to the Jonah Crab Fishery Management Plan*" (ECF No. 1-1) ("Addendum XXIX").

### A.    Addendum XXIX to the American Lobster Fishery FMP.

Addendum XXIX requires states to issue rules mandating that federally permitted lobster vessels install an electronic tracking device on board their fishing vessels by December 15, 2023.  The tracking device will transmit their spatial data using a Global Positioning System ("GPS").  According to the Addendum, the tracker must be capable of collecting "location data at a minimum rate of one ping per minute for at least 90% of the fishing trip," transmit  the "device's current datetime, latitude, longitude, device and vessel identifier," have a "[m]inimum accuracy of 100 meters," and "maintain the confidentiality of personally identifying information and other protected data in accordance with federal law."  ECF No. 1-1 at § 3.1.1.  The tracker also "must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished or target species."  *See id.* at Appendix B.  The Addendum exempts holders of state-only lobster permits without a federal commercial trap gear area permit and other fishermen licensed only in state waters.  *Id.* at § 3.0.

The four stated purposes of Addendum XXIX are not limited to "the conservation and management of the fishery."  16 U.S.C. § 1853.  Although Addendum XXIX cites a "critical need for high resolution spatial and temporal data" as its first goal, ECF No. 1-1 at §§ 1.0 & 2.1(1), it gives no

---

[2] While Section 101(b) of the CAA provides that the provisions of subsection (a) "shall not apply to an existing emergency rule, or any action taken to extend or make final an emergency rule that is in place on the date of enactment of this Act, affecting lobster and Jonah crab," there was no emergency rule in place requiring the installation of any electronic vessel tracker at the time of the CAA's enactment.

4

indication that the ASMFC consulted either the New England Council or the Secretary of Commerce on its electronic tracking data collection program either before, during or after the drafting process. *See id.* (stating that the "American Lobster Management Board initiated Addendum XXIX" based on an alleged "critical need for high-resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries"). Second, Addendum XXIX cites a need to improve risk reduction efforts under the ALWTRP. *Id.* at § 2.1(2). Third, the Addendum identifies "prioritiz[ing] the development of offshore renewable energy" as one of its driving purposes. *See id.* at § 2.1(3). Of course, offshore energy has nothing whatsoever to do with the management of the *fishery* itself, just its waters.

Finally, Addendum XXIX prioritizes "the efficiency and efficacy of offshore enforcement efforts." *See* ECF No. 1-1 at § 2.1(4). To that end, the Addendum states, in part, that:

> Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear. Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

*Id.* at § 2.2.5. After data is collected from the electronic tracking devices, it then will be shared and managed by the Atlantic Coastal Cooperative Statistics Program ("ACCSP"), which already maintains a database of self-reported information from lobster fishermen. *Id.* at § 3.2.3; *Compl.* at ¶¶ 53-56 (detailing existing requirement of mandatory SAFIS or trip ticket self-reports containing vessel, trip, and landings information). Although the ACCSP will then compare the electronic tracker data with the self-reported data by means of trip identification numbers and other vessel registration information, the criteria for "matching reported trip data with location data" has not yet been developed. ECF No. 1-1 at § 3.2.3.

Addendum XXIX contains little to no information on how the privacy of the electronic data will be maintained and protected from unauthorized use and disclosure. With respect to its "Data Dissemination and Confidentiality" policy, the Addendum simply states that:

> ACCSP maintains the confidentiality of trip and location data that have been submitted to ACCSP via API in addition to the trip data already maintained under its authority. ***Data is accessible to the appropriate state or federal entities with confidential data access. A map interface will be available in the SAFIS Management***

*System (SMS) for authorized federal and state administrators to query and visualize trip locations.*

ECF No. 1-1 at § 3.2.3 (emphasis supplied).   Apart from this vague statement, Addendum XXIX does not define those entities that the map will be available to, much less what laws these entities can use the data to enforce.  *Id.*  The Addendum also contains no reference to encryption, any data governance or privacy policy, or limits on the types of data that can be collected.  Fishermen are not given an opportunity to review the actual data that is collected from them or review terms of service that describe how the data from the tracking device on their vessels will be collected, transmitted, stored, and used.

### B.    The MDMR Rule Implementing Addendum XXIX.

Although Addendum XXIX recommends that NMFS "promulgate all necessary regulations . . . to implement complementary measures to those approved in this addendum" by May 1, 2023, with "implementation no later than December 15, 2023," ECF No. 1-1 at § 5.0, no such federal rule has been published or implemented, even on an emergency basis.  Accordingly, MDMR presently has the sole responsibility for enforcing Addendum XXIX's electronic tracking requirement in the Gulf of Maine.

