UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK THOMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 1:24-cv-00001-JAW |
| | ) | |
| PATRICK KELIHER, in his official | ) | |
| capacity as COMMISSIONER, MAINE | ) | |
| DEPARTMENT OF MARINE | ) | |
| RESOURCES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW**

Defendant Patrick Keliher, Commissioner, Maine Department of Marine Resources ("DMR" or "Department"), hereby opposes Plaintiffs' Motion for Preliminary Injunction ("PI Motion," ECF No. 7).

## I.    INTRODUCTION

Maine and the other states that participate in the American lobster fishery have a long tradition of collaborative active management of the fishery.  Based on their combined scientific and regulatory expertise, these states have determined that precise, reliable data about the location of lobster fishing activity is necessary to effectively manage the fishery.  Electronic vessel tracking technology enables states to characterize fishing activity on a level that has not been done before, by gathering detailed data that shows not only where vessels are fishing, but the locations and density of trap fishing gear in precise areas in the ocean.  This information will provide substantial benefit to the lobster fishery by improving fishery management and giving the states valuable data they can use to address various challenges faced by the lobster fishery.

In this lawsuit, Plaintiffs attack the Department's Rule implementing the states' decision to use electronic vessel tracking technology to collect this data. Plaintiffs' discomfort with the Department's Rule does not entitle them to preliminary injunctive relief. The Rule's requirement that certain Maine lobster license holders install electronic tracking devices on their fishing vessels is minimally intrusive in the context of the highly regulated commercial fishing industry. The Rule is rationally related to Maine's substantial interest in protecting the lobster fishery, and it clearly spells out what it prohibits. Stripping away Plaintiffs' futile attempts to constitutionalize fishery management decisions, Plaintiffs claims, at base, are rooted in speculation about hypothetical data breaches and improper use of location data. But Plaintiffs' baseless speculation and misunderstanding of the facts cannot support the extraordinary remedy of preliminary relief.

## II.    FACTUAL BACKGROUND[1]

### *Atlantic States Marine Fisheries Commission*

Since 1942, Maine has been a party to the Atlantic States Marine Fisheries Compact, an agreement between the Atlantic coastal states (including the District of Columbia) to "exercise joint regulatory oversight of their fisheries."[2] *Medeiros v. Vincent*, 431 F.3d 25, 27 (1st Cir. 2005); Ex. 1 (ASMFC Compact), Art. I; P.L. 1941, ch. 314. Maine is thus a member of the Atlantic States Marine Fisheries Commission ("ASMFC" or "Commission"), the interstate organization that implements the Compact. *See* 12 M.R.S. §§ 4651-4656. To that end, the Commission establishes interstate fishery management plans setting forth minimum conservation

---

[1] Defendant recites those facts most directly relevant to Plaintiffs' Motion and does not address all of Plaintiffs' many misstatements regarding how the American lobster resource is managed, which will be addressed at the merits stage. Defendant also respectfully directs the Court to the amicus brief of the Atlantic States Marine Fisheries Commission for a more fulsome explanation of the complex regulatory backdrop to this proceeding.

[2] Congress approved the Compact pursuant to Art. I, § 10, cl. 3, of the Constitution. *See* Pub. L. No. 77-539 (1942), as amended by Pub. L. No. 81-721 (1950).

standards that states must conform to (or exceed) by appropriate modifications to their state laws or regulations.[3]  *See R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009) ("*RIFA*"); *Medeiros*, 431 F.3d at 27-28.  The Commission typically acts through species-specific management boards—such as the American Lobster Management Board— whose membership includes the Commissioners from each member state with an interest in the relevant fishery.[4]  *See* Ex. 2 (ASMFC Interstate Fisheries Management Program ("ISFMP") Charter), § 4(b).  Board decisions are reached through an extensive public process as set forth in the ISFMP Charter and are appealable by a member state to the Commission's ISFMP Policy Board.  *See id.*, §§ 3(d)(9), 4(h), 6.

Since Congress's 1993 enactment of the Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA"), Pub. L. No. 103-206 (1993), 16 U.S.C. §§ 5101-5108, the Commission's fishery management plans have been backed by federal law.  Pursuant to the ACFCMA, the Commission must, among other things, "prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources," review states' implementation and enforcement of its plans, and "report the results of the reviews" to the Secretary of Commerce.  16 U.S.C. § 5104.  Should a member state fail to implement an essential element of a Commission plan, the Commission must notify the Secretary.  *Id.* § 5105(b).  If the Secretary independently determines that a state has failed to implement measures necessary for

---

[3] States have primary responsibility for conservation and management of fisheries within the territorial sea (in Maine's case, coastal waters within three nautical miles of shore).  *See* 43 U.S.C. §§ 1301-1315; 12 M.R.S. § 6001(6). Management within the Exclusive Economic Zone—from three to 200 nautical miles from shore—is the responsibility of the federal government.  *See, e.g.*, 16 U.S.C. § 1856(a).

[4] Each member state appoints three representatives to the Commission: its director of marine fisheries; a state legislator; and a public member with fisheries experience who is appointed by its governor.  Ex. 1, Art. III; *see also* 12 M.R.S. § 4652.  Commissioner Keliher is also a member of the Commission's American Lobster Management Board.  Keliher Decl. ¶¶ 4-5.

conservation, "the Secretary shall declare a moratorium on fishing in the fishery in question within the waters of the noncomplying State." *Id*. § 5106(c)(1).

