UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK THOMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 1:24-cv-00001-JAW |
| | ) | |
| PATRICK KELIHER, in his official | ) | |
| capacity as COMMISSIONER, MAINE | ) | |
| DEPARTMENT OF MARINE | ) | |
| RESOURCES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS
## AND MEMORANDUM OF LAW

Defendant Patrick Keliher, Commissioner, Maine Department of Marine Resources ("DMR" or "Department"), hereby moves to dismiss Plaintiffs' Complaint (ECF No. 1) pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## I.    INTRODUCTION

Based on their combined scientific and regulatory expertise, Maine and the other states that collaboratively manage the American lobster fishery have determined that precise, reliable data about the location of lobster fishing activity is necessary to effectively manage the fishery for the future.  To that end, DMR has promulgated a Rule requiring the installation of electronic devices on certain commercial lobstering vessels to collect precise data about where lobster fishing is occurring.  Plaintiffs seek to enjoin this well-grounded Rule concerning the highly regulated commercial lobstering industry.  But even accepting Plaintiffs' factual allegations and drawing all inferences in their favor, they have failed to plausibly plead any entitlement to relief. The Court should dismiss their claim based on alleged violations of state law because the Eleventh

Amendment bars this Court's consideration of such a claim.  And the Court should dismiss their various federal constitutional claims because Plaintiffs have failed to plausibly plead any violation of their constitutional rights.

## II.    FACTS[1]

### *The Atlantic States Marine Fisheries Commission and the Management of the American Lobster Fishery*

Since 1942, Maine has been a party to the Atlantic States Marine Fisheries Compact, an agreement between the Atlantic coastal states (including the District of Columbia) to "exercise joint regulatory oversight of their fisheries."[2]  *Medeiros v. Vincent*, 431 F.3d 25, 27 (1st Cir. 2005); P.L. 1941, ch. 314.  Maine is thus a member of the Atlantic States Marine Fisheries Commission ("ASMFC" or "Commission"), the interstate organization that implements the Compact.[3]  *See* 12 M.R.S. §§ 4651-4656.  To that end, the Commission establishes interstate fishery management plans setting forth minimum conservation standards that states must conform to (or exceed) by appropriate modifications to their state laws or regulations.[4]  *See R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009) ("*RIFA*");

---

[1] The background facts recited in this Motion are matters of public record not susceptible to dispute; are alleged in Plaintiffs' Complaint; or are drawn from the exhibits attached to the Complaint and materials incorporated by reference or relied upon in the Complaint.  *See Lowe v. Mills*, 68 F.4th 706, 713-14 (1st Cir. 2023); *Rivera v. Kress Stores of P.R., Inc.*, 30 F.4th 98, 102 (1st Cir. 2022).

[2] Congress approved the Compact pursuant to Art. I, § 10, cl. 3 of the Constitution.  *See* Pub. L. No. 77-539 (1942), as amended by Pub. L. No. 81-721 (1950).

[3] Each member state appoints three representatives to the Commission: its director of marine fisheries (here, Commissioner Keliher); a state legislator; and a public member with fisheries experience who is appointed by its governor.  *See* 12 M.R.S. § 4652; Compl. ¶ 18.

[4] States have primary responsibility for the conservation and management of fisheries within the territorial sea (in Maine's case, coastal waters within three nautical miles of shore).  *See* 43 U.S.C. §§ 1301-1315; 12 M.R.S. § 6001(6).  Management within the Exclusive Economic Zone—from three to 200 nautical miles from shore—is the primary responsibility of the federal government.  *See, e.g.*, 16 U.S.C. § 1856(a).  DMR has authority to enforce Maine's marine resources laws and regulations in federal and State waters.  *See* 12 M.R.S. § 6002(3).

*Medeiros*, 431 F.3d at 27-28. The Commission, through its American Lobster Management Board, coordinates the management of lobster fishing in its member states' jurisdictional waters pursuant to Amendment 3 to the Commission's Interstate Fishery Management Plan for American Lobster (the "Lobster Plan") and Addenda I-XXIX.[5] *See Medeiros*, 431 F.3d at 27-28.

Since Congress's 1993 enactment of the Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA"), Pub. L. No. 103-206 (1993), 16 U.S.C. §§ 5101-5108, the Commission's fishery management plans have been backed by federal law. Pursuant to the ACFCMA, the Commission must, among other things, "prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources," review states' implementation and enforcement of its plans, and "report the results of the reviews" to the Secretary of Commerce. 16 U.S.C. § 5104. Should a member state fail to implement an essential element of a Commission plan, the Commission must notify the Secretary. *Id.* § 5105(b). If the Secretary independently determines that a state has failed to implement measures necessary for conservation, "the Secretary shall declare a moratorium on fishing in the fishery in question within the waters of the noncomplying State." *Id.* § 5106(c)(1).

---

[5] Some fisheries overseen by the Commission are also managed by regional fishery management councils established under the Magnuson-Stevens Act ("MSA"), one of which is the New England Fishery Management Council ("NEFMC"). *See* 16 U.S.C. § 1852(a)(1)(A). These councils develop federal fishery management plans for certain fisheries in their regions that must meet the objectives of the MSA's National Standards. *See id.* § 1852(h). But there is no such fishery management plan through the NEFMC for American lobster. *See* https://www.nefmc.org/ (listing NEFMC fishery management plans) (last accessed Apr. 8, 2024). Instead, pursuant to the Atlantic Coastal Fisheries Cooperative Management Act, the American lobster fishery is cooperatively managed by the states and the federal government under the framework of the Commission. The individual member states regulate the fishery within their state coastal waters via state statutes and regulations that must comply with, or exceed, the minimum standards in the Lobster Plan. *See RIFA*, 585 F.3d at 46. For federal waters, the U.S. Department of Commerce, through the National Marine Fisheries Service, adopts regulations setting out lobster management measures that are complementary to the Lobster Plan and implements them via the federal permitting process for fishermen harvesting lobster in federal waters. *See* 16 U.S.C. §§ 5101-5108; 50 C.F.R. § 697.4. Therefore, neither the Commission nor its member states are constrained by the MSA or its National Standards in modifying the Lobster Plan or promulgating state regulations for the lobster fishery.