On September 13, 2023, MDMR issued a proposed rule entitled "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders."  *See* 13 C.M.R. 188, ch. 25, § 98 (the "MDMR Rule"), attached hereto as Exhibit A.  Although the proposed Rule has not been published in the Code of Maine Regulations, MDMR began informing fishermen with federal lobster permits that they must "have a tracker operational prior to the first fishing trip after December 15, 2023."  *See Federal Permit Holder Tracking Requirements* at 1 (ECF No. 1-3).  The MDMR Rule mirrors Addendum XXIX by requiring a device that "meets all the specifications outlined in Section 3.1 of [Addendum XXIX]," *Ex. A* at § A(1), and collects "the time and position of your vessel once per minute while the vessel is moving. While the vessel is tied up, the tracker collects the time and position of your vessel every 6 hours, until in motion again."  ECF No. 1-3 at 1.  MDMR represents that it will pay for the tracker and 3 years of associated cellular data service but is silent as to whether

fishermen will be responsible for all associated costs beyond the first three years of activation. *Id.*

The proposed MDMR Rule declares five new actions to be unlawful for "federally permitted lobster and crab license holders." *Ex. A* at § D.  They include:

A)    Fishing, taking, possessing, or landing "lobster or Jonah crab taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license;"

B)    "[R]emov[ing] or hav[ing] removed the approved tracking device from the permitted vessel listed on their license without written approval from [MDMR];"

C)    "[A]llow[ing] the permitted vessel listed on their license to be operated in the coastal waters of the State without the approved tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth;"

D)    Failing to maintain the tracking device "in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or *removed from the water*," or failing to "notify [MDMR] prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device; and[3]

E)    "[T]amper[ing] with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position."

*Id.* (emphasis supplied).  As for enforcement, the MDMR Rule simply states that:

In the event of an electronic tracking device failure, a violation of the prohibitions in section (C) shall not exist when the federally permitted lobster and crab fishing license holder makes notification of the failure to the Department by phone, text message, or email prior to beginning a fishing trip with the inoperable device.   The license holder must work with the Department in good faith and in a timely manner to restore device operability as soon as possible. It is unlawful for a license holder to begin subsequent fishing trips with an inoperable device without written approval from the Department.

*Id.* at § E.  Because the proposed but currently enforced Rule does not specify how enforcement will be handled in other exigent circumstances, it remains unclear what responsibilities and repercussions will be applied to fishermen unaware of a malfunction of their electronic tracking device, a particular concern given that fishermen are not given access to the settings on the device itself, or if the fisherman is unable to repair the device at sea.  Additionally, it is unclear: (i) what penalties may be imposed for violations of the Rule; (ii) whether an appeal process exists for fishermen to exercise their Due Process rights; and (iii) if so, what branch of government will have jurisdiction to process such an appeal.

---

[3] In many parts of Maine, lobstermen remove their vessels from the water during the winter months, often keeping them in the dooryards of their personal residences.  In other words, surveillance is taking place in the curtilage of people's homes.

7

**C.    The Particle TrackerOne Device.**

In the fall of 2023, MDMR began sending federally permitted lobster fishermen the electronic trackers required by the MDMR Rule, together with operating instructions crafted by MDMR.    *See Operating Instructions* (ECF No. 1-3).    The tracking device MDMR selected is known as the "TrackerOne," an electronic tracker distributed by Particle, a U.S. based company that manufactures the devices in China.    *Aff. of Frank Thompson* at ¶ 4, attached hereto as Exhibit B ("Thompson Aff.").    Although Particle offers users a so-called "dashboard" allowing them visibility into the data being collected by the device in real time, Maine lobstermen receiving the tracker were not provided with dashboard access or any terms of service describing how the data from the tracking device will be collected, transmitted, stored, and used.    *See id.* at ¶ 9.    Indeed, apart from referring fishermen to Addendum XXIX, neither the MDMR Rule nor the instructions accompanying the tracker provide any information concerning what precise data will be collected or how it will be used, maintained, or shared.

The lack of specificity concerning the data to be collected is particularly worrisome given that, in addition to collecting the device's current datetime, latitude, longitude, device and vessel identifier, the TrackerOne is *Bluetooth compatible*, may be adapted in order to collect *audio information*, and employs a predictive algorithm that can *anticipate vessel movements*.    *Thompson Aff.* at ¶ 9.    *See also* https://www.particle.io/particle-tracking-system/ (stating that the "Particle Tracking System is designed to integrate with any external sensor, enabling your business to track asset location, along with any additional variable such as temperature, sound, motion, air quality, and more" and can "[t]rack asset history to suggest optimal routes or increase accuracy of information needed for business intelligence").

Particle's privacy policy (which was not provided to fishermen by MDMR) states that it collects and retains "personally identifiable information," including "[g]eneral personal information, such as full name, email address, mailing and billing addresses," "[t]echnical identifiers, such as usernames, device IDs, SIM card ID and IP address[es]," "[g]eolocation information, such as GPS coordinates," "[b]rowser

8

identifiers, such as user agent strings" and other "commercial information," as well as "[i]nferences about personal preferences and attributes drawn from profiling." *See Particle Privacy Policy* at 2-3 & 13, attached hereto as Exhibit C.  It is unclear who the "user" of MDMR's tracking device is.  The policy further states that "Particle may share personally identifiable information with its chosen service providers in support of its principal business operations" and to assist with "[a]uditing," "[a]dvertising analytics" and "[m]arketing" services.  *Id.* at 5 & 13-14.  Particle also reserves the right to "disclose personally identifiable information as is necessary" in order to, *inter alia*, "comply with a subpoena or court order," "[c]ooperate with law enforcement or other government agencies," and "[h]elp with internal and external investigations."  *Id.* at 6.  Particle's Terms of Use require strict adherence to its Privacy Policy and allows Particle *to use an individual's image and likeness*.  *See Particle Terms of Use* at 6, 9, attached hereto as Exhibit D.  Ironically, Particle's Terms of Use prohibit the use of its devices for "non-consensual surveillance" – which is precisely the use intended by the MDMR Rule.  *Id.* at 7-8.