### Management of the American Lobster Fishery

The Commission, through its American Lobster Management Board, coordinates the management of lobster fishing in its member states' jurisdictional waters pursuant to Amendment 3 to the Commission's Interstate Fishery Management Plan for American Lobster (the "Lobster Plan") and Addenda I-XXIX.[5]  *See Medeiros*, 431 F.3d at 27-28.  The Lobster Plan's goal is to secure "a healthy American lobster resource and a management regime which provides for sustained harvest, maintains appropriate opportunities for participation, and provides for cooperative development of conservation measures by all stakeholders." Ex. 3 (Amendment 3 to the Lobster Plan) at ii.  The Lobster Management Board may modify the Lobster Plan based on new information.  *See* Ex. 3, § 3.6.  And indeed, over the years the Board has issued several Addenda modifying the Lobster Plan in response to evolving information about the status and needs of the lobster fishery.[6]

---

[5] Some fisheries overseen by the Commission are also managed by regional fishery management councils established under the Magnuson-Stevens Act ("MSA"), one of which is the New England Fishery Management Council ("NEFMC").  *See* 16 U.S.C. § 1852(a)(1)(A).  These councils develop federal fishery management plans for certain fisheries in their regions that must meet the objectives of the MSA's National Standards.  *See id.* § 1852(h).  But there is no such federal fishery management plan through the NEFMC for American lobster.  Keliher Decl. ¶ 7.  Instead, pursuant to the ACFCMA, the American lobster fishery is cooperatively managed by the states and the federal government under the framework of the Commission.  The individual member states regulate the fishery within their state coastal waters via state statutes and regulations that must comply with, or exceed, the minimum standards in the Lobster Plan.  *See RIFA*, 585 F.3d at 46.  For federal waters, the U.S. Department of Commerce, through the National Marine Fisheries Service ("NMFS"), adopts regulations setting out lobster management measures that are complementary to the Lobster Plan and implements them via the federal permitting process for fishermen harvesting lobster in federal waters.  *See* 16 U.S.C. §§ 5101-5108; 50 C.F.R. § 697.4.  Therefore, neither the Commission nor its member states are constrained by the MSA or its National Standards in modifying the Lobster Plan or promulgating state regulations for the lobster fishery.

[6] The Addenda to Amendment 3 are available at https://asmfc.org/species/american-lobster.

*Development and Adoption of Addendum XXIX*

After identifying deficiencies in lobster fishery data,[7] the Lobster Management Board initiated Addendum XXIX "to consider implementing electronic vessel tracking requirements for federally[] permitted vessels in the lobster . . . fisher[y]."[8] Ex. 4 (Addendum XXIX), § 1.0, p. 1. The Board explained that the Addendum's goal "is to collect high-resolution spatial and temporal data" that will allow the Commission and member states to better characterize "effort"—that is, the location of fishing vessels and the location and density of fishing gear—in the American lobster fishery for "management and enforcement needs." *Id.*

Specifically, the Board initiated Addendum XXIX in the context of four "challenges the fishery is currently facing [that] pose a critical need for electronic tracking data." Ex. 4, § 2.1, p. 2. First, the Board explained that currently available data, including data collected from Vessel Trip Reports, is insufficiently detailed for management and scientific purposes, such as conducting stock assessments. *See id.*, §§ 2.1, 2.2.2, pp. 2-4. Second, the Board explained that the limitations of the currently available data make it difficult to contribute valuable information about commercial lobster fishing to NMFS's whale risk reduction efforts under the Atlantic Large Whale Take Reduction Plan ("ALWTRP").[9] *See id.*, § 2.1, p. 2. Third, the Board explained that

---

[7] *See* Brief of Amicus Curiae, submitted by the Commission, for additional information about the Board's activities leading to its approval of Addendum XXIX.

[8] Addendum XXIX was accompanied by Addendum IV to the Jonah Crab Fishery Management Plan. Although federal lobstering permits and Maine lobstering licenses are also crab fishing permits and licenses, for simplicity this brief refers exclusively to lobstering permits, lobstering licenses, and the lobster fishery.

[9] Plaintiffs severely mischaracterize the Board's discussion of the ALWTRP. Addendum XXIX in no way indicates that the Board intended to promote specific actions that NMFS has taken or might take as part of its whale risk reduction efforts. The Addendum simply acknowledges some basic truths: NMFS will continue to issue regulations that it believes are necessary to reduce the risk of harm to large whales; NMFS will likely include in future regulations restrictions on lobster fishing gear that could have a substantial economic impact on the industry; NMFS has used the limited data available about the distribution of commercial lobster fishing gear in its modeling of the perceived risks to whales; and if NMFS had more thorough and accurate data about commercial lobstering activity, the agency would be better informed, its models would be more accurate, and presumably its regulatory efforts would better reflect the actual conditions in the lobster fishery. *See* Ex 4, § 2.2.3, p. 4; Keliher Decl. ¶ 11; DeVoe Decl. ¶ 18.

better data will improve assessment of the potential effects on the lobster fishery of competing uses, such as aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration.  *See id.*, §§ 2.1, 2.2.4, pp. 2, 4-5.  The Board noted that the lack of sufficiently detailed fishery activity data currently hinders analysis of the potential effects of proposed projects on the lobster fishery.[10]  *See id*.  <u>Fourth</u>, the Board explained that better fishery activity data will improve the efficiency and effectiveness of limited enforcement resources in federal waters, with their "large geographic footprint and low density of lobster gear," thereby conserving the lobster resource and ensuring the ongoing viability of the commercial fishery.  *See id.*, § 2.1, p. 2; § 2.2.5, p. 5.

The Board also assessed what "ping rate" would capture the type of detailed data that would advance the Addendum's goal—that is, how often a vessel's electronic tracking device should capture and transmit the vessel's position.  The Board considered evidence that a rate of one ping per minute would capture information about the location and density of fishing gear that less frequent ping rates would miss.  *See* Declaration of William DeVoe ("DeVoe Decl.") ¶¶ 2, 13; Ex. 4, pp. 15-37.  The Board concluded that a rate of one ping per minute while the vessel is underway is necessary to accomplish the Board's goal of accurately characterizing activity in, and effectively managing, the lobster fishery.  *See* Ex. 5 (American Lobster Management Board Proceedings, Dec. 6, 2021), pp. 3, 11; *see also* DeVoe Decl. ¶¶ 2, 13-18.  Accordingly, in Addendum XXIX the Board required that any vessel tracking device "must collect location data at a minimum rate of one ping per minute for at least 90% of the fishing trip" because that rate

---

[10] Plaintiffs again completely distort Addendum XXIX by claiming it "identifies 'prioritiz[ing] the development of offshore renewable energy' as one of its driving purposes."  PI Mot. at 5.  Addendum XXIX actually states that "[r]ecent executive orders have prioritized the development of offshore renewable energy," simply acknowledging that forces outside the lobster fishery have the potential to significantly impact the fishery if competing uses are sited in areas where the fishery is active.  *See* Ex. 4, § 2.1, p. 2.