***Development and Adoption of Addendum XXIX***

After many years of regulatory oversight, the American Lobster Management Board "recognized the critical need for high-resolution spatial and temporal data to characterize effort"—that is, the location of fishing vessels and the location and density of fishing gear—in the American lobster fishery. Mot. to Dismiss Ex. 1 ("Ex. 1"), § 1.0, p. 1.[6] The Board therefore initiated Addendum XXIX "to consider implementing electronic vessel tracking requirements for federally[] permitted vessels in the lobster . . . fisher[y]."[7] *Id.*

Specifically, the Board initiated Addendum XXIX in the context of four "challenges the fishery is currently facing [that] pose a critical need for electronic tracking data." Ex. 1, § 2.1, p. 2. <u>First</u>, the Board explained that currently available data, including data collected from Vessel Trip Reports, is insufficiently detailed for management and scientific purposes, such as conducting stock assessments. *See id.*, §§ 2.1, 2.2.2, pp. 2-4. <u>Second</u>, the Board explained that the limitations of the currently available data make it difficult to contribute valuable information about commercial lobster fishing to the National Marine Fisheries Service's ("NMFS") whale risk reduction efforts under the Atlantic Large Whale Take Reduction Plan ("ALWTRP").[8] *See*

---

[6] Plaintiffs purported to attach the Commission's Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan as Exhibit A to their Complaint. However, the version attached to the Complaint is notably missing the text of Appendix A to the Addendum, the "Ping Rate Analysis" that the Commission considered. For completeness, Defendant is attaching the complete Addendum XXIX as Exhibit 1 to this Motion. The complete Addendum XXIX was also submitted to the Court as Exhibit 4 to Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 16-6) and is also publicly available at:
https://asmfc.org/uploads/file/65b7d396AmLobsterAddendumXXIX_JonahCrabAddendumIV_March2022_1.pdf.

[7] Addendum XXIX was accompanied by Addendum IV to the Jonah Crab Fishery Management Plan. Although federal lobstering permits and Maine lobstering licenses are also crab fishing permits and licenses, for simplicity this Motion refers exclusively to lobstering permits, lobstering licenses, and the lobster fishery.

[8] In their Complaint, Plaintiffs allege that "[t]he primary purpose of the Addendum is to support risk reduction efforts promulgated in NMFS's 2021 [ALWTRP]." Compl. ¶ 8. But Addendum XXIX, which speaks for itself, does not in any way indicate that supporting risk reduction efforts is the Addendum's "primary purpose." Rather, the Addendum identifies federal implementation of risk reduction efforts as one of the multiple challenges facing the industry. More specifically, the Addendum simply acknowledges some basic truths: NMFS will continue to issue regulations that it believes are necessary to reduce the risk of harm to large whales; NMFS will likely include in future regulations restrictions on lobster fishing gear that could have a substantial economic impact on the fishery; NMFS has already

*id.*, § 2.1, p. 2.  Third, the Board explained that better data will improve assessment of the potential effects on the lobster fishery of competing uses, such as aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration.  *See id.*, §§ 2.1, 2.2.4, pp. 2, 4-5.  The Board noted that the lack of sufficiently detailed fishery activity data currently hinders analysis of the potential effects of proposed projects on the lobster fishery.[9] *See id*.  Fourth, the Board explained that better fishery activity data will improve the efficiency and effectiveness of limited enforcement resources in federal waters, with their "large geographic footprint and low density of lobster gear," thereby conserving the lobster resource and ensuring the ongoing viability of the commercial fishery.  *See id.*, §§ 2.1, 2.2.5, pp. 2, 5.

The Board also assessed what "ping rate" would capture the type of detailed data that would advance the Addendum's goal—that is, how often a vessel's electronic tracking device should capture and transmit the vessel's position.  The Board considered evidence that a rate of one ping per minute would capture important information about the location and density of fishing gear that less frequent ping rates would miss.  *See* Ex. 1, pp. 15-37.  Accordingly, in Addendum XXIX the Board required that any vessel tracking device "must collect location data at a minimum rate of one ping per minute" because that rate "is necessary to distinguish lobster fishing activity from transiting activity and can allow estimation of the number of traps per trawl."  *See id.*, § 3.1.1, p. 7.

---

used the limited data available about the distribution of commercial lobster fishing gear in its modeling of the perceived risks to whales; and if NMFS had more thorough and accurate data about commercial lobstering activity, the agency would be better informed, its models would be more accurate, and presumably its regulatory efforts would better reflect the actual conditions in the lobster fishery.  *See* Ex. 1, § 2.2.3, p. 4.

[9] Plaintiffs again completely distort Addendum XXIX by alleging it identifies "support[ing] the development of offshore renewable energy" as one of its "objectives."  *See* Compl. ¶ 9.  The Addendum does no such thing.  Addendum XXIX actually states that "[r]ecent executive orders have prioritized the development of offshore renewable energy," simply acknowledging that forces outside the lobster fishery have the potential to significantly impact the fishery if competing uses are sited in areas where the fishery is active.  *See* Ex. 1, § 2.1, p. 2.