## IV.    LEGAL STANDARD

In considering a request for a preliminary injunction, the Court must determine: "(1) the movant's likelihood of success on the merits; (2) whether and to what extent the movant would suffer irreparable harm if the request were rejected; (3) the balance of hardships between the parties; and (4) any effect that the injunction or its denial would have on the public interest." *Diaz-Carrasquillo v. Garcia-Padilla*, 750 F.3d 7, 10 (1st Cir. 2014).  "The first two factors are the most important." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## V.    ARGUMENT

Each of the Plaintiffs are federally permitted Maine lobster fishermen who have received a Particle TrackerOne device from MDMR.  *See, e.g.*, *Thompson Aff.* at ¶¶ 2, 4.  Like thousands of other fishermen in this state, the Plaintiffs do not use their vessels solely for lobster fishing; Mr. Thompson, for example, uses his vessel not only to transport his lobsters and others from Vinalhaven to Rockland,

but also to fish for tuna, menhaden, and scallops. *Id.* at ¶ 3. He also takes recreational day trips with his family. *Id.* Like other similarly situated fishermen, Mr. Thompson has been told that if he does not install the TrackerOne on his vessel by December 15, 2023, he will face sanctions that could have adverse impacts on his ability to harvest lobster in federal waters. *Id.* at ¶ 8. Mr. Thompson, however, is unclear what those sanctions will be due to the absence of any enforcement provisions in the MDMR Rule. *Id.* Mr. Thompson also is acutely concerned about his privacy, as he considers his chosen fishing grounds to be a personal trade secret that he zealously guards. *Id.* ¶ 9.

### A.    The Plaintiffs Can Demonstrate a Likelihood of Success on the Merits.

Because the "district court is required only to make an estimation of likelihood of success and need not predict the eventual outcome on the merits with absolute assurance," *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (internal quotation marks omitted), the Plaintiffs in this case can easily establish the "most important" factor in the Court's analysis for three reasons. *Woodhouse v. Me. Comm'n on Gov't Ethics & Election Practices*, 40 F. Supp. 3d 186, 191 (D. Me. 2014).

First, by requiring electronic surveillance of their movements on a minute-by-minute basis, the Rule subjects the Plaintiffs to an unconstitutional warrantless search and seizure under the Fourth Amendment. Second, the MDMR Rule is a violation of the Plaintiffs' equal protection rights in that the Rule: 1) subjects federally-permitted fishermen to constant surveillance even when fishing in state waters, while fishermen with state-only permits fishing in those same waters are not monitored; and 2) is void for vagueness in that it fails to describe the conditions under which it will be enforced, any penalties for noncompliance, and the mechanism for an appeal of any adverse actions taken. Finally, the MDMR Rule is both arbitrary and capricious and contrary to law under the Maine Administrative Procedure Act, 5 M.R.S. §§ 8001 et seq. (the "Maine APA"), because it both does not promote the National Standards set forth in the MSA and violates the CAA's prohibition on new regulations designed to reduce entanglement risks to the North Atlantic right whale.

**1.      The MDMR Rule Violates the Fourth Amendment.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Municipal Court of City and Cnty. of San Francisco,* 387 U.S. 523, 528 (1967)). Searches unsupported by probable cause and a warrant are *per se* unreasonable when they violate a reasonable expectation of privacy. *Arizona v. Gant*, 556 U.S. 332 (2009); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). An unconstitutional search also occurs when the Government trespasses upon private property without a warrant. *See United States v. Jones*, 565 U.S. 400, 404 (2012) (attachment of GPS tracking device to motor vehicle was a "search" by trespassing against an "effect" (i.e., the vehicle) for the purpose of revealing information). Both types of searches are at issue here.

### a)      The MDMR Rule is an Unconstitutional Search of an Effect.

A search need not amount to an invasion of privacy to trigger the "guarantee against unreasonable searches, which . . . provide[s] at a minimum the degree of protection [the Fourth Amendment] afforded when it was adopted." *Jones*, 565 U.S. at 411. Under this property-based analysis, "a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (citing *Jones*, 565 U.S. at 404). "It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment," *Jones*, 565 U.S. at 404, because it is the "physical intrusion," not the information collected, that matters. *See Florida v. Jardines*, 569 U.S. 1, 11 (2013). Accordingly, a warrantless trespass is unconstitutional regardless of whether the trespass is reasonable. *Id.* By compelling fishermen to install an electronic tracker on their vessels, MDMR is effectively forcing them to consent to a warrantless trespass in lieu of excluding them from participating in the only industry they know. *See Thompson Aff.* at ¶¶ 2, 9 (describing how Mr.

Thompson has been fishing off of Vinalhaven for 55 years and is a fifth-generation lobsterman).

> b)   *The MDMR Rule is an Unconstitutional Invasion of Privacy.*

With respect to searches that invade a reasonable expectation of privacy, "the requirement that charter boats," like commercial fishing boats, "transmit their GPS location to the Government appears to be a search, and no warrant authorizes that search." *Mexican Gulf Fishing Co.*, 60 F.4th at 967. Nevertheless, "[s]earch regimes where no warrant is ever required," like the one at issue here, "may be reasonable where special needs . . . make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interests in crime control." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 420 (2015) (internal quotation marks and citations omitted). Accordingly, this so-called "closely-regulated-industry doctrine" operates as an exception to the general rule that warrantless searches are unreasonable. While the Plaintiffs concede that commercial fishing is a closely-regulated industry, *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry"), even warrantless searches in a closely regulated commercial fishing industry are unconstitutional if vessel operators "have a legitimate expectation of privacy to the whole of their movements while at sea, and, if so, . . . the regulation violates that expectation." *Mexican Gulf Fishing Co.*, 60 F.4th at 970.