"is necessary to distinguish lobster fishing activity from transiting activity and can allow estimation of the number of traps per trawl." Ex. 4, § 3.1.1, p. 7.

After the Commission's approval of Addendum XXIX in March 2022, and to comply with Maine's obligations under the Compact, the Department promulgated Chapter 25.98 ("the DMR Rule"), with an effective date of November 5, 2023.[11]  *See* Exs. 6 (certified rule); 7 at p. 5 (rule adoption notice); 8 (final rule adoption materials).

***The DMR Rule***

The DMR Rule applies only to harvesters who hold both a Maine commercial lobster license and a federal lobster permit.[12]  *See* Ex. 6. §(A)(2).  It requires a license holder to install an approved electronic tracking device on the vessel listed on their license and maintain the device in operational order while the vessel is in use.[13]  *Id*. §§ (B)1, (C). An approved electronic tracking device is one that meets the specifications of, and has been approved by, the Commission pursuant to Addendum XXIX.[14]  *Id*. § (A)(1).  DMR has provided license holders with approved Particle

---

[11] Maine was the second Atlantic state to adopt a regulation pursuant to Addendum XXIX.  Massachusetts adopted a regulation effective May 1, 2023.  *See* 322 Code Mass. Regs. § 7.11.

[12] Maine-registered vessels must hold a Maine license as well as a federal permit to fish for lobster in federal waters. These vessels may also fish in Maine coastal waters.  Maine license holders who do not have a federal permit are limited to fishing in Maine's coastal waters (within three nautical miles of shore).  Keliher Decl. ¶ 8.

[13] As of December 15, 2023, it is unlawful for license holders to fish for lobster without having approved tracking devices installed and operating on their vessels, and license holders may not power down the device or tamper with it or its signal.  *See* Ex. 6, § (C).   However, several exceptions apply: (1) the device may be without an external power source when the vessel is moored or docked at berth; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from DMR while the situation is addressed.  *See id*.  Federal permit holders whose permitted vessel is no longer in use or who do not use lobster traps are exempt from the Rule.  *See id.* § (D).  A violation of the Rule is a "civil violation for which a fine of not less than $100 for each violation may be adjudged."  12 M.R.S. § 6174(3). A civil violation is subject to the due process provided through a court adjudication.  The Department may suspend a license without a prior adjudication based on the license holder's commission of marine resource violations, but such suspension is subject to procedural requirements and judicial review on appeal.  *See* 12 M.R.S. §§ 6351 *et seq*. To date, the Department has not issued any notices of violation of the Rule.  Keliher Decl. ¶ 21.

[14] Devices ping once per minute while the vessel is moving.  *See* Ex. 9 (tracker instructions), p. 1.  When the vessel is moored or docked, the ping rate drops to once every six hours.  *See id*.  The license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked.  *See* Ex. 6, § C(3).

TrackerOne devices, but a license holder can choose a different device from an approved list.[15] *See* Ex. 10.

Vessel tracking data is transmitted to the Atlantic Coastal Cooperative Statistics Program ("ACCSP"), an affiliate of the Commission that already collects data from multiple fisheries, including the lobster fishery. *See* Declaration of Patrick Keliher ("Keliher Decl.") ¶ 20; DeVoe Decl. ¶¶ 10, 12. ACCSP has protected confidential information relating to fisheries for years using the same electronic transmittal systems (approved by NMFS) and the Standard Atlantic Fisheries Information System ("SAFIS") database, as described in Addendum XXIX. *See* Ex. 4, § 3.2.3, pp. 12-14. ACCSP's Data Collection Standards describe a host of confidentiality protections that prohibit public access to confidential data and ensure that any data that is publicly released does not identify individual vessels or license holders. *See* Ex. 11 (ACCSP Data Collection Standards), pp. 21-23.[16] The Commission has also provided information to the public about data privacy. *See* Ex. 12 (ASMFC Vessel Tracking FAQs), p. 6.[17]

Ultimately, ACCSP applies Maine law to resolve any questions about releasing data collected pursuant to the DMR Rule. *See* Ex. 11, p. 22. Maine law requires that fisheries data be

---

[15] Plaintiffs surmise that the Particle TrackerOne devices may collect audio information, may use an algorithm that can predict vessel movements, and may collect and retain personally identifiable information. None of these assumptions is correct. The Particle TrackerOne device has only Bluetooth Low Energy, which can transmit small bits of data but not audio, and the device does not have a microphone. DeVoe Decl. ¶¶ 3-4. The device has no capacity to predict where a vessel will go. DeVoe Decl. ¶ 5. And Particle does not act as a data collector in this instance; rather, the company merely serves as a third-party processor. DeVoe Decl. ¶ 6. That is, personally identifiable information about individual license holders is neither collected nor stored by Particle, with the exception of the name of the vessel and the license holder and the hull number, which information is already publicly available. DeVoe Decl. ¶ 7. The language on Particle's website about using a person's image and likeness is likewise inapplicable to the Particle TrackerOne device, which cannot collect such information. DeVoe Decl. ¶ 8. Regardless, if Plaintiffs have any particular objection to using the Department-provided device, they can use one of the other tracking devices approved by the Commission. *See* Ex. 10 (ASFMC Vessel Tracking Informational Factsheet), *also available at* https://asmfc.org/uploads/file/6580caefVesselTrackingInfo_December2023.pdf.

[16] *Available at* https://www.accsp.org/what-we-do/data-standards/.

[17] *Available at* https://www.asmfc.org/uploads/file/62473e68ElectronicVesselTrackingLobster_Jonah_FAQs.pdf.

kept confidential and not be disclosed in a manner that permits identification of any person or vessel.  12 M.R.S. § 6173.  Department regulations require that publicly released data does not identify individual vessels or license holders.[18]  *See* 13-188 C.M.R. ch. 5.  In sum, Maine law and regulation protects the data that the tracking devices collect and transmit to ACCSP pursuant to the DMR Rule, just as it has protected other fisheries data collected and transmitted to ACCSP over the years by the Department and by Maine license holders.  *See* Keliher Decl. ¶ 20.