After the Commission's approval of Addendum XXIX in March 2022, and to comply with Maine's obligations under the Compact, the Department promulgated Chapter 25.98 ("the DMR Rule"), with an effective date of November 5, 2023.[10]  *See* Mot. to Dismiss Ex. 2 ("Ex. 2").[11]

**The DMR Rule**

The DMR Rule applies only to harvesters who hold both a Maine commercial lobster license and a federal lobster permit—meaning that they can legally fish for lobster in both state and federal waters.  *See* Ex. 2 § (A)(2).  It requires a license holder to install an approved electronic tracking device on the vessel listed on their license and maintain the device in operational order while the vessel is in use.  *Id*. §§ (B)1, (C).  DMR has provided license holders with approved Particle TrackerOne devices, *see* Compl. Ex. C (ECF No. 1-3), but a license holder can choose a different device so long as it meets the specifications of, and has been approved by, the Commission pursuant to Addendum XXIX, Ex. 2 § (A)(1).

The Particle TrackerOne device collects the position of the vessel once per minute while the vessel is moving and once every six hours when the vessel is moored or docked.  Compl. Ex. C, p. 1.  As of December 15, 2023, it is unlawful for license holders to fish for lobster without having approved tracking devices installed and operating on their vessels, and license holders may not power down the device or tamper with the device or its signal.  *See* Ex. 2 § (C).  However, several exceptions apply: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative

---

[10] Maine was the second Atlantic state to adopt a regulation pursuant to Addendum XXIX.  Massachusetts adopted a regulation effective May 1, 2023.  *See* 322 Code Mass. Regs. § 7.11.  Since Maine adopted its regulation, at least one more Atlantic state has adopted a regulation pursuant to Addendum XXIX.  *See* 56 N.J.R. 481a (Apr. 1, 2024).

[11] The DMR Rule has yet to be published by the Secretary of State in the Code of Maine Rules.  Accordingly, Defendant is attaching a certified copy of the DMR Rule as adopted and currently in force as Exhibit 2 to this Motion.  This certified copy was also previously submitted to the Court as Exhibit 6 to Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 16-8).

when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from DMR while the situation is addressed. *See id.*[12]

Vessel location data is transmitted to the Atlantic Coastal Cooperative Statistics Program ("ACCSP"), which maintains the Standard Atlantic Fisheries Information System ("SAFIS") database. Compl. ¶ 62. ACCSP has protected confidential information relating to fisheries— including self-reported Vessel Trip Report data—for years using the same electronic transmittal systems (approved by NMFS) and SAFIS database, as described in Addendum XXIX. *See* Ex. 1, § 3.2.3, pp. 12-14. Further, the vessel location data is "designated as confidential through Maine law and regulation." Compl. Ex. C, p. 2. Specifically, Maine law requires that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel. 12 M.R.S. § 6173. Department regulations also require that publicly released data do not identify individual vessels or license holders. *See* 13-188 C.M.R. ch. 5.

On January 2, 2024, Plaintiffs filed their Complaint alleging that the DMR Rule (1) violates the Fourth Amendment, incorporated against the states through the Fourteenth Amendment (Count I); (2) violates the Equal Protection Clause of the U.S. and Maine Constitutions (Count II); and (3) violates the Maine Administrative Procedure Act, 5 M.R.S. §§ 8001-11008 (Count III). On January 12, 2024, Plaintiffs filed a Motion for Preliminary

---

[12] Federal permit holders whose permitted vessel is no longer in use or who do not use lobster traps are exempt from the Rule. *See* Ex. 2 § (D). A violation of the Rule is a "civil violation for which a fine of not less than $100 for each violation may be adjudged." 12 M.R.S. § 6174(3). A civil violation is subject to the due process provided through a court adjudication, and the Department may suspend a license after such adjudication. 12 M.R.S. § 6351(1)(D). Alternatively, the Department may administratively suspend a license without a prior court adjudication based on the license holder's commission of a marine resource violation. 12 M.R.S. § 6371(3)(A). An administrative suspension is subject to procedural requirements and judicial review on appeal. *See* 12 M.R.S. § 6374.

Injunction (ECF No. 7), which is fully briefed and pending before this Court.

## III.    STANDARD OF REVIEW

When a defendant brings a "facial" challenge to a claim pursuant to Fed R. Civ. P. 12(b)(1), a court must determine whether the well-pleaded facts in the complaint, when taken as true, indicate that the court has subject matter jurisdiction. *See Torres-Negrón v. J & N Recs., LLC*, 504 F.3d 151, 162 (1st Cir. 2007). Ultimately, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (internal quotation marks omitted).

To avoid dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although [a court] accept[s] as true the complaint's well-pleaded factual allegations and draw[s] all reasonable inferences in favor of the non-moving party, [the court does] not credit conclusory legal allegations [or] factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Id*. (internal citations and quotation marks omitted). In other words, "[if] the factual allegations in a complaint, stripped of conclusory legal allegations, raise no more than a sheer possibility that a defendant has acted unlawfully, the complaint should be dismissed. *Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (internal quotation marks omitted). "[A]ssessing plausibility is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (internal quotation marks omitted).

## IV.    ARGUMENT

### A. THE COURT SHOULD DISMISS COUNT III FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1)

In Count III, Plaintiffs allege that the DMR Rule violates the Maine Administrative Procedure Act, 5 M.R.S. §§ 8001-11008, in several ways. *See* Compl. ¶¶ 95-100. The Complaint on its face, however, establishes that the Court does not have jurisdiction over this claim because the Eleventh Amendment to the U.S. Constitution "denies federal courts jurisdiction to award . . . relief against state officials based upon violations of state law." *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 (1st Cir. 2009) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)); *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 22 (1st Cir. 2022) (noting "that the plaintiffs may obtain relief only if they establish that the [state] court officials violated the First Amendment, not merely state law"). When a plaintiff asks a federal court to compel state officers to comply with state law—even in a suit also bringing claims grounded in federal law— the only appropriate response is to dismiss the state law claims. *See Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option."); *Pennhurst*, 465 U.S. at 121 (noting, "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment").