> i)   **The Plaintiffs Have a Reasonable Expectation of Privacy in the Movements of Their Fishing Vessels.**

"Although no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Carpenter*, 138 S. Ct. at 2213-14 (quoting *Carroll v. United States,* 267 U.S. 132, 149 (1925) (footnote omitted). It is also informed by the notion "that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* (quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948)).

As technology changes, so does the law. Because "individuals have a reasonable expectation of

privacy in the whole of their physical movements," the Supreme Court has held that GPS monitoring of individuals and their vehicles constitutes a search regardless of "[w]hether the Government employs its own surveillance technology" or "leverages the technology of a wireless carrier." *Carpenter*, 138 S. Ct. at 2217, 2220. *Cf. Mexican Gulf Fishing Co.*, 60 F.4th at 970-71 (voicing "serious concerns that the GPS requirement violates the Fourth Amendment in this circumstance, given the Supreme Court's instruction [in *Carpenter*] that members of the public have a 'reasonable expectation of privacy in the whole of their movements'" but declining to reach the issue because "the [tracking] requirement violates the APA for other, non-constitutional reasons"). While the Plaintiffs certainly have an expectation of privacy in their trade secretive fishing grounds, *Thompson Aff.* at ¶¶ 2, 9, this is *not* a case where MDMR is merely surveilling fishermen for a brief period of time such that there is no concern that the entirety of their fishing grounds will be exposed with detailed precision. Rather, by subjecting fishermen to minute-by-minute surveillance, MDMR and others will know the precise location of their traps, where they fish in certain seasons and weather, and "a wealth of detail" concerning their fishing habits. *See Leaders of a Beautiful Struggle, et al. v. Baltimore Police Dept.*, 2 F.4th 330, 341 (4th Cir. 2021) (aerial surveillance violated reasonable expectation of privacy when the program enabled "retrospective location tracking in multi-hour blocks, often over consecutive days, with a month and a half of daytimes for analysts to work with" that yielded "'a wealth of detail,' greater than the sum of the individual trips"). Maine lobstermen obviously have an expectation of privacy in keeping that "wealth of detail" private.

> ii)    **The MDMR Rule Violates Reasonable Expectations of Privacy.**

Having established that fishing vessel operators have a legitimate expectation of privacy in their movements, the question then becomes whether the MDMR Rule violates that expectation. Because "businesspeople ha[ve] a constitutional right to go about [their] business free from unreasonable official entries upon [their] private commercial property," to pass constitutional muster, so-called "administrative searches" – i.e., regulations requiring the collection of transactional, commercial or location data from a

business – must be minimally intrusive, limited in scope and specific in the information it demands. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 487–88 (S.D.N.Y. 2019) (finding unconstitutional a city ordinance that required Airbnb to produce monthly reports containing a variety of rental information collected from hosts because the ordinance applied to all "booking services," was of indefinite duration, and did not restrict the City's ability to share the information with law enforcement and other governmental authorities). There also must be a "substantial" government interest behind the regulatory scheme pursuant to which the administrative search is made. *See New York v. Burger*, 482 U.S. 691, 702 (1987). This should hold particularly true when information obtained by the search reveals commercial trade secrets. *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) ("[o]nce data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest").

The MDMR Rule does not satisfy any of these criteria. First, Addendum XXIX's overarching goal of improved spatial information does not establish a "substantial" government interest justifying a warrantless search in the form of its electronic tracking requirement because, since 2018, the American lobster fishery FMP has required fishermen to self-report their trip data through SAFIS reports, which must include fishing location, number of traps hauled, number of traps set on a trip, length of trip, and quantity (in pounds) of the harvest. *See generally* ECF No. 1-2. The electronic monitoring called for in Addendum XXIX simply increases the precision of the information that fishermen already must self-report without a corresponding risk reduction to the fishery based on the National Standards set forth in the MSA. *See Mexican Gulf Fishing Co.*, 60 F.4th at 973 (similar tracking requirement for charter fishing vessels held invalid because the data to be collected "only tells the Government what it already knows: when a charter boat embarks on a trip, how long it is gone, and when it returns"). While the Addendum professes a "critical need for electronic tracking data" to satisfy the program's stated goals, it does not specify why ***minute-by-minute surveillance*** is necessary to combat an existing lack of current

14

spatial information, particularly when a vessel is not fishing for lobster in federal waters.  It also does not specify why "there is no basis to believe … spot checks" are "unworkable." *Patel*, 576 U.S. at 427.