## III.    ARGUMENT

A preliminary injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To establish that they are entitled to a preliminary injunction, Plaintiffs must show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023).  "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  Plaintiffs have failed to demonstrate they are likely to succeed on the merits, the only factor to which their Motion gives significant attention. The Court should therefore deny their motion on that basis.  But even if the Court disagrees as to Plaintiffs' likelihood of success, they have not demonstrated that the other factors weigh in favor of preliminary relief.

---

[18] During the rulemaking process, the Department noted that "[t]he spatial information collected through the electronic tracking devices is designated as confidential through Maine law and regulation."  *See* Ex. 8, p. 13.  The Department also reminded lobstermen of this protection in the materials it sent them with the Particle TrackerOne devices.  *See* Ex. 9, *also available at* https://www.maine.gov/dmr/fisheries/commercial/fisheries-by-species/lobsters/trackers.

## A. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

### 1. Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their Fourth Amendment Claim

Contrary to Plaintiffs' contention, the DMR Rule's requirement that certain license holders install electronic trackers on their fishing vessels meets the test for a valid "administrative search" of a closely regulated industry.[19]

#### i. Because the DMR Rule's electronic tracker requirement constitutes an administrative search of a closely regulated industry, the Fourth Amendment issue before the Court is a narrow one.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. It is well-established that "warrantless searches of private premises are presumptively unreasonable." *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)). However, courts have recognized several exceptions to this presumption of unreasonableness. Of relevance here, an "administrative search" is a warrantless search that "serve[s] a 'special need' other than conducting criminal investigations." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015). Generally, these warrantless searches do not violate the Fourth Amendment if the subject of the search is afforded an opportunity for pre-compliance review before a neutral decisionmaker. *Id.*

Where the search is of commercial premises in a "closely regulated" industry, however, an even "more relaxed standard" applies. *Patel,* 576 U.S. at 424. Such a search does not infringe the Fourth Amendment if there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; the search is necessary to furthering that interest; and the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the

---

[19] For purposes of this Opposition to Plaintiffs' PI Motion, Defendant agrees that the electronic tracking requirement constitutes a search within the meaning of the Fourth Amendment.

commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *New York v. Burger*, 482 U.S. 691, 702-03 (1987); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216-217 (1st Cir. 2015) (articulating the "*Burger* test"); *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (same). The "more relaxed standard" for administrative searches of closely regulated industries applies precisely because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home [and] is particularly attenuated in commercial property employed in 'closely regulated' industries." *Burger*, 482 U.S. at 700; *see also Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) ("[T]he owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises.").[20]

Plaintiffs attempt to confuse the narrow Fourth Amendment issue before this Court. They acknowledge that this case implicates the well-established exception to the warrant requirement for administrative searches of closely regulated industries—here, the commercial fishing industry.[21] *See* PI Mot. at 12 ("[T]his so-called 'closely-regulated-industry doctrine' operates as an

---

[20] This lower expectation of privacy in commercial premises also applies when the "premises" is a vehicle. *See United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) (noting, in analyzing administrative searches of commercial trucks, that "[f]or purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles").

[21] Plaintiffs rightly "concede that commercial fishing is a closely[] regulated industry." PI Mot. at 12 (citing *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry.")); *see also Lovgren v. Byrne*, 787 F.2d 857, 865 & n.8 (3d Cir. 1986) (noting that "the fishing industry has been the subject of pervasive governmental regulation almost since the founding of the Republic" and collecting cases). Since *Raub* and *Lovgren*, the Supreme Court has questioned the scope of the closely regulated industry doctrine and noted that the Court itself has only recognized four industries (liquor sales, firearms dealing, mining, and automobile junkyards) as "closely regulated." *Patel*, 576 U.S. at 424. However, the Court's actual holding in *Patel* was only that "hotels" in general do not constitute a closely regulated industry. *Id.* at 425-26. And post-*Patel*, courts have continued to recognize various industries as closely regulated. *See Killgore v. City of South El Monte*, 3 F.4th 1186, 1189 & n.4 (9th Cir. 2021) (recognizing the continuing viability of pre-*Patel* characterizations of "salmon fishing, commercial fishing, family day care homes, transportation of hazardous materials, veterinary drugs, foreign trade zones, and commercial trucking" as closely regulated industries); *id.* at 1190-92 (determining that the "massage industry" is closely regulated and noting the post-*Patel* characterization by other courts of "dump trucks," "precious metals," "commercial trucking" and "pain management clinics" as closely regulated). Since *Patel*, the First Circuit has suggested that "adult entertainment machines" used for gambling are "closely regulated," *Rivera-Corraliza*, 794 F.3d at 219, and cited pre-*Patel* case law to support the conclusion that the pharmaceutical industry is closely regulated,

exception to the general rule that warrantless searches are unreasonable.").  Yet they resist what necessarily follows—that their expectation of privacy while engaging in a closely regulated industry is "particularly attenuated."[22]  *Burger*, 482 U.S. at 700.  Specifically, Plaintiffs posit that "even warrantless searches in a closely regulated commercial fishing industry are unconstitutional if vessel operators have a legitimate expectation of privacy to the whole of their movements while at sea."  PI Mot. at 12 (internal quotation marks omitted).  But Plaintiffs provide no support for this proposed *exception to the exception*—an unprecedented carve-out from administrative search law for cases involving "movements while at sea."[23]

Plaintiffs do not cite a single case for the proposition that an otherwise valid administrative search is unlawful if the search involves a person's "movements."  The cases Plaintiffs cite do not

---

*U.S. DOJ v. Ricco Jonas*, 24 F.4th 718, 734-35 (1st Cir. 2022).  Although the Fifth Circuit recently suggested it was "not so sure" that the "commercial fishing industry" is closely regulated, the court expressly declined to address the question given that the case before it involved the "charter boat fishing industry."  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 968-69 (5th Cir. 2023).