Plaintiffs' contention that "[a] challenge to the [DMR] Rule does not involve questions specific to Maine state law because the [DMR] Rule adopts . . . federal policy," Compl. ¶ 100, does not help them for two reasons. First, their suggestion that the DMR Rule is a creature of federal law is simply incorrect. As explained above, the Rule arises from Addendum XXIX, which is itself a creation of the multistate Commission and not of any federal entity. *See supra*, Section II. Further, as also explained above, the DMR Rule does not have to be consistent with the MSA's National Standards. *See supra*, note 5. Second, and more importantly, the issue is whether Count

III seeks relief against a state official based on violations of state law, *see Guillemard-Ginorio*, 585 F.3d at 529, not whether Count III involves "questions specific to Maine state law."  In other words, the major problem with Count III is this Court's lack of jurisdiction under the Eleventh Amendment, not the principles underlying *Burford* abstention.  *See* Compl. ¶¶ 50-52 (Plaintiffs' explanation of *Burford* abstention and their contention why it does not apply to Count III); *Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 29 (1st Cir. 2011) (explaining that "the fundamental concern in *Burford* is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution" (internal quotation marks omitted)); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

For these reasons, the Complaint on its face demonstrates that this Court lacks jurisdiction over Count III because of the Defendant's sovereign immunity.  The Court should therefore dismiss Count III pursuant to Fed R. Civ. P. 12(b)(1).

## B. THE COURT SHOULD DISMISS COUNT I FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(b)(6)

Plaintiffs contend that the DMR Rule's requirement that certain license holders install electronic trackers on their fishing vessels violates the Fourth Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment.  Compl. ¶¶ 80-86.  Generally, they contend the Rule violates their "reasonable expectation of privacy in the movements of their fishing vessels and the precise location of their lobster traps" and their "right to be free from unreasonable official entries upon private commercial property when acting in a business capacity."[13]  *Id.* ¶¶ 81, 83.  More specifically, they contend that the DMR Rule does not meet the

---

[13] It is unclear how Plaintiffs' purported "reasonable expectation of privacy in the data produced by the tracker itself," Compl. ¶ 82, is distinct from their expectation of privacy in the movements of their vessels, which movements are captured by the tracker data.

requirements for a lawful "administrative search" of a closely regulated industry.  *Id.* ¶ 85.  But the facts alleged, even drawing all reasonable inferences in Plaintiffs' favor, show no plausible path to relief because the Rule unquestionably meets the requirements for a lawful "administrative search" and, therefore, does not violate the Fourth Amendment.

### 1. Background law

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  It is well-established that "warrantless searches of private premises are presumptively unreasonable."  *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)).  However, courts have recognized several exceptions to this presumption of unreasonableness.  Of relevance here, an "administrative search" is a warrantless search that "serve[s] a 'special need' other than conducting criminal investigations."  *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015).  Generally, these warrantless searches do not violate the Fourth Amendment if the subject of the search is afforded an opportunity for pre-compliance review before a neutral decisionmaker.  *Id.*

Where the search involves commercial premises in a "closely regulated" industry, however, an even "more relaxed standard" applies.  *Patel,* 576 U.S. at 424.  Such a search does not infringe the Fourth Amendment if there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; the search is necessary to furthering that interest; and the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *New York v. Burger*, 482 U.S. 691, 702-03 (1987); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216-217 (1st Cir. 2015) (articulating the "*Burger* test"); *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (same).  The "more

relaxed standard" for administrative searches of closely regulated industries applies because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home [and] is particularly attenuated in commercial property employed in 'closely regulated' industries."  *Burger*, 482 U.S. at 700; *see also Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) ("[T]he owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises.").[14]  In short, a lawful administrative search of a closely regulated industry is "reasonable" and does not violate the Fourth Amendment.

## 2. The DMR Rule constitutes a lawful administrative search of a closely regulated industry.

By requiring the installation of devices on commercial lobster fishing vessels that transmit vessel location data while the vessel is lobstering in federal and state waters,[15] the DMR Rule constitutes an administrative search of commercial premises engaged in a closely regulated industry.[16]  Because the Rule complies with the well-established requirements for such a search, the Rule is consistent with reasonable expectations of privacy and does not violate the Fourth Amendment.[17]

---

[14] This lower expectation of privacy in commercial premises also applies when the "premises" is a vehicle.  *See United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) (noting, in analyzing administrative searches of commercial trucks, that "[f]or purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles").

[15] In their Complaint, Plaintiffs suggest that the electronic tracking devices only collect data about commercial fishing in federal waters.  *See* Compl. ¶ 84.  A cursory review of the DMR Rule reveals that this is incorrect.  Location data is collected from the trackers whenever a vessel is in motion.  *See* Ex. 2 § (C).  The Rule's purpose—collecting data to better characterize the lobster fishery and address future challenges to that fishery—is not limited to lobstering in a particular area.

[16] For purposes of this Motion, Defendant agrees that the electronic tracking requirement constitutes a search within the meaning of the Fourth Amendment.

[17] This Motion, like Plaintiffs' Complaint, focuses on Plaintiffs' privacy expectations in their movements while engaging in the lobster fishery and in the location of their lobster traps.  *See* Compl. ¶¶ 81-83.  Plaintiffs assert in passing that fishing vessels covered by the DMR Rule are also occasionally used for other purposes.  *See* Compl.