Second, Addendum XXIX's minute-by-minute tracking requirement is not "carefully limited in time, place, and scope." *Burger*, 482 U.S. at 703.  Any statute that requires the collection of information must serve the "two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.*  In this case, however, the MDMR Rule has made no effort whatsoever to limit the scope of the information it collects – or the manner in which the agency uses it – to only what is *necessary* to promote the conservation and sustainability of the lobster fishery.  Indeed, there are no limits on its use in enforcement actions taken outside of the fishery based on alleged conduct exposed by the data, nor will notice be provided to fishermen if the scope of the data collected changes and/or its use for enforcement expands.   Unlike the scallop fishery, which operates on a quota system and requires vessels to power on trackers that "ping" once every hour only when they leave port for the purpose of fishing for scallops in designated waters, *see generally* 50 C.F.R. 648, *Thompson Aff.* at ¶ 7, the MDMR Rule and Addendum XXIX require lobster vessels to install trackers that ping at *sixty times* that rate through a tracker that "must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished or target species."  *See* ECF No. 1-1 at Appendix B. This means that a holder of a federal lobster permit must have her movements surveilled at all times when she is operating her vessel, even if she is fishing for scallops, pleasure cruising with her family, or conducting a search and rescue operation.  Put simply, collecting such granular GPS data from lobster fishermen when they are not lobster fishing does nothing to conserve the lobster fishery.

Nor does the MDMR Rule attempt to minimize its intrusion on the fishermen's rights to privacy by limiting the way the data can be used.  Apart from applications to the lobster fishery, the Rule and Addendum XXIX allow MDMR and the ASMFC to assist in developing offshore wind projects, to

reduce risks to right whales, and to share the information collected with "appropriate state and federal entities" and "authorized federal and state administrators" (whoever they are) through a virtual data map that updates the movements of each member of the federal lobster fleet in real time. ECF No. 1-1 at § 3.2.3. In an Orwellian twist that was not part of the story that MDMR told to the fishermen, these unnamed "federal and state administrators" can even employ the device's predictive algorithms to make "[i]nferences about personal preferences and attributes drawn from profiling." *See Ex. C* at 13; *Thompson Aff.* at ¶ 9. MDMR, in other words, has not even limited the scope of its search to *current* movements – it has expanded it to include possible *future* ones as well, an inadvertent but chilling homage to H.L. Mencken's Minority Report. Nor has MDMR made any effort to restrict or foreclose Particle's ability to maintain, use or disclose the information its devices collect to its business partners and others having nothing to do with regulating the lobster fishery. *Ex. C* at 6.

In sum, the granular level of the data collected by the TrackerOne device without a warrant, probable cause, or court oversight, combined with the fact that fishermen have a reasonable expectation of privacy not only in their physical movements, but in the precise location of their fishing grounds, gives rise to an unconstitutional search and a violation of their reasonable expectations of privacy.

### 2. The MDMR Rule Violates Equal Protection.

The Plaintiffs are also likely to succeed on their claim that the MDMR Rule violates the equal protection guarantees of Articles V and XIV of the U.S. Constitution because the Rule 1) treats some fishermen in state waters differently than other fishermen in state waters based on whether a fisherman also has a permit to fish in *federal* waters; and 2) is void for vagueness because it does not describe the penalties for noncompliance or any due process rights for an appeal and challenge.

### a) *The MDMR Rule Treats Similarly Situated Individuals Differently.*

"The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004).

In assessing an equal protection claim based on disparate treatment, courts in this Circuit "look for two elements: (1) whether the [ ] [plaintiffs] [were] treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration . . . ." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 452 (D. Me. 2017) (quoting *Macone v. Town of Wakefield*, 277 F.3d 1, 10 (1st Cir. 2002). "Once these two elements are shown, the court must determine what level of scrutiny applies to the law at issue." *Id.*

In this case, similarly situated persons – i.e., those engaged in the commercial harvesting of lobsters in state waters – are treated differently in those same waters based on whether or not they also have a permit to harvest lobsters within the EEZ. Fishermen with only a state permit are not subject to 24/7, minute-by-minute surveillance at *any* time. *See Ex. A.* at § A (defining those subject to the MDMR Rule); ECF No. 1-1 at § 3.0 (Addendum XXIX's statement that the electronic tracking requirement does not apply to "[a] person with a state-only lobster permit and no federal commercial trap gear area permit"). But fishermen with federal permits are subject to constant surveillance, even when they are fishing in those same state waters (or are not fishing at all). Put differently, whether or not an individual is subject to around-the-clock surveillance by the state government while operating their vessels in state waters does not depend on their conduct but on whether that individual also is permitted by a *separate* government to fish in *separate* waters. Federal licensure status is an impermissible consideration when determining if a fishermen should be surveilled in state waters because the entire purpose of the MDMR Rule is to promote "offshore enforcement efforts" in federal waters. ECF No. 1-1 at § 2.1. Because the Rule is not concerned with fishermen harvesting lobsters in state waters, their dual federal license should not inform whether they are subject to surveillance when they are not fishing under their federal permit.

Nor is the MDMR Rule "suitably tailored to serve a compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (stating that laws "imping[ing] on personal rights guaranteed by the Constitution" are subject to strict scrutiny). As a practical matter, the interest at issue

here is only a federal one.  Now if the MDMR Rule applied only to lobstering in state waters (and leaving aside altogether the excessive amount of surveillance at issue) there might not be an equal protection problem because all similarly situated fishermen (i.e., those harvesting lobsters in state waters) would be treated substantially the same under a suitably tailored law to promote enforcement efforts in a state fishery.  But because the MDMR Rule *exempts* holders of state only permits yet requires around the clock surveillance of federally permitted fishermen "regardless of landing state, trip type, location fished or target species," *see* ECF No. 1-1 at Appendix B, the MDMR Rule patently violates equal protection because it does not promote any compelling *state* interest in regulating fishing in waters within its jurisdiction.  Because the only purpose behind the MDMR Rule is a federal one, the State clearly cannot demonstrate it has a compelling interest in requiring an activated electronic tracking device while federally permitted individuals are engaged in fishing in state waters.