[22] This brief, like Plaintiffs' Motion, focuses on Plaintiffs' privacy expectations in their movements while engaging in the lobster fishery and in their fishing "trade secrets."  *See* PI Mot. at 16 ("[F]ishermen have a reasonable expectation of privacy not only in their physical movements, but in the precise location of  their fishing grounds."); *id.* at 23 (speculating about the potential "economic implications of these privacy concerns" if fishing location data were to be widely disseminated).  Plaintiffs assert in passing that fishing vessels covered by the DMR Rule are also occasionally used for other purposes.  But Defendant respectfully submits that Plaintiffs' preliminary injunction motion, which mounts a facial attack on the DMR Rule, is not the proper vehicle for addressing these sporadic applications.  *See Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (plaintiffs mounting a facial challenge must "establish that no set of circumstances exists under which the [regulation] would be valid" (internal quotation marks omitted)).  Regardless, Plaintiffs have provided no support for the proposition that they have a reasonable expectation of privacy in their movements while fishing for non-lobster species or engaging in search-and-rescue operations at sea.  To the extent Plaintiffs have a reasonable expectation of privacy in their movements while using their fishing vessels for recreational cruises, the collection of location data from these sporadic trips as an occasional incident to the valid administrative search regime likely falls within the de minimis exception to the Fourth Amendment's warrant requirement.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (characterizing a minor additional intrusion upon an individual's privacy beyond the bounds of a valid Fourth Amendment stop as "de minimis" and not constitutionally cognizable); *Taylor v. City of Saginaw*, 620 F. Supp. 3d 655, 664 (E.D. Mich. 2022) ("Properly understood, the *de minimis* exception allows government officials to make minor, warrantless intrusions in favor of only 'substantial' government interests." (citing *United States v. Jacobsen*, 466 U.S. 109, 125 (1984))).

[23] Plaintiffs' garbled use of language from *Mexican Gulf Fishing* is misleading and inapposite.  In that case, the Fifth Circuit considered whether charter boat owners "have a legitimate expectation of privacy to the whole of their movements while at sea" only after the court had determined that the "charter boat fishing industry" is not closely regulated and therefore that the framework for analyzing administrative searches of closely regulated industries did not apply.  *Mexican Gulf Fishing Co.*, 60 F.4th at 970.

involve administrative searches of closely regulated industries and are inapposite.  In *Carpenter v. United States*, 585 U.S 296, 310 (2018), the Supreme Court considered an individual's legitimate expectation of privacy "in the record of his physical movements" as captured through detailed cell-site location information and gathered as part of a criminal investigation.  The Court concluded that individuals have a legitimate expectation of privacy in their movements as they go about their everyday lives because detailed data about such movements "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."  *Id.* at 311 (internal quotation marks omitted).  Similarly, in *Leaders of a Beautiful Struggle  v. Baltimore Police Department*, 2 F.4th 330, 341 (4th Cir. 2021), the Fourth Circuit considered the privacy implications of "prolonged tracking that can reveal intimate details through habits and patterns."  The movements of Plaintiffs' vessels while engaging in the closely regulated commercial fishing industry do not implicate these concerns about the revelation of such "intimate details."  In other words, the mere fact of electronic tracking of vessel movements does not somehow heighten the privacy interests involved to the extent that the framework for administrative searches of closely regulated industries no longer applies.

Nor does the fact that the tracking occurs "at sea" heighten the privacy interests at stake.  To the contrary, people operating vessels at sea ordinarily have a reduced expectation of privacy, regardless of whether they are engaging in a closely regulated industry.  A vessel at sea, unlike a personal vehicle on a highway or a pedestrian on a public street, can be stopped for document checks and safety inspections at any time even without reasonable suspicion.  *See United States v. Villamonte-Marquez*, 462 U.S. 579, 592-93 (1983); *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *State v. Giles*, 669 A.2d 192, 193 (Me. 1996).  Indeed, Maine law provides that any person who "receives a [marine resources] license . . . has a duty to submit to inspection and search

for violations related to the licensed activities by a marine patrol officer" and that "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . may be searched or inspected at any time."  12 M.R.S. § 6306(1).

Finally, Plaintiffs have provided no relevant support for the contention that their purported "trade secrets" heighten their otherwise attenuated privacy interest.  This is unsurprising considering that nearly every closely regulated industry involves what could loosely be called "trade secrets." The target of an administrative search is often precisely those documents and other materials containing such information.  *See U.S. DOJ v. Ricco Jonas*, 24 F.4th 718, 734 (1st Cir. 2022)  ("The closely regulated industry doctrine recognizes that there is a diminished expectation of privacy for materials that are maintained by a business that is subject to pervasive regulation and inspection."). It is especially difficult to comprehend how the location of Plaintiffs' lobster traps could constitute sensitive trade secrets considering that (1) traps must be marked for identification, *see* 13-188 C.M.R. ch. 25.08, and (2) traps are placed in the open ocean, where marker buoys are subject to visual identification by anyone in the vicinity, *see Oliver v. United States*, 466 U.S. 170, 179 (1984) (noting that so-called "open fields" "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance").[24]

Therefore, this Court should reject Plaintiffs' attempts to confuse the issue and turn to the relevant question of whether the DMR Rule satisfies the requirements for an administrative search of a closely regulated industry.  For the reasons below, this Court should conclude that the Rule does satisfy those requirements.

---

[24] Plaintiffs' reliance on the Fifth Circuit's "serious concerns that the GPS requirement violates the Fourth Amendment" in *Mexican Gulf Fishing* is again misplaced.  *See Mexican Gulf Fishing Co.*, 60 F.4th at 970.  The court's statement, which is dicta, is of limited relevance to this case.  The court was opining upon the Fourth Amendment implications of location data collection from the "charter boat fishing industry," which the court specifically noted is distinct from the "commercial fishing industry" and "more recreational than it is commercial in many respects."  *Id.* at 960-61, 969, 970.

### ii. The DMR Rule satisfies the requirements for an administrative search of a closely regulated industry.

### a. The DMR Rule furthers a substantial government interest.

A lawful administrative search of a closely regulated industry must be necessary to furthering a substantial government interest. *See Burger*, 482 U.S. at 702. DMR undoubtedly has a substantial interest in regulating the lobster fishery and ensuring its long-term viability as an economic and cultural pillar of Maine society. *See* Keliher Decl. ¶ 3; *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1123 (9th Cir. 2014) (stating, "[t]o be sure, protecting the fishery is an important governmental interest"). And the DMR Rule is necessary to furthering that substantial interest. As outlined above, *see* Section II *supra*, the detailed data based on a one-minute ping rate that will be collected from the electronic trackers is necessary to characterizing accurately activity in the fishery, including the locations and density of commercial fishing gear, which is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock assessment. *See also* Keliher Decl. ¶ 18; Devoe Decl. ¶¶ 2, 13-18.