### a. Commercial fishing is a closely regulated industry.

An industry is "closely regulated" when it is subject to pervasive regulation and inspection. *U.S. DOJ v. Ricco Jonas*, 24 F.4th 718, 734 (1st Cir. 2022). Courts have recognized that commercial fishing fits this description. *See, e.g.*, *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry."); *Lovgren v. Byrne*, 787 F.2d 857, 865 & n.8 (3d Cir. 1986) (noting that "the fishing industry has been the subject of pervasive governmental regulation almost since the founding of the Republic" and collecting cases).[18] Beyond this persuasive authority, a comparison with other closely regulated industries demonstrates that commercial fishing is closely regulated. For example, in *Burger*, the Supreme Court determined that automobile junkyards were closely regulated because operators must obtain a license; must maintain records and make them available for government

¶¶ 72, 98. But these allegations do not support a plausible inference that they have a reasonable expectation of privacy in their movements while fishing for non-lobster species—activity within the scope of the pervasively regulated commercial fishing industry—or engaging in search-and-rescue operations at sea. To the extent Plaintiffs have a reasonable expectation of privacy in their commercial fishing vessels' movements while using these vessels for personal travel, Plaintiffs' allegations do not support a plausible inference that the collection of location data from these trips as an occasional incident to the lawful administrative search regime falls outside the de minimis exception to the Fourth Amendment's warrant requirement. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (characterizing a minor additional intrusion upon an individual's privacy beyond the bounds of a lawful Fourth Amendment stop as "de minimis" and not constitutionally cognizable); *Taylor v. City of Saginaw*, 620 F. Supp. 3d 655, 664 (E.D. Mich. 2022) ("Properly understood, the *de minimis* exception allows government officials to make minor, warrantless intrusions in favor of only 'substantial' government interests." (citing *United States v. Jacobsen*, 466 U.S. 109, 125 (1984))).

[18] In *Patel*, the Supreme Court questioned the scope of the closely regulated industry doctrine and noted that the Court itself has only recognized four industries (liquor sales, firearms dealing, mining, and automobile junkyards) as "closely regulated." *Patel*, 576 U.S. at 424. However, the Court's actual holding in *Patel* was only that "hotels" in general do not constitute a closely regulated industry. *Id.* at 425-26. And post-*Patel*, courts have continued to recognize various industries as closely regulated. *See Killgore v. City of South El Monte*, 3 F.4th 1186, 1189 & n.4 (9th Cir. 2021) (recognizing the continuing viability of pre-*Patel* characterizations of "salmon fishing, commercial fishing, family day care homes, transportation of hazardous materials, veterinary drugs, foreign trade zones, and commercial trucking" as closely regulated industries); *id.* at 1190-92 (determining that the "massage industry" is closely regulated and noting the post-*Patel* characterization by other courts of "dump trucks," "precious metals," "commercial trucking" and "pain management clinics" as closely regulated). Since *Patel*, the First Circuit has suggested that "adult entertainment machines" used for gambling are "closely regulated," *Rivera-Corraliza*, 794 F.3d at 219, and cited pre-*Patel* case law to support the conclusion that the pharmaceutical industry is closely regulated, *Ricco Jonas*, 24 F.4th at 734-35.

inspection; must display their registration number in various ways; and are subject to criminal penalties, loss of license, or civil fines for failing to comply with these requirements. 482 U.S. at 704-05. A sample of the federal and state laws and regulations governing commercial lobster fishing in Maine, of which this Court may take judicial notice,[19] demonstrates requirements that are just as stringent and wide-ranging as those in *Burger*, if not more so:

- As noted above, the ACFCMA, 16 U.S.C. §§ 5101-5108, requires the Commission to adopt fishery management plans and, should a member state fail to comply with a plan, gives the U.S. Secretary of Commerce authority to declare a moratorium on that state's fishery.

- 50 C.F.R. Part 697 manages lobster fisheries by, among other things, requiring vessel permits, trap limits and tags, restricting gear in certain areas, and providing for at-sea sampler/observer coverage.

- Under 46 C.F.R. Chapter 1, the U.S. Coast Guard and the Department of Homeland Security require commercial fishing vessels to carry certain safety equipment.

- Title 12, Chapter 619, of the Maine Revised Statutes and Chapter 25 of DMR's rules, 13-188 C.M.R. ch. 25, manage the lobster fishery by, among other things, requiring licensure, limiting the size of lobsters that may be taken, requiring that certain lobsters be notched and thrown back, and managing how lobster gear is tagged and handled and how traps are constructed.

- Maine law provides that any person who "receives a [marine resources] license . . . has a duty to submit to inspection and search for violations related to the licensed activities by a marine patrol officer" and that

---

[19] A court may consider judicially noticeable "matters of public record" without converting a motion to dismiss to a motion for summary judgment. *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000). In general, federal courts may take judicial notice of federal and state laws and regulations. *See* 21B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 5102.1 (2d ed.); *see also Greene v. Rhode Island,* 398 F.3d 45, 48-49 (1st Cir. 2005) (taking judicial notice of a federal statute at the motion to dismiss stage).

> "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . may be searched or inspected at any time."  12 M.R.S. § 6306(1).

What is more, people operating vessels at sea—whether or not they are engaging in commercial fishing—are subject to a network of regulations that allow officials to board and inspect vessels.  A vessel at sea, unlike a personal vehicle on a highway or a pedestrian on a public street, can be stopped for document checks and safety inspections at any time even without reasonable suspicion.  *See United States v. Villamonte-Marquez*, 462 U.S. 579, 592-93 (1983); *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *State v. Giles*, 669 A.2d 192, 193 (Me. 1996).  Maine law specifically provides that "[m]arine patrol officers may stop and board any watercraft at any time to inspect its documents, licenses and permits of the occupants of the watercraft and to conduct a safety inspection."  12 M.R.S. § 6133(1).