### b)    The MDMR Rule is Void for Vagueness.

Second, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13 (1st Cir. 2011) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)).  To comport with historical due process requirements, a rule or regulation therefore must define prohibited conduct "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 13–14 (citation omitted).  "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement," the Supreme Court has recognized "that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'"  *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (citation omitted).  For this reason, "laws that fail to incorporate a scienter requirement may also receive greater scrutiny."  *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023)

(citing *United States v. Nieves-Castano*, 480 F.3d 597, 603 (1st Cir. 2007)).

Although Addendum XXIX and the MDMR Rule purport to promote "the efficiency and efficacy of offshore enforcement efforts," ECF No. 1-1 at § 2.1, it remains unclear how violators of the MDMR Rule will be punished. While the Rule lists five categories of conduct that are now declared to be "unlawful," the Rule does not state whether such conduct will be punished civilly or criminally, the amount of any associated fines, whether intentional and unintentional violations will be treated differently, whether violations can impact state as well as federal licensure, what other laws the data can be used to enforce, whether any additional, non-data driven individualized suspicion will be required before the data can be used to bring any enforcement action, who will be bringing those actions, whether criminal enforcement actions can rely on the new electronic data, what adjudicatory processes must be followed before sanctions can be imposed, and what appellate rights are available. *Ex. A* at § C; *Thompson Aff.* at ¶ 8. While the "mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague," *United States v. Lachman*, 387 F.3d 42, 56 (1st Cir. 2004), "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09. With only a description of prohibited conduct and no discussion whatsoever of the consequences of that conduct, the MDMR Rule crosses the constitutional line.

**3.    The MDMR Rule Violates the Maine Administrative Procedures Act.**

Finally, the MDMR Rule violates the Maine APA in two ways. First, while the fact sheet accompanying the MDMR Rule provides a brief "estimate of the fiscal impact of the rule" 5 M.R.S. § 8057-A(1), the Rule only does so from the perspective of MDMR, not from the perspective of affected fishermen. Second, the MDMR Rule "is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" pursuant to 5 M.R.S. § 8058(1) in that the Rule "is unreasonable, has no rational factual basis justifying the conclusion or lacks substantial support in the evidence." *Cent. Me. Power*

*Co. v. Waterville Urb. Renewal Auth.,* 281 A.2d 233, 242 (Me. 1971).

The MDMR Rule is procedurally deficient because it fails to contain "[a]n estimate of the fiscal impact of the Rule," 5 M.R.S. § 8057-A(1)(C), or provide a small business impact statement under 5 M.R.S. § 8052(5-A).[4]  In this case, the MDMR Rule's statement of fiscal impact simply states that: "[e]nforcement of these proposed amendments will not require additional activity in this agency. Existing enforcement personnel will monitor compliance during their routine patrols."  *Ex. A* at *Rule-Making Fact Sheet*.  While the Rule states that "at this time a minimum of three years of costs associated with this requirement will be covered for permit holders," it is silent as to who will bear the associated costs after that or what those costs will be apart from "the annual data plan costing ~$130 per participant."  *Ex. A* at 12-13.  Because the Rule does not contain any of the information required by 5 M.R.S. § 5082(5-A) with respect to small businesses, it is procedurally defective.  *See also Mexican Gulf Fishing Co.,* 60 F.4th at 973-74 (finding that the "insignificant benefits" of a GPS tracking requirement "do not bear a rational relationship to the serious financial and privacy costs imposed").

Second, the Rule is arbitrary and capricious because there is no rational factual or legal basis for justifying minute-by-minute surveillance in the face of the undisputed infringement on individual privacy rights.  Mark Walick, a privacy expert for Google, has reviewed the MDMR Rule and notes the lack of a clear data governance policy and numerous privacy concerns that do not appear to have been addressed by MDMR or the ASMFC, including the following:

1)  The MDMR Rule and Addendum XXIX are silent as to data encryption, meaning there is no information about how the confidentiality of the data will be maintained throughout the collection and storage process. Data collection policies typically are explicit in how the data collected will be encrypted.  *Affidavit of Mark Walick* at ¶ 6, attached hereto as Exhibit E.

2)  There is no description or mention of access control in the Addendum, meaning it is not clear who will actually review the data that is being collected, what data beyond GPS data is being collected, where the data will be stored and viewed, or how the data will be used after it is collected.  Although Addendum XXIX states the ACCSP will be responsible for filtering the electronic data, it does not say who will be responsible for detecting such discrepancies or how access to the data set will be limited, if at all.  This is

---

[4]  For any rule that may impact a small business, 5 M.R.S. § 5082(5-A) requires an economic impact statement that identifies A) the type and number of the small businesses subject rule; B) the "costs required for compliance;" C) "[a] brief statement of the probable impact;" and D) "[a] description of any less intrusive or less costly, reasonable alternative methods…."

inconsistent with typical data governance policies. *Id.* at ¶ 7.