Contrary to Plaintiffs' contention, the current system of self-reported data—or Plaintiffs' suggested "spot checks"—lacks the accuracy, reliability, and precision that would allow DMR and other fishery managers to characterize a fishery occurring over vast areas and far from shore. *See* Ex. 4, § 2.1; DeVoe Decl. ¶ 18; Keliher Decl. ¶¶ 10-14. DMR has reasonably concluded that an alternative system by which lobstermen could turn the tracking systems off and on based on when they self-report lobster fishing would compromise reliability. Keliher Decl. ¶ 19; DeVoe Decl. ¶ 19. Simply put, not only is DMR required to implement the Rule under the Compact, but DMR has also concluded, based on scientific evidence and its fishery management expertise, that the electronic tracking requirement is necessary to protect and manage the fishery. Plaintiffs—who, again, have the burden of demonstrating a likelihood of success on their claim, *We the People PAC v. Bellows*,

15

40 F.4th 1, 8 (1st Cir. 2022) —have offered nothing more than a bare assertion to the contrary.[25]

### b. The DMR Rule performs the basic functions of a warrant.

The DMR Rule also "perform[s] the two basic functions of a warrant" by "[1] advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and . . . [2] limit[ing] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. First, the Rule clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms. *See Tart v. Commonwealth of Mass.*, 949 F.2d 490, 498 (1st Cir. 1991) (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports"). Second, the Rule properly limits government discretion by tracking only location data of licensed commercial fishing vessels. In this way, the Rule is comparable to other administrative search regimes that have been approved as properly limited under the *Burger* test.

For example, in *Burger*, the Supreme Court concluded there were "appropriate restraints upon the discretion of inspecting officers" where "[t]he inspections can be made only of vehicle-dismantling and related industries" and "the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements" of the relevant statute. *Burger*, 482 U.S. at 711

---

[25] Once again, Plaintiffs' reliance on *Mexican Gulf Fishing* is misplaced. In that case, the relevant regulation required charter fishing boat owners to, among other things, install vessel tracking systems that transmit GPS data to the government. *Mexican Gulf Fishing Co.*, 60 F.4th at 961. The court ultimately set the regulation aside, concluding that it violated the federal Administrative Procedure Act in multiple ways. *Id.* In opining that the GPS data was "entirely duplicative" of existing self-reported data, the court stated that the GPS data "only tells the [g]overnment what it already knows: when a charter boat embarks on a trip, how long it is gone, and when it returns." *Id.* at 973. Here, of course, the detailed, minute-by-minute location data collected pursuant to the DMR Rule is completely different from the bare bones data described as "duplicative" by the Fifth Circuit.

(internal quotation marks omitted).   Courts have approved administrative searches with comparably specific limits on government discretion.  *See Gonsalves*, 435 F.3d at 68 (approving administrative searches of drug-storage facilities "to determine whether any of the provisions [of the relevant pharmaceutical control law] are being violated, and to secure samples or specimens" (internal quotation marks omitted)); *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009) (same as to administrative searches of commercial vehicles on public highways for certain cargo and documents presenting potential regulatory violations); *Killgore v. City of South El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021) (same as to "reasonable inspections of any massage establishment . . . to ensure compliance with" regulations (internal quotation marks omitted)).

There is one obvious aspect of the searches in this case that differs from the usual administrative search of a business which may be limited to certain hours.  *See, e.g., Killgore*, 3 F.4th at 1192 (noting that searches of massage businesses were limited to "regular business hours").  Vessel location data collection under the DMR Rule has no obvious restrictions on timing—data is collected around-the-clock whenever a vessel is in operation.  The *Burger* court, however, made clear that temporal limitations on administrative searches are only relevant to the extent they demonstrate that the administrative search regime "place[s] appropriate restraints upon the discretion of the inspecting officers."  *Burger*, 482 U.S. at 711.  That is, timing restrictions for timing restrictions' sake are not necessary, and courts have approved administrative searches with no time limitations.  For example, in *Tart*, the First Circuit considered the constitutionality of administrative searches pursuant to a Massachusetts statute providing that state fishing permits "shall be produced for examination upon demand of any authorized person" with no restriction on when such requests could be made.  949 F.2d at 497.  Considering the third prong of the *Burger* test, the court concluded that the statute, "although a tersely phrased authorization to conduct

documentation checks," appropriately limited "the exercise of the fisheries officer's discretion in the field." *Id.* at 498. The court explicitly noted that a statute authorizing an administrative search "need not in all circumstances prescribe exhaustive restrictions limiting the target, time and place of the inspection." *Id.* As the court concluded, "[c]onsidered in the context of the entire regulatory scheme applicable to the commercial fishing industry . . . [t]he minimally intrusive nature of a proper verbal request to produce required documentation, and the importance of the governmental interests served by the Commonwealth's permitting requirement, satisfy us that the documentation inspection in this case did not offend the fourth amendment." *Id.* at 499.

Similarly, in *Ponce-Aldona*, the Eleventh Circuit concluded that a regime of unannounced, warrantless stops and searches of commercial vehicles on public highways did not violate the Fourth Amendment despite the complete lack of "time and place restrictions" on the searches. 579 F.3d at 1226. The court stated that "the absence of such restrictions is insignificant in the context of regulation of the commercial trucking industry" because "neither time nor place restrictions would be feasible"—commercial trucks operate 24 hours a day and could avoid fixed highway checkpoints. *Id.* More recently, the First Circuit noted that "a regime may pass the *Burger* test even if there are no time limits—context is key" and cited *Ponce-Aldona* for the proposition that administrative search "schemes with no timing limits [are constitutional] if such limits would make inspections unworkable." *Rivera-Corraliza*, 794 F.3d at 221.