For these reasons, commercial fishing is a closely regulated industry, and Plaintiffs necessarily have a greatly reduced expectation of privacy when engaging in an industry that is subject to such pervasive regulation.  Plaintiffs have alleged no facts that would support a different conclusion.[20]

### b.  The DMR Rule furthers a substantial government interest.

A lawful administrative search of a closely regulated industry must be necessary to furthering a substantial government interest.  *See Burger*, 482 U.S. at 702.  DMR undoubtedly has a substantial interest in regulating the lobster fishery and ensuring its long-term viability as an economic and cultural pillar of Maine society.  *See* 12 M.R.S. § 6021 (establishing DMR in part to "conserve and

---

[20] Indeed, in their Motion for Preliminary Injunction, Plaintiffs "concede that commercial fishing is a closely[] regulated industry."  PI Mot. at 12.  Although the Fifth Circuit recently suggested it was "not so sure" that the "commercial fishing industry" is closely regulated, the court expressly declined to address the question given that the case before it involved the "charter boat fishing industry."  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 968-69 (5th Cir. 2023).

develop marine . . . resources"); *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1123 (9th Cir. 2014) (stating, "[t]o be sure, protecting the fishery is an important governmental interest"). And the DMR Rule is necessary to further that substantial interest. As stated in Addendum XXIX, the detailed data based on a one-ping-per-minute rate that will be collected from the electronic trackers is necessary to accurately characterizing activity in the fishery, including the locations and density of commercial fishing gear, which is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock assessment. *See* Ex. 1, § 2.1. The current system of self-reported data lacks the accuracy, reliability, and precision that would allow DMR and other fishery managers to characterize a fishery occurring over vast areas and far from shore. *See id.* Further, it is common sense that an alternative system by which lobstermen could turn the tracking systems off and on based on when they self-report lobster fishing would compromise reliability and increase the chances of operator error or intentional evasion. Simply put, not only is DMR required to implement the Rule under the Compact, *see supra*, Section II, but DMR has also concluded, based on scientific evidence and its fishery management expertise, that the electronic tracking requirement is necessary to protect and manage the fishery. Plaintiffs have not alleged facts supporting a plausible inference to the contrary.

### c. The DMR Rule performs the basic functions of a warrant.

The DMR Rule also "perform[s] the two basic functions of a warrant" by "[1] advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and . . . [2] limit[ing] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. First, the Rule clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms. *See Tart v. Commonwealth of Mass.*, 949 F.2d 490, 498 (1st Cir. 1991) (finding adequate notice where the

regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports").  Second, the Rule properly limits government discretion by tracking only location data of licensed commercial fishing vessels.  In this way, the Rule is comparable to other administrative search regimes that have been approved as properly limited under the *Burger* test.

For example, in *Burger*, the Supreme Court concluded there were "appropriate restraints upon the discretion of inspecting officers" where "[t]he inspections can be made only of vehicle-dismantling and related industries" and "the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements" of the relevant statute.  *Burger*, 482 U.S. at 711 (internal quotation marks omitted).  Courts have approved administrative searches with comparably specific limits on government discretion.  *See Gonsalves*, 435 F.3d at 68 (approving administrative searches of drug-storage facilities "to determine whether any of the provisions [of the relevant pharmaceutical control law] are being violated, and to secure samples or specimens" (internal quotation marks omitted)); *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009) (same as to administrative searches of commercial vehicles on public highways for certain cargo and documents presenting potential regulatory violations); *Killgore v. City of South El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021) (same as to "reasonable inspections of any massage establishment . . . to ensure compliance with" regulations (internal quotation marks omitted)).

It is true that vessel location data collection under the DMR Rule occurs around-the-clock whenever a vessel is in operation.  The *Burger* court, however, made clear that temporal limitations on administrative searches are only relevant to the extent they demonstrate that the administrative search regime "place[s] appropriate restraints upon the discretion of the inspecting officers."

*Burger*, 482 U.S. at 711.  That is, timing restrictions for timing restrictions' sake are not necessary, and courts have approved administrative searches with no time limitations.  For example, in *Tart*, the First Circuit considered the constitutionality of administrative searches pursuant to a Massachusetts statute providing that state fishing permits "shall be produced for examination upon demand of any authorized person" with no restriction on when such requests could be made.  949 F.2d at 497.  Considering the third prong of the *Burger* test, the court concluded that the statute, "although a tersely phrased authorization to conduct documentation checks," appropriately limited "the exercise of the fisheries officer's discretion in the field."  *Id.* at 498.  The court explicitly noted that a statute authorizing an administrative search "need not in all circumstances prescribe exhaustive restrictions limiting the target, time and place of the inspection."  *Id.*  As the court concluded, "[c]onsidered in the context of the entire regulatory scheme applicable to the commercial fishing industry . . . [t]he minimally intrusive nature of a proper verbal request to produce required documentation, and the importance of the governmental interests served by the Commonwealth's permitting requirement, satisfy us that the documentation inspection in this case did not offend the fourth amendment."  *Id.* at 499.

Similarly, in *Ponce-Aldona*, the Eleventh Circuit concluded that a regime of unannounced, warrantless stops and searches of commercial vehicles on public highways did not violate the Fourth Amendment despite the complete lack of "time and place restrictions" on the searches.  579 F.3d at 1226.  The court stated that "the absence of such restrictions is insignificant in the context of regulation of the commercial trucking industry" because "neither time nor place restrictions would be feasible"—commercial trucks operate 24 hours a day and could avoid fixed highway checkpoints.  *Id.*  More recently, the First Circuit noted that "a regime may pass the *Burger* test even if there are no time limits—context is key" and cited *Ponce-Aldona* for the proposition that

administrative search "schemes with no timing limits [are constitutional] if such limits would make inspections unworkable." *Rivera-Corraliza*, 794 F.3d at 221.