3) The MDMR Rule does not include an explicit intended purpose for the data that the tracker will be collecting. Such a pronouncement is typically included within data governance policies. While Addendum XXIX identifies four objectives for the electronic tracking requirement, there is no description of what sort of testing was done to determine the minimum data needed to accomplish these objectives, and there is no evidence that minute by minute granular location changes are necessary in order to accomplish the purposes of the Addendum. *Id.* at ¶ 8.

4) Neither the MDMR Rule nor Addendum XXIX contain an explanation of the format that any data reports will take or the explicit purposes that these reports will serve (i.e., whether different reports will be prepared for spatial planning forecast and enforcement efforts). For example, should MDMR desire to overlay whale migration paths with the data retrieved by the TrackerOne devices, the data collected should be limited to that purpose and the fisherman assured of that limited use. Because MDMR does not identify what data fields or data points will be used in pursuit of each individual purpose, place any limits on the individuals and organizations with whom the data can be shared, or limit how long that data can be retained, the Rule runs afoul of typical governance policies. *Id.* at ¶ 9.

There is also no indication that MDMR considered collecting data anonymously, which would give it all the benefits intended by the Rule while protecting individual users from becoming targeted or having their individualized trade secrets exposed. Because the MDMR Rule has not even considered these variables, much less provide an adequate explanation for why it does not comport with typical data governance policies, the Rule is arbitrary and capricious on its face. *Cf. Mexican Gulf Fishing Co.,* 60 F.4th at 971-73 (finding a GPS tracking requirement for charter fishing vessels was arbitrary and capricious under the federal APA because NMFS failed to adequately address privacy concerns).

Third, as the Fifth Circuit has explained, the MDMR Rule is contrary to law because electronic trackers are not "necessary" or "appropriate" measures to carry out the National Standards set forth in the MSA because the Government already has the information it seeks to collect. *Mexican Gulf Fishing Co.,* 60 F.4th at 964-65. Moreover, the MDMR Rule does not limit its surveillance to those operating in the federal fishery. Electronic tracking cannot be said to prevent overfishing, be "reasonably calculated to promote conservation," "take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches," or utilize "economic and social data . . . in order to provide for the sustained participation of such communities, and  . . . minimize adverse economic impacts on such communities" when it is tracking individuals who are not even harvesting lobsters. *See* 16 U.S.C. § 1851. Were the Rule designed to track fishermen only while they are actually harvesting lobsters from the

federal fishery, it would (at least arguably) serve these purposes to some extent. But because the Rule requires constant surveillance of fishermen when they are fishing for other species, on recreational day trips, or even engaged in search and rescue missions, the Rule goes far beyond the purposes of the MSA and is therefore contrary to the only law that even arguably supports an electronic tracking requirement.

Finally, to the extent the MDMR Rule is designed to promote "risk reduction efforts under the [ALWTRP]," *see* ECF No. 1-1 at § 2.1, the Rule is again contrary to law. The CAA, which clearly preempts the MDMR Rule to the extent it is implemented as part of ALWTRP, states that the existing ALWTRP measures are sufficient until December 2028. The only exception applies to emergency rules. Because Addendum XXIX and the MDMR Rule are not emergency rules, MDMR, or any other agency acting under the color of federal law, are barred from publishing new regulations pursuant to ALWTRP.

### B. The Plaintiffs Have Demonstrated a Likelihood of Irreparable Harm.

The Court must measure irreparable harm "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (internal quotation marks and citation omitted). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Id.* at 43 (internal quotation marks omitted). Accordingly, even if the Court finds that the "likelihood of success is low," it can still order injunctive relief based on a "significant showing of irreparable harm." *Me. Educ. Ass'n Benefits Trust v. Cioppa*, 842 F. Supp. 2d 386, 387 (D. Me. 2012).

"Although constitutional violations are not per se irreparable harm, certain constitutional violations are more likely to bring about irreparable harm, namely 'infringements of free speech, association, *privacy* or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief.'" *Me. Forest Products Council v. Cormier*, 586 F. Supp. 3d 22, 62 (D. Me. 2022) (emphasis supplied) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 484 (1st Cir. 2009)). It is hard to imagine a more fundamental genre of irreparable

harm than an administrative rule, promulgated without legislative oversight, that subjects individuals to around the clock surveillance as a condition of their ability to engage in their chosen vocation. *See Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation"). But even leaving aside the Plaintiffs' interests in their constitutional rights, enforcement of the MDMR Rule will result in the storage of individualized trip data with minute-by-minute precision without a strong privacy policy in place. Making matters worse, such data collection risks exposure of valuable trade secrets to the public domain, which could result in harmful economic outcomes for the fishermen.

Consider the following: if any of the data collected is used in connection with promulgating another update to the ALWTRP or in granting a permit to an offshore wind developer, it will necessarily become part of the related administrative record and will be publicly revealed during any subsequent challenge. Consequently, these routes and locations will become general knowledge to competitive and adverse interests, ruining hard earned business advantages. With no limitation on the agencies that can view this data, it risks further exposure through subpoena *duces tecum*, data breaches, or even inadvertent Bluetooth connections. The fact that the economic implications of these privacy concerns have not been addressed also is a violation of the MSA's National Standard that FMPs must "take into account the importance of fishery resources to fishing communities by utilizing economic and social data[,]… to the extent practicable, [to] minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(8).