The DMR Rule presents the circumstances identified in *Tart* and *Ponce-Aldona*. As in *Tart*, the collection of location data at issue here is minimally intrusive in the context of the "entire regulatory scheme applicable to the commercial fishing industry." 949 F.2d at 499. Specifically, the nature of the search in this case—the collection of a vessel's location data by a tracking device—is less intrusive than the suspicionless boarding and search of a vessel, which is already authorized

under state and federal law.  *See* Section III.A.1.i *supra*.  There is a manifest distinction in the degree of intrusiveness between a tracker collecting data and an officer boarding and visually inspecting a vessel and its occupants.  As in *Ponce-Aldona*, timing restrictions on the electronic data collection would not be feasible because like commercial trucking, commercial lobstering does not follow regular business hours.  *See* 579 F.3d at 1226; Keliher Decl. ¶ 19.  As explained above, *see* Section III.A.1.ii.a *supra*, allowing vessel owners to turn the tracker on and off at their discretion—for example, when they self-report that they are not using the vessel to fish for lobster—would seriously undermine the reliability and administrability of the entire data collection program.[26]

### iii.  Plaintiffs' remaining arguments that the DMR Rule violates the Fourth Amendment are unavailing.

Beyond their unsupported argument regarding their privacy interests, *see* Section III.A.1.i *supra*, Plaintiffs rely on bare assertions or speculation, which cannot support preliminary relief. *See We the People PAC*, 40 F.4th at 26 ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction." (quoting *In re Rare Coin Galleries, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988))).  For example, Plaintiffs' assertions that the Department has not attempted to limit the Rule to "only what is necessary" or that the Rule "does nothing to conserve the lobster fishery" are entirely unsupported and run headlong into the Department's reasonable conclusion that the Rule as currently formulated is necessary to protecting the future of the lobster fishery.[27]  *See* Keliher Decl. ¶ 22; DeVoe Decl. ¶¶ 13-19; Ex.

---

[26] That said, as noted above, the DMR Rule does feasibly limit data collection by allowing an infrequent "ping" rate when a vessel is in port and by allowing vessel owners to apply for authorization to turn a tracker off when "the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device."  Ex. 6, § (C).

[27] Plaintiffs' assertion that the lobster vessel trackers are required to "ping" at a greater frequency than trackers required in the scallop fishery is a non-sequitur because Plaintiffs do not even attempt to demonstrate that the scallop fishery presents the same data collection needs and challenges as the lobster fishery, or that scallops are fished in a similar manner using similar gear.

4, § 2.1, p. 2.  Similarly, Plaintiffs offer sinister but confusing hints about possible future uses of the data that are reminiscent of dystopian science fiction novels but entirely fail to show that the presently contemplated uses of the data are unlawful.  Plaintiffs do not argue, for example, that the mere use of the location data in criminal or civil enforcement actions would render the DMR Rule unconstitutional, and binding precedent forecloses that argument.  *See Burger*, 482 U.S. at 704-05 (discussing an administrative search regime where business owners were subject to criminal penalties, loss of license, or civil fines for violations of the regulations the searches were conducted to enforce); *id.* at 716 ("Nor do we think this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself.").[28]

For these reasons, the DMR Rule's electronic tracking requirement constitutes a lawful administrative search of a closely regulated industry and Plaintiffs have failed to demonstrate a likelihood of success on their Fourth Amendment claim.

### 2.  Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their Equal Protection Clause Claim

Plaintiffs contend that the DMR Rule violates the Equal Protection Clause of the U.S. Constitution because it treats lobstermen with Maine licenses and federal lobstering permits (who are subject to the Rule) differently than lobstermen with only Maine licenses (who are not).  To establish such a claim, a plaintiff must demonstrate that "compared with others similarly situated, [the plaintiff] was selectively treated . . . based on impermissible considerations such as race,

---

[28] Despite raising concerns about data security, Plaintiffs do not cite to a single case holding that hypothetical data breaches or erroneous public disclosure of private information by government officials or by a non-governmental entity such as Particle renders an otherwise valid administrative search regime unconstitutional.  Regardless, although Defendant does not have the burden to disprove speculation, Plaintiffs' imagined threats to their privacy do not account for the stringent existing confidentiality protections in Maine law or the Commission's history of responsibly handling potentially confidential fishery data.  *See* Section II *supra*.

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004) (internal quotation marks omitted) (emphasis omitted).  Differential treatment alone is not enough; the differential treatment must be based on an invidious consideration.  *See Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010) ("Statutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974))).  Even assuming for purposes of this Opposition that Plaintiffs are similarly situated to the group they identify—lobstermen with only a Maine license—in all relevant respects,[29] Plaintiffs have failed to even allege, let alone demonstrate, invidious discrimination. And to the extent Plaintiffs contend that the DMR Rule is subject to strict scrutiny solely because it "impinges"—that is, negatively impacts—a constitutional right, this contention fails for the same reasons as their Fourth Amendment claim.[30]  This Court should therefore determine that Plaintiffs have failed to demonstrate a likelihood of success on their Equal Protection claim.

### 3.  Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their Void-For-Vagueness Claim

A rule is unconstitutionally vague only when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited[] or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008). Plaintiffs do not identify in their motion what terms of the DMR Rule they claim are

---

[29] To state the obvious, lobstermen with federal lobstering permits can fish in federal waters while lobstermen with only Maine licenses cannot.  *See* Keliher Decl. ¶ 8.

[30] Because the DMR Rule is not based on invidious discrimination and does not impinge on a constitutional right, it is subject to rational basis review.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  Here, the Rule, and the distinction it draws between groups of lobstermen, is rationally related to the State's legitimate interest in ensuring the long-term viability of the lobstering industry and addressing the challenges of marine mammal protection, competing uses, and enforcement that are particularly acute in federal waters, where Maine lobstermen with federal permits fish.  *See* Keliher Decl. ¶¶ 2-3, 8-22; Ex. 4, § 2.1, p. 2.  Plaintiffs' contention that "the interest at issue here is only a federal one" is baseless and absurd.

unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement. Rather, they opine that the Rule is impermissibly vague because the consequences of violating it are unclear. Even assuming the precise penalties a person may incur from violating a Rule are the subject of constitutional vagueness analysis—and Plaintiffs have not cited a single case for that proposition—they are wrong on the facts.