The DMR Rule presents the circumstances identified in *Tart* and *Ponce-Aldona*. As in *Tart*, the collection of location data at issue here is minimally intrusive in the context of the "entire regulatory scheme applicable to the commercial fishing industry." 949 F.2d at 499. Specifically, the nature of the search in this case—the collection of a vessel's location data by a tracking device— is less intrusive than the suspicionless boarding and search of a vessel, which is already authorized under state and federal law. *See supra*, Section IV.B.2.a. There is a manifest distinction in the degree of intrusiveness between a tracker collecting data and an officer boarding and visually inspecting a vessel and its occupants. As in *Ponce-Aldona*, timing restrictions on the electronic data collection would not be feasible because, like commercial trucking, commercial lobstering does not follow regular business hours. *See* 579 F.3d at 1226. Apart from seasonal nighttime and weekend restrictions, lobster fishing may take place at any time. *See* 12 M.R.S. § 6440. And as noted above, *see supra*, Section IV.B.2.b, allowing vessel owners to turn the tracker on and off at their discretion—for example, when they self-report that they are not using the vessel to fish for lobster—would seriously undermine the reliability and administrability of the entire data collection program.[21]

### 3. Plaintiffs' contention that the DMR Rule violates their reasonable expectations of privacy is unavailing.

Administrative search doctrine holds that a warrantless search of commercial premises in a closely regulated industry is "reasonable" within the meaning of the Fourth Amendment if it

---

[21] That said, as noted above, the DMR Rule does feasibly limit data collection by allowing a less frequent "ping" rate when a vessel is in port and by allowing vessel owners to apply for authorization to turn a tracker off when "the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device." Ex. 2 § (C).

meets the requirements for an administrative search.  *Burger*, 482 U.S. at 700.  Therefore, Plaintiffs' assertion that the DMR Rule violates their "right to be free from unreasonable official entries upon private commercial property," Compl. ¶ 83, necessarily fails.  As a lawful administrative search, the DMR Rule does not constitute an "unreasonable" entry upon their "commercial property"—their fishing vessels.

Further, the relevant administrative search analysis does not change simply because the administrative search reveals the movements of Plaintiffs' fishing vessels and the precise location of their lobster traps.  Plaintiffs cite *Carpenter v. United States*, 585 U.S 296, 310 (2018), in support of their expectation of privacy, Compl. ¶ 23, but that case is entirely inapposite.  In *Carpenter*, the Supreme Court considered an individual's legitimate expectation of privacy "in the record of his physical movements" as captured through detailed cell-site location information and gathered as part of a criminal investigation.  585 U.S. at 310.  The Court concluded that individuals have a legitimate expectation of privacy in their movements as they go about their everyday lives because detailed data about such movements "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."  *Id.* at 311 (internal quotation marks omitted).  The movements of Plaintiffs' vessels while engaging in the closely regulated commercial fishing industry plainly do not implicate these concerns about the revelation of such intimate information.  In other words, the mere fact that data about a vessel's "movements" are being collected does not somehow heighten the privacy interests involved to the extent that the framework for administrative searches of closely regulated industries no longer applies.

Plaintiffs' contention that the location of their lobster traps constitutes a "trade secret," *see* Compl. ¶ 3, also does not change the analysis, for several reasons.  First, Plaintiffs have not pleaded

any facts supporting their general assertion that the location of their traps is a true "trade secret." While lobstermen undoubtedly develop specific knowledge about where to fish for lobster, it is difficult to comprehend how the location of Plaintiffs' lobster traps could constitute a "secret" considering that (1) traps must be marked for identification, *see* 13-188 C.M.R. ch. 25.08, and (2) traps are placed in the open ocean, where marker buoys are subject to visual identification by anyone in the vicinity, *see Oliver v. United States*, 466 U.S. 170, 179 (1984) (noting that so-called "open fields" "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance").   Second, every lawful administrative search may reveal to the government how an entity does business; the target of an administrative search is often precisely those documents and other materials containing such information. *See Ricco Jonas*, 24 F.4th at 734 ("The closely regulated industry doctrine recognizes that there is a diminished expectation of privacy for materials that are maintained by a business that is subject to pervasive regulation and inspection.").   Third, Plaintiffs do not plausibly allege how their expectation of privacy in their "trade secrets" will be violated by the DMR Rule, which only exposes vessel-specific data to the government and keeps such data confidential from the broader public, including fishing competitors.

Even drawing all reasonable inferences in their favor, Plaintiffs have failed to plausibly allege that the DMR Rule's electronic vessel tracking requirement constitutes anything other than a lawful administrative search of commercial premises used in a closely regulated industry.   For this reason, the Court should dismiss Plaintiffs' Fourth Amendment claim (Count I) for failure to state a claim.[22]

---

[22] To the extent Plaintiffs separately allege that the potential use of vessel location data in criminal or civil enforcement proceedings would violate their due process rights, *see* Compl. ¶ 86, they have not pleaded any facts supporting a plausible claim to relief.  Binding precedent forecloses any argument that the use of information collected through an administrative search in separate enforcement proceedings renders an otherwise lawful administrative search

### C. THE COURT SHOULD DISMISS COUNT II FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(b)(6)

Plaintiffs contend that the DMR Rule violates the Equal Protection Clauses of the U.S. and Maine Constitutions because it is vague.[23]  *See* Compl. ¶¶ 87-94.  A rule is unconstitutionally vague only when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited[] or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).[24]  Further, "the Supreme Court has applied a less strict vagueness test to commercial regulation . . . [a]nd vagueness review is less exacting still where the law at issue carries no criminal penalties."  *ACA Connects – Am.'s Commc'ns Assoc. v. Frey*, 471 F. Supp. 3d 318, 330 (D. Me. 2020) (internal quotation marks omitted).