### C.   *The Balance of Hardships Weigh in the Plaintiffs' Favor.*

The third factor is what the First Circuit terms the "balance of relevant impositions," an assessment of "the hardship to the nonmovant if enjoined as contrasted to the hardship to the movant if no injunction is granted." *Esso Stand. Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13 (1st Cir. 2006). Leaving aside the unconstitutional invasion of their privacy rights and the loss of trade secrets, the burden imposed on fishermen is extensive. Not only will they need to install and ensure compliance

with an unfamiliar technology, they also face possible monetary fines and enforcement actions by MDMR and other agencies without knowing precisely what information they are transmitting.

Meanwhile, MDMR's interest in improving its data collection appears minimal, as neither MDMR nor the ASMFC has identified a compelling state interest that can only be addressed by constant surveillance – only a federal one.  And even Addendum  XXIX's "statement of the problem" does not identify a specific risk to the federal lobster fishery.  Quite to the contrary, recent stock assessment reports indicate that there is a record high stock abundance of lobster in the Gulf of Maine.[5] To the extent spatial information is needed to conserve either the state or federal fishery, this information is already available through the FMP's existing self-reporting requirements, which already require the reporting of fishing locations, the number of traps hauled, the numbers of traps set per trip, the length of the trip, and the quantity (in pounds) of the harvest.  *See* ECF No. 1-2.  The duplicative nature of the electronic tracker is a violation of the MSA itself.  *See* 16 U.S.C. § 1851(a)(7) ("Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication"); *Mexican Gulf Fishing Co.*, 60 F.4th at 973 ("Although the Government stresses the value of verifying this information, verification is entirely duplicative where, as here, the Government offers no evidence that the preexisting reporting is inaccurate.").  Accordingly, enjoining the Rule will only minimally impact either fishery, if at all.

### D.    *The Public Interest Lies in Favor of an Injunction.*

Finally, it is axiomatic that the public has a compelling interest in upholding constitutionally protected rights.  "'[W]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights.'" *Acosta v. Pablo Restrepo*, 470 F. Supp. 3d 161, 168 (D.R.I. 2020) (quoting *Am. Civ. Liberties Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636 (6th Cir. 2015)).  Indeed, "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional

---

[5] *See, e.g., 2021 BiOp* at 17 ("The Gulf of Maine/Georges Bank stock is at near record high abundance, above the abundance threshold, and overfishing is not occurring"), ECF No. 1-1, *MLU v. Raimondo*, D. Me. Docket No. 1:21-cv-00-275-LEW.

law or regulation." *Condon*, 961 F. Supp. at 331. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

For the reasons expressed above, the MDMR rule is both a violation of fundamental constitutional rights and an unlawful agency action. Beyond that, it is a dangerous precedent. If an agency can mandate the installation of an electronic tracker on a fishing vessel as a condition of licensure, regardless of the activity the vessel is engaged in, then the Government's ability to surveille private citizens appears to have no limits. In the abstract, the Government always can identify some salutary objective that might benefit from data on the minute-by-minute movements of its citizens. But does that justify, for example, requiring every individual driving on an interstate highway to install a vehicle tracker in order to enforce traffic laws? Does it justify requiring cell phone providers to record all international calls in order to monitor illegal narcotics trafficking? Of course not. Because the MDMR Rule unconstitutionally imposes virtually unfettered individual surveillance on Maine's federally permitted lobster fishermen as a condition to engaging in their vocation, it must be enjoined immediately.

## VI.    CONCLUSION

In the end, the MDMR Rule is a drastic overreach. While Maine lobstermen have and will continue to make every effort to conserve their fishery and protect the endangered species that inhabit it, dynamic management of the fishery's resources cannot come at the expense of its participants' constitutional rights. This is particularly true when fishermen already self-report the very data that the electronic tracker purports to collect. A workable solution exists whereby MDMR can collect the data it needs while protecting the constitutional rights of fishermen. Collecting data at a less granular level, anonymous tracking, surveillance limited to those engaged in fishing effort in federal waters, user access to the information, etc., are all options that must be considered. But around the clock surveillance of every single vessel movement must be enjoined.

**WHEREFORE**, the Plaintiffs respectfully request that the Court preliminarily enjoin the Maine Department of Marine Resources from enforcing the so-called "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab Holders."

Dated at Portland, Maine this 12th day of January, 2024.

/s/     <u>Thimi R. Mina</u>
        Thimi R. Mina

/s/     <u>Alfred C. Frawley IV</u>
        Alfred C. Frawley IV

        MCCLOSKEY, MINA, CUNNIFF & FRAWLEY, LLC
        12 City Center
        Portland, Maine 04101
        207.772.6805
        207.879.9375
        tmina@lawmmc.com
        afrawley@lawmmc.com

        *Attorneys for Plaintiffs Frank Thompson, Joel Strout, Jason Lord, Chris Smith and Jack Cunningham*

## <u>CERTIFICATE OF SERVICE</u>

I, Alfred C. Frawley IV, hereby certify that on this 12th day of January, 2024, I filed the foregoing **MOTION FOR PRELIMINARY INJUNCTION** with the CM/ECF system, which shall send notification of such filing to counsel of record for all parties.

Dated at Portland, Maine, this 12th day of January, 2024.

/s/    <u>Alfred C. Frawley IV</u>
Alfred C. Frawley IV

McCloskey, Mina, Cunniff & Frawley, LLC
12 City Center
Portland, Maine
Tel.: 207.772.6805
Fax: 207.879.9375
afrawley@lawmmc.com

27