As noted above, under Maine law, a violation of the DMR Rule is a civil violation incurring a fine of not less than $100 and could lead to a possible state license suspension. *See supra* note 13. And any violation is subject to the same process and procedures—including appellate procedures—as any other violation of a DMR Rule. *Id.* It is simply not true that covered vessel owners are in the dark about the potential consequences of their conduct, especially considering that they operate in a highly regulated industry and can be expected to know the applicable regulations. *See United State v. Facteau*, 89 F.4th 1, 33 (1st Cir. 2023) ("For provisions that concern economic regulation . . . the [unconstitutional vagueness] test is whether a 'business person of ordinary intelligence would understand' what conduct is prohibited—a 'less strict vagueness test.'" (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)) (emphasis omitted)). Nor have Plaintiffs cited a single case supporting their suggestion that questions about the use of the location data to enforce *other laws* is relevant to their facial challenge of the DMR Rule. In short, vagueness can void a rule only when "its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Here, the DMR Rule clearly defines the conduct it prohibits, is not so standardless as to encourage discriminatory enforcement, and is therefore not unconstitutionally vague.

### 4. Plaintiffs Have Not Demonstrated A Likelihood Of Success On Their State Law Claims

This Court should swiftly reject Plaintiffs' claims based in state law. The Eleventh Amendment to the U.S. Constitution "denies federal courts jurisdiction to award injunctive relief against state officials based upon violations of state law." *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 (1st Cir. 2009) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)); *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 22 (1st Cir. 2022) (noting "that the plaintiffs may obtain relief only if they establish that the [state] court officials violated the First Amendment, not merely state law"). Therefore, when a plaintiff asks a federal court to compel state officers to comply with state law—even in a suit also bringing claims grounded in federal law—the only appropriate response is to dismiss the state law claims. *See Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option."); *Pennhurst*, 465 U.S. at 121 (noting, "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment.").

The Eleventh Amendment requires dismissal of Plaintiffs' state law claims and Plaintiffs have therefore failed to demonstrate a likelihood of success on those claims in this Court.

### B. PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH IN THEIR FAVOR

Plaintiffs are only entitled to the extraordinary remedy of preliminary injunctive relief if they can demonstrate a likelihood of success on the merits. *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022); *New Comm Wireless Servs., Inc.*, 287 F.3d at 9. Because Plaintiffs have failed to do so, this Court should deny their motion. But even considering the other preliminary injunction factors, Plaintiffs have failed to demonstrate an entitlement to preliminary relief.

*Irreparable Harm*

Even if plaintiffs demonstrate a likelihood of success on the merits, they must still make "some positive showing of irreparable harm." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 43 (1st Cir. 2010). Plaintiffs have failed to make that showing, for two major reasons. <u>First</u>, Plaintiffs largely point to harms that are not *irreparable*. Regarding the potential harm Plaintiffs claim to their "hard earned business advantages," PI Mot. at 23, "it has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable," *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009); *see also Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (defining irreparable harm as "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy"). Although some economic losses can be so catastrophic as to warrant injunctive relief, *see Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 63 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022), Plaintiffs have not claimed, let alone demonstrated, that their potential economic damages will be so severe that they will no longer be able to operate in the lobster fishery if the Rule is allowed to continue in effect pending an adjudication on the merits. Regarding the potential harm to Plaintiffs' privacy interests, the risk of harm is low for the reasons state above—that is, Plaintiffs have not demonstrated that the DMR Rule violates the Fourth Amendment, Plaintiffs' relevant privacy interests are "particularly attenuated," and the intrusion on Plaintiffs' privacy effected by the collection of vessel location data is minimal. *See* Section III.A.1 *supra*.

<u>Second</u>, Plaintiffs have failed to demonstrate that any irreparable harm is "likely"—not just possible, conceivable, or a worst-case scenario. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization

of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Plaintiffs' only concrete example of irreparable harm is a speculative scenario in which location data becomes part of the record in a hypothetical future legislative or administrative proceeding and is publicly revealed through a subsequent legal challenge in that proceeding. *See* PI Mot. at 23. Such speculation about hypothetical proceedings or hypothetical data breaches not only ignores the data protections that are in place but also misconstrues the facts and fails to come anywhere near demonstrating that irreparable harm is "likely" pending a full adjudication on the merits. *See* Section II *supra*.

*Balance of Equities and Consideration of the Public Interest*

The final preliminary injunction factors, the balance of equities and consideration of the public interest, merge when the government is the party opposing a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). On one side of the balance, the Department has a substantial interest in gathering the detailed location data that will enable it to better characterize the lobster fishery, including the location of fishing gear, and address serious challenges to the fishery. *See* Keliher Decl. ¶¶ 3, 9-19, 22; Ex. 4, § 2.1, p. 2. Any delay in collecting this data will hinder DMR's ability to address these challenges now and as they arise. DeVoe Decl. ¶ 18; Keliher Decl. ¶¶ 9-14, 22. On the other side of the balance, Plaintiffs have failed to demonstrate that the DMR Rule will be more than a minimal intrusion on their "particularly attenuated" privacy interests as operators in the closely regulated commercial lobster fishery—an industry in which they are already subject to more intrusive measures, such as the boarding of their vessels for compliance and document checks. In sum, Plaintiffs have failed to demonstrate that these factors weigh in favor of granting the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated:  March 1, 2024                    Respectfully submitted,

                                         AARON M. FREY
                                         Attorney General


                                         */s/ Valerie A. Wright*
                                         Valerie A. Wright
                                         Jack Dafoe
                                         Assistant Attorneys General
                                         6 State House Station
                                         Augusta, ME  04333-0006
                                         Tel. (207) 626-8800
                                         Valerie.A.Wright@maine.gov
                                         Jack.Dafoe@maine.gov

                                         Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter, as follows:

Alfred Cecil Frawley, IV
McCloskey, Mina, Cunniff, & Frawley LLC
12 City Center
Portland, ME 04101
(207) 772-6805
afrawley@lawmmc.com

Thimi R. Mina
McCloskey, Mina, Cunniff, & Frawley LLC
12 City Center
Portland, ME 04101
(207) 772-6805
tmina@lawmmc.com

Sean H. Donahue
Donahue, Goldberg & Herzog
1008 Pennysylvania Ave., SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com

Dated: March 1, 2024                    */s/ Valerie A. Wright*
                                        Valerie A. Wright
                                        Assistant Attorney General
                                        6 State House Station
                                        Augusta, ME 04333-0006
                                        Tel. (207) 626-8800
                                        Valerie.A.Wright@maine.gov