Plaintiffs do not identify in the Complaint what terms of the DMR Rule are unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement.  Rather, they opine that the Rule is impermissibly vague because the

---

unconstitutional. *See Burger*, 482 U.S. at 704-05 (discussing an administrative search regime where business owners were subject to criminal penalties, loss of license, or civil fines for violations of the regulations the searches were conducted to enforce); *id.* at 716 ("Nor do we think this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself.").

[23] A "void-for-vagueness" claim is usually analyzed under the Due Process Clause. *See, e.g., Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 50 (1st Cir. 2003).  Although Plaintiffs' Complaint could be read as asserting an equal protection theory separate from their vagueness argument, the nature of that separate theory is entirely unarticulated.  Plaintiffs do not, for example, assert in their Complaint that the DMR Rule violates equal protection by treating similarly situated individuals differently on an impermissible basis.

[24] In Count II, Plaintiffs purport to assert a claim that the DMR Rule violates the Equal Protection Clause of the Maine Constitution, Me. Const. Art. I, § 6-A.  The Maine Civil Rights Act ("MCRA"), 5 M.R.S. §§ 4681-4685, is the sole vehicle by which a plaintiff may bring a claim alleging a violation of the Maine Constitution, and the MCRA requires that such violation involve actual or threatened violence, damage or destruction of property, or trespass. *See Andrews v. Dep't of Env't Prot.,* 1998 ME 198, ¶ 23, 716 A.2d 212.  Even assuming that a claim against Defendant grounded in the Maine constitution is cognizable by this Court, any claim that the DMR Rule violates the Maine Constitution fails and must be dismissed because the Complaint neither states a cause of action under the MCRA nor pleads any use or threat of violence, damage or destruction of property, or trespass. *See Davis v. Theriault*, 1:22-cv-275-JDL, 2023 WL 5628193, at *43 (D. Me. Aug. 31, 2023).

consequences of violating it are unclear.  But even assuming the precise penalties a person may incur from violating a rule are the subject of constitutional vagueness analysis, the consequences of violating this Rule are clearly set out in State law.

Like many civil violations, the DMR Rule prohibits certain conduct, regardless of whether it is intentional.  *See* Ex. 2 § (C).  As noted above, under Maine law, a violation of the DMR Rule carries no criminal penalty; it is a civil violation incurring a fine of not less than $100 and could lead to a state license suspension.  *See supra*, note 12.  Any violation is subject to the same process and procedures—including appellate procedures—as a violation of any other DMR rule.  *Id.*  It is simply not plausible that covered vessel owners are in the dark about the potential consequences of their conduct, especially considering that they operate in a highly regulated industry and can be expected to know the applicable regulations.  *See United States v. Facteau*, 89 F.4th 1, 33 (1st Cir. 2023) ("For provisions that concern economic regulation . . . the [unconstitutional vagueness] test is whether a 'business person of ordinary intelligence would understand' what conduct is prohibited—a 'less strict vagueness test.'" (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)) (emphasis omitted)).  As the U.S. Supreme Court has recognized, "businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action [and] have the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process." *Vill. of Hoffman Ests.*, 455 U.S. at 498 (footnotes omitted).  In this case, ample clarification has already been provided to lobstermen about how to determine whether the tracker is working and what to do if it stops working.  *See* Compl. Ex. C.  The DMR Rule itself specifically informs lobstermen what they can do to remain in compliance in the event of a device failure.  *See* Ex. 2 § (E). Although Plaintiffs may have questions about how the vessel location data could potentially be

used to enforce *other* laws, *see* Compl. ¶ 94, such questions have no bearing on their claim that the DMR Rule itself is unconstitutionally vague.

Vagueness can void a rule only when "its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Here, the DMR Rule clearly defines the conduct it prohibits, is not so standardless as to encourage discriminatory enforcement, and is therefore not unconstitutionally vague. The Complaint simply does not contain factual allegations that support a plausible void-for-vagueness claim. The Court, therefore, should dismiss Count II for failure to state a claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion to Dismiss this suit.

Dated:  April 8, 2024                    Respectfully submitted,

                                         AARON M. FREY
                                         Attorney General


                                         */s/ Jack Dafoe*
                                         Jack Dafoe
                                         Valerie A. Wright
                                         Assistant Attorneys General
                                         6 State House Station
                                         Augusta, ME  04333-0006
                                         Tel. (207) 626-8800
                                         Jack.Dafoe@maine.gov
                                         Valerie.A.Wright@maine.gov

                                         Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter, as follows:

Alfred Cecil Frawley, IV
McCloskey, Mina, Cunniff, & Frawley LLC
12 City Center
Portland, ME 04101
(207) 772-6805
afrawley@lawmmc.com

Thimi R. Mina
McCloskey, Mina, Cunniff, & Frawley LLC
12 City Center
Portland, ME 04101
(207) 772-6805
tmina@lawmmc.com

Sean H. Donahue
Donahue, Goldberg & Herzog
1008 Pennysylvania Ave., SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com

Russell B. Pierce, Jr.
Norman Hanson DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112
(207) 553-4621
rpierce@nhdlaw.com

Dated: April 8, 2024                    */s/ Jack Dafoe*
                                        Jack Dafoe
                                        Assistant Attorney General
                                        6 State House Station
                                        Augusta, ME  04333-0006
                                        (207) 626-8800
                                        Jack.Dafoe@maine.gov