UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK THOMPSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00001-JAW |
| | ) | |
| PATRICK KELIHER, *in his official* | ) | |
| *capacity as* COMMISIONER, | ) | |
| MAINE DEPARTMENT OF | ) | |
| MARINE RESOURCES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION**

Maine lobstermen brought suit against the commissioner of the Maine Department of Marine Resources, seeking to enjoin the enforcement of a rule issued by the department that compels federally licensed lobstermen to install a tracking device on their fishing vessels.[1] The lobstermen challenge the rule under Maine's Administrative Procedure Act and on federal and state constitutional grounds as a violation of their right to be free from unreasonable searches and seizures and right to equal protection under the law. The defendant moves to dismiss the case for failure to state a claim and for lack of subject matter jurisdiction. The lobstermen seek a preliminary injunction, which the defendant also opposes. The court dismisses the plaintiffs' claim under the Maine Administrative Procedure Act for lack of subject matter jurisdiction and dismisses the Fourth Amendment and equal protection

---

[1] Throughout this order, the Court uses "lobstermen" as a gender-neutral term. *See* Maine Lobster Community Alliance, *A Lobsterman is a Lobsterman, Regardless of Gender* (Jul. 7, 2023), A Lobsterman is a Lobsterman, Regardless of Gender (mlcalliance.org).

claims for failure to state a claim on which relief can be granted. Although the court grants the motion to dismiss the Fourth Amendment claim pursuant to Supreme Court and First Circuit caselaw on administrative searches, this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling.

Having granted the defendant's motion to dismiss, the court dismisses the motion for preliminary injunction as moot.

## I.   PROCEDURAL HISTORY

On January 2, 2024, Frank Thompson, Joel Strout, Jason Lord, Christopher Smith, and Jack Cunningham (collectively, the Plaintiffs) filed a facial complaint against Patrick Keliher, in his official capacity as Commissioner of the Maine Department of Marine Resources (MDMR), seeking declaratory and injunctive relief against a rule issued by the MDMR that requires federally permitted lobstermen to install an electronic tracking device on their fishing vessels. *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).

On January 12, 2024, the Plaintiffs filed a motion for preliminary injunction. *Pls.' Mot. for Prelim. Inj.* (ECF No. 7). On March 1, 2024, Commissioner Keliher responded in opposition to the motion for preliminary injunction. *Def.'s Opp'n to Mot. for Prelim. Inj.* (ECF No. 16). That same day, the Atlantic States Marine Fisheries Commission (ASMFC), as amicus curiae, also opposed injunctive relief. Amicus Curiae *Atl. States Marine Fisheries Comm'n's Mem. in Opp'n to Pls.' Mot. for Prelim.*

2

*Inj.* (ECF No. 15).  On March 12, 2024, the Plaintiffs replied.  *Pls.' Reply to Opp'n to Mot. for Prelim. Inj.* (ECF No. 17).

On April 8, 2024, Commissioner Keliher moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  *Def.'s Mot. to Dismiss* (ECF No. 23) (*Mot. to Dismiss*).  That same day, ASMFC filed an amicus curiae memorandum in support of Commissioner Keliher's motion to dismiss.  Amicus Curiae *Atl. States Marine Fisheries Comm'n's Mem. in Support of Def.'s Mot. to Dismiss* (ECF No. 22) (*Amicus Mem. in Support of Mot. to Dismiss*).  On April 29, 2024, the Plaintiffs responded in opposition to the motion to dismiss.  *Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 24) (*Pls.' Opp'n*).  On May 13, 2024, Commissioner Keliher replied.  *Def.'s Reply to Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 25) (*Def.'s Reply*).

On June 3, 2024, the Plaintiffs moved for oral argument on the motion for preliminary injunction and the motion to dismiss, *Unopposed Mot. for Oral Arg.* (ECF No. 26); the Court granted the motion for oral argument on the same day.  *Order* (ECF No. 27).  On June 19, 2024, ASMFC requested leave to participate in oral argument as amicus curiae.  *Mot. of* Amicus Curiae *Atl. States Marine Fisheries Comm'n for Leave to Participate in Oral Arg. on Mot. to Dismiss and Mot. for Prelim. Inj.* (ECF No. 28).  The Court granted the ASMFC's motion on June 25, 2024, *Order*. (ECF No. 29), and held oral argument on November 19, 2024.  *Min. Entry* (ECF No. 32).

3

## II.   FACTUAL BACKGROUND[2]

### A.   The American Lobster Fishery

The American Lobster fishery is one of the nation's most valuable fisheries. *Compl.* ¶ 1.  In 2016 alone, approximately 159 million pounds of lobster were landed within the fishery.  *Id.*  Over 97% of this haul was landed in the Gulf of Maine and Georges Bank, an area far offshore between Massachusetts and Nova Scotia.  *Id.*

Roughly 4,800 lobster license holders, 1,100 student license holders, and a great number of lobster dealers, processors, sternmen, bait dealers, trap builders, boat mechanics, shipyards, and local coastal merchants depend on the Maine lobster fishery for their very survival.  *Id.* ¶ 2.  Maine's lobster supply chain contributes $1 billion to the state's economy each year, in addition to the value of its actual lobster landings.  *Id.*  By virtue of custom and practice over generations of lobstering men and women, the placement of lobster traps and trip routes is akin to "coveted individual trade secrets used by lobstermen to optimize their harvest."  *Id.* ¶ 3. Accordingly, this information has substantial economic value to each lobsterman.  *Id.*

Federal and state regulators share oversight of the Atlantic coast fisheries.  *Id.* ¶ 4.  Individual states regulate waters within three nautical miles of shore, while the National Marine Fisheries Service (NMFS), a sub-agency of the National Oceanic and Atmospheric Administration (NOAA), regulates the federal waters extending 200

---

[2]      Consistent with the motion to dismiss standard, the Court relied on the complaint's well-pleaded facts.  "[T]he court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

nautical miles from the inner boundary of state waters (known as the Exclusive Economic Zone or EEZ). *Id.*

### B.    The Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act (MSA) governs fishing within the EEZ. *Id.* ¶¶ 7, 29 (citing 16 U.S.C. § 1802). In recognition of the economic importance of commercial and recreational fishing, Congress adopted the MSA to protect, manage, and grow the United States' fishery resources. *Id.* ¶ 28. To these ends, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. *Id.* (citing 16 U.S.C. §§ 1801 *et seq.*). The MSA grants the U.S. Department of Commerce the ability to exercise "sovereign rights" to conserve and manage fishery resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the EEZ. *Id.* § 29 (citing 16 U.S.C. §§ 1801(b)(1), 1811(a)).

The MSA created eight Regional Fishery Management Councils (the Councils) and empowers both the regional councils and Secretary of Commerce to prepare fishery management plans (FMPs). *Id.* ¶ 30. Maine is governed by the New England Council, which also oversees the fisheries of New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id.* The New England Council has authority over fisheries in the Atlantic Ocean seaward from those states. *Id.* (citing 16 U.S.C. § 1852(a)(1)). Under the MSA, FMPs must be "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and

to protect, restore, and promulgate the long-term health and stability of the fishery."

*Id.* (citing 16 U.S.C § 1853).

Section 301 of the MSA lists ten "National Standards" that all FMPs, regardless of the drafting entity, are required to follow. *Id.* ¶ 33. At least six national standards are implicated by the Addendum at issue in the case at bar:

1. National Standard One, which requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."

2. National Standard Two, which requires that "[c]onservation and management measures shall be based upon the best scientific information available."

3. National Standard Four, which requires that all agency measures that allocate or assign fishing privileges among various … fisherm[e]n" should be "fair and equitable" and "reasonably calculated to promote conservation" …. Furthermore, "[n]o particular individual, corporation, or other entity [should] acquire[] an excessive share of such privileges."

4. National Standard Six, which requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."

5. National Standard Seven, which requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."

6. National Standard Eight, which requires that "[c]onservation and management measures shall, consistent with the conservation requirements … , take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (b) to the extent practicable, minimize adverse economic impacts on such communities."

*Id.* (citing 16 U.S.C. § 1851(a)(1), (2), (4), (6)-(8)) (internal citations omitted).

The MSA does not authorize or permit any collection of information on vessel movements when the vessel is not fishing under its permit.  *Id.* ¶ 32.  The MSA also "does not require lobster boats to have a vessel tracker[,] nor does it mention or contemplate 24-hour location and movement surveillance of any vessel, whether by GPS or otherwise," regardless of whether the vessel is fishing in federal waters under a federal permit or being used for an unregulated purpose.  *Id.* ¶ 34.  Rather, the MSA "only permits the collection of information that is beneficial for developing, implementing, or revising FMPs."  *Id.* at ¶ 32 (citing 16 U.S.C. § 1881a(a)(1)[3]).  If a Council determines information collection is necessary in order to prepare an FMP, it may request that the Secretary of Commerce implement such collection.[4]  *Id.* (citing 16 U.S.C. § 1881a(a)(1)[5]).

## C.    The Atlantic States Marine Fisheries Commission

Both the federal and state governments regulate lobster fishing in U.S. waters through the Atlantic States Marine Fisheries Commission.  *Id.* ¶ 4.  The ASMFC is a multi-state collaborative organization through which fifteen Atlantic Coast states, including Maine, coordinate their conservation efforts and share in the management

---

[3]    Plaintiffs' complaint ¶ 32 cites 18 U.S.C. § 1881a(a)(1).  This is incorrect.  The proper citation is 16 U.S.C. § 1881a(a)(1).

[4]    "Only where the Secretary has determined that the collection is justified does he or she have a duty to promulgate regulations implementing the collection program."  *Compl.* ¶ 32 (citing 16 U.S.C. § 1881a(a)(2)).  The Secretary may also initiate an "information collection program . . . if deemed necessary."  *Id.*

The Court has again corrected Plaintiffs' citation from 18 U.S.C. § 1881a(a)(1) to 16 U.S.C. § 1881a(a)(1).

[5]    The Court has again corrected Plaintiffs' citation from 18 U.S.C. § 1881a(a)(1) to 16 U.S.C. § 1881a(a)(1).

of migratory fisheries within their state waters. *Id.* ¶¶ 4, 5. Pursuant to the Atlantic Coastal Fisheries Cooperative Act (ACA), "[t]he responsibility for managing Atlantic Coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the [ASMFC]." *Id.* ¶ 25 (citing 16 U.S.C. § 5101). The ACA says that it is the federal government's responsibility "to support such cooperative interstate management of coastal fishery resources." *Id.* (citing 16 U.S.C. § 5101).

The ACA encourages this shared responsibility by requiring the ASMFC to draft interstate FMPs, pursuant to which each of the member-states regulates that portion of the migratory fishery falling within their individual waters. *Id.* ¶ 5 (citing 16 U.S.C. § 5104(a)). Under the ACA, states are required to adopt and enforce fishery plans promulgated by the ASMFC. *Id.* ¶ 5. However, FMPs implemented by any of the NOAA Councils or the Secretary of Commerce pursuant to the MSA supersede any conflicting regulation issued by the ASMFC. *Id.* ¶ 31 (citing 16 U.S.C. § 5103). Thus, while the ACA empowers the ASMFC to draft regulations governing the EEZ, it cannot supplant regulations issued by NOAA, NMFS, or the Secretary of Commerce. *Id.* ¶ 36.

When the ASMFC drafts FMPs containing regulations and enforcement guidelines, it specifies the requirements for state compliance. *Id.* ¶ 6. The states then draft their own rules; in Maine, this work is done by the MDMR, which regulates lobster fishing in the state's waters pursuant to an FMP. *Id.* ¶¶ 5-6 (citing 12 M.R.S. §§ 6421-6482; 13-188 C.M.R. ch. 25, § 98). If a member state fails to timely enact

rules adopting the ASMFC's plan for a particular fishery, the Secretary of Commerce has the authority to impose a moratorium on fishing in that state's waters.  *Id.* (citing 16 U.S.C. § 5106).

### D. Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan

In March 2022, the ASMFC published an addendum to an existing FMP entitled Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan; Addendum IV to the Jonah Crab Fishery Management Plan (the Addendum).  *Id.* ¶ 8; *see also Compl.*, Attach. 1, *Addendum XXIX to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum IV to the Jonah Crab Fishery Mgmt. Plan* (ECF No. 1-1) (*Addendum XXIX*).  The primary purpose of the Addendum is to support risk reduction efforts promulgated in NMFS's 2021 Atlantic Large Whale Take Reduction Plan (Take Reduction Plan), which is designed to reduce the risk of North Atlantic right whale entanglement in fishing lines.  *Compl.* ¶ 8.  As promulgated by NMFS, the Take Reduction Plan does not contain a vessel tracking requirement.  *Id.*

In addition to protecting the North Atlantic right whale, the Addendum identifies three secondary objectives for its "'24/7' tracking requirement: 1) to improve information available to fishery managers and stock assessment scientists; 2) to support the development of offshore renewable energy and the conservation of U.S. waters; and 3) to promote improved fishery management and offshore enforcement of federal lobster fisheries in the EEZ."  *Id.* ¶ 9.

The Addendum requires states to issue rules mandating federally permitted lobstermen to install an electronic tracking device onboard their respective fishing vessels that will transmit their spatial data using a Global Positioning System (GPS). *Id.* ¶ 10. "According to the Addendum, the 'vessel tracker must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished or target species.'" *Id.* The Addendum mandated compliance with the tracking program by December 15, 2023. *Id.*

### 1. The Origins and Drafting of Addendum XXIX

When the ASMFC published the Addendum, it gave no indication that it had consulted with any Council during the drafting process. *Id.* ¶ 53.

The Addendum was initiated from what the American Lobster Management Board (ALMB) characterized as a "critical need for high resolution spatial and temporal data." *Id.* ¶ 54. At the time of the Addendum's drafting, however, the ALMB's purported need for more spatial data had been previously addressed by a prior addendum published in February 2018, Addendum XXVI. *Id.*; *see also Compl.*, Attach. 2, *Addendum XXVI to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum III to the Jonah Crab Fishery Mgmt. Plan* (ECF No. 1-2) (*Addendum XXVI*). Addendum XXVI initiated a pilot program for electronic tracking of vessels that required all federally permitted vessels to self-report harvester data either electronically or manually. *Id.*

Addendum XXVI mandated that federally licensed lobstermen self-report: 1) a unique trip identification number; 2) a vessel identification number, 3) the trip start

date, the location (by NMFS Statistical Area) of the trip; 4) the lobster management area; 5) a ten-minute square level; 6) the number of traps hauled on the trip; 7) the number of traps set on the trip; 8) the species harvested; 9) the quantity (in pounds) of the harvest; 10) the length of the trip; 11) the number of traps employed per trawl; 12) the number of buoy lines employed; and 13) the soak time of the traps. *Compl.* ¶ 55; *see also Addendum XXVI.*

At the end of Addendum XXVI's one-year pilot program, the ASMFC was directed to assess the effectiveness of different tracking technologies and consider whether the adoption of an electronic vessel tracking requirement was appropriate. *Compl.* ¶ 56.  The ASMFC did so, formally adopting the vessel tracking program piloted under Addendum XXVI when it issued Addendum XXIX. *Id.* ¶ 57.

### 2.     The Requirements of Addendum XXIX

As noted, the Addendum requires that federally licensed lobstermen install and activate an electronic tracking device on their vessels by December 15, 2023. *Id.* The device must be installed directly on the vessel and remain activated so that it can continually transmit location data at all times, even when the vessel is not in use (i.e., when it is docked) or when it is not fishing in federal waters (i.e., when the vessel is being operated by a lobsterman for personal use). *Id.* The electronic tracking data is in addition to data that lobstermen are already required to self-report about their location. *Id.*

The Addendum requires the electronic tracker to have a once-per-minute "ping rate"; this means that the device will "ping," or collect the device's longitude, latitude,

corresponding vessel identifier, and the date, at one-minute intervals. *Id.* ¶ 58. The Addendum also requires lobstermen to use a device that can track their vessel's location within 100 meters of accuracy. *Id.*

> Per the Addendum:
>
> To date, the majority of spatial analyses of lobster . . . fishery data ha[s] been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds. The application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists. In particular, a number of challenges the fishery is currently facing pose a critical need for electronic tracking data in the offshore fishery.

*Id.* ¶ 59.

### 3.    The Goals of Addendum XXIX

The Addendum enumerates four goals of its electronic tracking requirement:

1. To improve spatial information data concerning the location of where the majority of fishing effort occurs by collecting spatial data more frequently and with more accurate precision;

2. To improve risk reduction efforts under the [Take Reduction Plan] that are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution;

3. To promote and prioritize the development of offshore renewable energy and the conservation of federal waters, including wind energy, aquaculture, and marine protected areas that may all create marine spatial planning challenges for the lobster and Jonah crab fisheries; and

4. To combat difficulties associated with locating gear for compliance checks and to increase the efficiency and efficacy of enforcement efforts in offshore federal management areas.

*Id.* ¶ 60. *See also Addendum XXIX* at 2.

"The Addendum further addresses the ASMFC's offshore enforcement goals by enabling the ASMFC to use this newly available data to identify subjects for investigations into potential illegal fishing practices." *Compl.* ¶ 61. The Addendum states, in part, that:

> Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear. Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

*Id.*

### 4. Data Sharing Pursuant to Addendum XXIX

The data collected from the tracking devices is shared with and managed by the Atlantic Coastal Cooperative Statistics Program (ACCSP), which maintains a database referred to as the Standard Atlantic Fisheries Information System (SAFIS). *Id.* ¶ 62. SAFIS currently hold self-reported data from lobstermen as required by Addendum XXVI in the form of "SAFIS reports" or "trip tickets." *Id.* SAFIS will be the repository of both self-reported trip data (eVTR data) and the new electronic monitoring data collected by the vessel trackers. *Id.* The Addendum indicates that ACCSP will match the two sources of data by means of trip identification numbers and other vessel registration information. *Id.* ¶ 63.

The Addendum "contains little to no information on how this data will be protected from unauthorized use and disclosure." *Id.* ¶ 64. There are no references

to encryption, and there is no data governance policy detailing the specific intended use of the data. *Id.* Instead, "the Addendum gives the ASMFC and MDMR broad discretion on how they can use the data collected, without assurances that the data will be immune from third party subpoena or how access by third parties will be limited, even though ACCSP data has been subject to subpoenas in the past." *Id.*

Unlike electronic devices or tracking applications available in the private marketplace, the Addendum does not provide lobstermen with the ability to view the reporting dashboards associated with the tracking data or to agree to terms of service describing the data collection process, nor does it provide any limits regarding how and in what format the data can be used. *Id.* ¶¶ 65-66. It also does not place any upward limits on how sophisticated the data collection can be, "i.e., whether the data collected is limited to spatial data or whether other types of data such as voice, speed, and other data categories can be collected." *Id.* ¶ 66.

The Addendum enumerates only two exceptions to the tracking requirement. *Id.* ¶ 67. First, the requirement does not apply to vessels in Trap Area 6, which covers state waters off the coast of New York and Connecticut, because a federal permit is not required for lobster fishing in that area. *Id.* Second, the Addendum exempts holders of state-only lobster permits without a federal commercial trap gear area permit. *Id.*

The Addendum states that the ASMFC "recommends that the federal government promulgate all necessary regulations in Section 3.0 to implement complementary measures to those approved in this addendum" and "requests that

14

NOAA Fisheries publish the final rule on vessel tracking by May 1, 2023, with implementation no later than December 15, 2023." *Id.* ¶ 68. At the time of the Plaintiffs' filing of the complaint, no such final federal rule has been published by NOAA fisheries, much less implemented.[6] *Id.*

### E.    The MDMR Rule

As noted, MDMR is responsible for enforcing ASMFC's amendments in the state of Maine. *Id.* ¶ 69. On September 13, 2023, MDMR complied with the Addendum by publishing a final rule entitled "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders" (the MDMR Rule). *Id.* ¶ 11 (citing 13-188 C.M.R. ch. 25, § 98). The MDMR Rule required all Maine lobstermen holding federal lobster permits to comply with the tracking device installation requirement by December 15, 2023. *Id.* ¶¶ 10, 70.

The MDMR Rule adopts the Addendum and also lists five new actions that MDMR deems unlawful:

1. It is unlawful for a federally permitted lobster . . . fishing license holder to fish for, take, possess, or land lobster . . . taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

2. It is unlawful for a federally permitted lobster . . . fishing license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the [MDMR].

3. It is unlawful for a federally permitted lobster . . . fishing license holder to allow the permitted vessel listed on their license to be operated in the coastal waters of the State without the approved

---

[6]    The Court recites this fact as recounted by Plaintiffs in their complaint, *Compl.* ¶ 68; however, NOAA appears to have implemented a final rule on May 30, 2024. *See* Removal of American Lobster Effort Control Measures, 89 Fed. Reg. 46825 (May 30, 2024) (to be codified at 50 C.F.R. pt. 697).

tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth.

4. The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The license holder shall notify the [MDMR] prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

5. It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering with an approved tracking device is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the [MDMR].

*Id.* ¶ 69.

The MDMR Rule does not list specific punishments for failure to comply with its requirements. *Id.* ¶ 71. Rather, the rule "simply states that individuals will not be punished for a device malfunction if the fisherman notifies MDMR of the issue and makes efforts to restore it to operation in an unspecified 'timely manner.'" *Id.* Because the MDMR Rule does not specify how enforcement will be handled in any other exigent circumstance, "it remains unclear what responsibilities and repercussions will be applied to fishermen unaware of malfunction of their electronic tracking device." *Id.* Plaintiffs emphasize this as a particular concern given that lobstermen are not given access to the settings on the device itself, or in the instance where a lobsterman is unable to repair the device. *Id.* It is also unclear if lobstermen

are entitled to appeal any fines, penalties, or other enforcement actions levied against them regarding the MDMR Rule. *Id.*

Like the Addendum, the MDMR Rule requires continuous tracking and monitoring of lobstermen even when they are not fishing in federal waters, despite the fact that lobstermen use their vessels in other commercial capacities (such as scallop, tuna, and menhaden fishing) as well as recreationally. *Id.* ¶ 72. Thus, lobstermen's "movements will be tracked on a minute-by-minute basis even during emergency search and rescue operations." *Id.*

"Upon information and belief, the scope of potential privacy and security intrusions associated with the MDMR Rule far exceed those of any other vessel (or motor vehicle) tracking requirement ever implemented in [Maine]." *Id.* ¶ 73. The existing scallop tracking requirement, for example, mandates that a tracker be active only when the vessel is entering the federal scallop fishery and requires a once-per-hour ping rate. *Id.*

### 1.     The Particle TrackerOne Device

In November 2023, MDMR began sending federally permitted lobstermen electronic trackers that complied with the MDMR Rule. *Id.* ¶ 74. MDMR received funding for the electronic trackers and the associated data plans through a NOAA and National Fish Wildlife Grant. *Id.* MDMR represents that it will pay for the associated data plan for the first three years of the program; it is unclear who will fund the data plan beyond that period. *Id.*

17

MDMR used these grant funds "to select and purchase one of the many available electronic trackers meeting the specifications called for by the Addendum." *Id.* ¶ 75. The tracking device MDMR selected is the "TrackerOne," an electronic tracker distributed by Particle, a U.S.-based company. *Id.* Particle intends to store the data on their U.S.-based servers and offers "dashboards" that allow users visibility into the data being collected by the TrackerOne device in real time. *Id.* The TrackerOne is manufactured in China based on Particle's design. *Id.*

In the materials that accompany each TrackerOne device, *see Compl.*, Attach. 3, *Fed. Permit Holder Vessel Tracking Requirements* (ECF No. 1-3) (*Vessel Tracking Requirements*), MDMR requires that the TrackerOne be installed directly on fishing vessels either via a USB port or by hardwiring the tracker to the vessel. *Compl.* ¶ 76. After installation, the lobsterman is then responsible for ensuring that the tracker remains activated at all ties, either by running a generator or by using the vessel's house batteries. *Id.*

MDMR did not provide lobstermen with any of the manufacturer's specifications, privacy agreements, dashboard access, or other information associated with the tracker. *Compl.* ¶ 77. Lobstermen are thus unaware of what data will be collected, how that data will be used, or the circumstances under which that data can be shared. *Id.* Plaintiffs note "[t]his is particularly worrisome given that, in addition to determining a user's GPS coordinates, the TrackerOne appears to be Bluetooth compatible, may be adapted in order to collect audio information, and employs a predictive algorithm that can anticipate vessel movements." *Id.*

18

### F.     Plaintiffs' Attempts to Raise their Concerns

In the fall of 2023, the Plaintiffs voiced their concerns about the Addendum to the Sustainable Maine Fishing Foundation (SMFF), a non-profit entity established to support efforts to sustain the lobster fishery and protect the rights of the fishing communities that depend on the lobster industry.  *Id.* ¶ 78.

In response to the confidentiality, privacy, and enforcement concerns voiced by many affected lobstermen, SMFF corresponded with Commissioner Keliher, in his official capacity, on December 13, 2023 to detail the lobstermen's apprehensions and to request further information on the TrackerOne and how its data would be collected, stored, maintained, and protected.  *Id.* ¶ 79; *see also Compl.*, Attach. 4, *Dec. 13, 2023 Correspondence* (ECF No. 1-4).  SMFF also requested an extension of the December 15, 2023 implementation date.  *Id.*   At the time of filing, SMFF had not received a formal response to its correspondence.[7]  *Id.*   However, Commissioner Keliher "informed a member of the [Maine Lobstermen's Union] that the tracking requirement was 'out of his hands.'"  *Id.*

### G.     The Parties

The Plaintiffs in this case are individual Maine lobstermen subject to the tracking device requirements of the MDMR Rule.  *See id.* ¶¶ 13-18.

Plaintiff Frank Thompson is an individual residing in Vinalhaven, Maine. *Compl.* ¶ 13.  Mr. Thompson and his spouse, Jean Thompson, are co-owners of Fox Island Lobster Company LLC (FILCO).   *Id.*   He is also a federally permitted

---

[7]      The Court restates this fact as recounted in Plaintiffs' complaint.  *Compl.* ¶ 79.

lobsterman and fishes 800 traps in federal waters. *Id.* MDMR gave Mr. Thompson a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Plaintiff Joel Strout is an individual lobsterman residing in Harrington, Maine and the President of the District 4 Lodge of the International Association of Machinist and Aerospace Workers, Local Lodge 207, formerly known as IAMAW Maine Lobstering Union – Local 207 (MLU). *Id.* ¶ 14. All MLU members hold active Maine commercial lobster and crab fishing licenses. *Id.* Mr. Strout himself is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id.* MDMR gave Mr. Strout a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Plaintiff Jason Lord is an individual lobsterman residing in Pemaquid, Maine. *Id.* ¶ 15. Mr. Lord is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id.* MDMR gave Mr. Lord a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Plaintiff Christopher Smith is an individual residing in Jonesport, Maine. *Id.* ¶ 16. Mr. Smith is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id.* MDMR gave Mr. Smith a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Plaintiff Jack Cunningham is an individual residing in Bar Harbor, Maine. *Id.* ¶ 17. Mr. Cunningham is a federally permitted lobsterman who fishes 800 traps in

federal waters. *Id.* MDMR gave Mr. Cunningham a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Defendant Patrick Keliher is the Commissioner of the MDMR, appearing as a Defendant in his official capacity. *Id.* ¶ 18. Commissioner Keliher is also a member of the ASMFC. *Id.* In his official role, Commissioner Keliher "supervises and directs all business conducted by the MDMR and is responsible for ensuring that the actions, decisions, and rules of that agency comply with all applicable laws and regulations." *Id.*

## III.  THE PARTIES' POSITIONS ON WHETHER DISMISSAL IS APPROPRIATE

### A.  The Plaintiffs' Allegations

Plaintiffs challenge the adoption and enforcement of the MDMR Rule on three grounds. *Compl.* ¶ 12. They argue, first, that the MDMR Rule's requirement of a twenty-four-hour-a-day vessel tracker is an unreasonable search and seizure in violation of due process protections in the Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* They argue, second, that the MDMR Rule violates Plaintiffs' equal protection rights pursuant to the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 6-A of the Maine Constitution by failing to describe any of the conditions under which it will be enforced and the penalties for noncompliance, such that the Court should find it to be void for vagueness.[8] *Id.* Third, Plaintiffs aver

---

[8]      The Plaintiffs state in their complaint that they bring their federal equal protection claim pursuant to Articles V and XIV of the U.S. Constitution. *Compl.* ¶ 12. As Plaintiffs' counsel acknowledged at oral argument, the references to Articles V and XIV, not Amendments V and XIV, are an obvious typographical error, and the Court has treated the references to be to the Amendments.

that the MDMR Rule violates the Maine Administrative Procedure Act (the Maine APA), 5 M.R.S. §§ 8001 *et seq.*, because it is arbitrary and capricious and contrary to law. *Id.*

### 1.   Count One: The Fourth Amendment

Plaintiffs begin by informing the Court that the Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures; a search or seizure is "unreasonable" when the government trespasses into personal property, without a warrant, in violation of a reasonable expectation of privacy. *Id.* ¶ 21 (citing U.S. CONST. amend. IV).   Plaintiffs aver that the use of information or evidence obtained through an unconstitutional search and seizure is a violation of the due process protections in the Fourteenth Amendment.   *Id.* ¶ 22 (citing U.S. CONST. amend. XIV).

Plaintiffs point out that the United States Supreme Court has held that long-term "GPS monitoring of even a vehicle traveling on public streets constitutes a search," and that individuals have a reasonable expectation of privacy in physical movements captured by GPS monitoring.  *Id.* ¶ 23 (citing *Carpenter v. United States*, 585 U.S. 296, 309, 314-15 (2018) ("Whether the Government employs its own surveillance technology . . . or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements").

---

The Court also notes that allegations of "void for vagueness" are typically argued as a violation of due process rights, not equal protection.  However, the Court views the complaint "in the light most favorable to the plaintiff," *Germanowski*, 854 F.3d at 71, and infers that Plaintiffs intended to bring Count Two as a violation of their rights to due process.

These constitutional protections extend, Plaintiffs argue, to an individual's right to conduct a business free from government incursion. *Id.* ¶ 24 (citing *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 487-88 (S.D.N.Y. 2019) (finding businesspeople "ha[ve] a constitutional right to go about [their] business free from unreasonable official entries upon [their] private commercial property")). To comply with the Fourth Amendment, Plaintiffs contend, "an administrative search of a business must have a limited scope, a relevant purpose, specificity in its demands, and a neutral arbiter." *Id.*

Turning to the case at hand, Plaintiffs contend that, under the Fourth Amendment's protection against unreasonable searches and seizures, they "have a reasonable expectation of privacy in the movements of their fishing vessels and the precise location of their lobster traps." *Id.* ¶ 81. Plaintiffs argue that they also have a reasonable expectation of privacy "in the data produced by the tracker itself." *Id.* ¶ 82. They assert that they have a constitutional right to be free from unreasonable official entries upon their private commercial property when acting in a business capacity, *id.* ¶ 83, and that the tracking requirements set forth in the Addendum and the MDMR Rule constitutes a Fourth Amendment search "insofar as the Defendant, without a warrant, is tracking the Plaintiffs' movements while conducting business activities within federally regulated waters, as well as their personal movements while in state-controlled waters." *Id.* ¶ 84.

They aver that neither the ASMFC nor MDMR have articulated the "limited scope, relevant purpose, and specificity required to otherwise obtain this satellite

23

tracking data through a constitutional administrative search." *Id.* ¶ 85.  "Because ASM[F]C and MDMR intend to use the tracker's surveillance data in connection with offshore enforcement efforts," they opine, "the information being collected without [a] warrant from the Plaintiffs, and potentially used punitively against them, violates their right to be free from the deprivation of life, liberty, and property without due process of law." *Id.* ¶ 86.

### 2.      Count Two: Equal Protection

Plaintiffs assert that the guarantee of equal protection enshrined in the Fifth and Fourteenth Amendments of the federal Constitution and Article I, § 6-A of the Maine Constitution, "applies to the conduct and action of the Defendant and its officials and employees."  *Id.* ¶ 88.  They aver that they "have a constitutionally protected right to equal protection under the law when the government regulates their private property, movements, and business activities."  *Id.* ¶ 89.

The MDMR Rule, Plaintiffs contend, does not provide this constitutionally required protection and is thus "void for vagueness in that it is designed to enforce criminal and regulatory offenses without defining the contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.* ¶ 91.

"By way of example," Plaintiffs continue, "the MDMR Rule does not list the penalties for noncompliance, indicate what offenses can be prosecuted based on the data that is collected, what enforcement efforts can be used in connection with the

tracking device, or whether any non-compliance has implications on their fishing licensure." *Id.* ¶ 92. They also argue that the MDMR Rule does not state what penalties, if any, may be imposed for unintentional, as opposed to intentional, violations, "whether MDMR will make efforts to distinguish server-side errors from fisherman error," or what appellate rights plaintiffs have pursuant to the rule. *Id.* ¶ 93. "Given the lack of clarity on how MDMR intends to incorporate the 'offshore enforcement' efforts called for by the Addendum, and the fact that there are no detailed penalties in the MDMR rule for noncompliance," Plaintiffs conclude that "the MDMR Rule is void for vagueness in that it violates the equal protection guarantees provided by both the [U.S.] and Maine constitutions." *Id.* ¶ 94.

### 3.    Count Three: The Maine APA

Plaintiffs inform the Court that rules promulgated by a Maine administrative agency can be challenged under the Maine APA on procedural and substantive grounds, *id.* ¶ 49 (citing 5 M.R.S. § 8058(1)), and that a court reviewing a challenged agency action:

> must set aside an agency rule that 1) does not contain the written statement required by Section 8057-A; 2) involves a procedural effort that is substantial and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not occurred; or 3) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Id.* ¶ 96 (citing 5 M.R.S. § 8058).

First, Plaintiffs establish that the Maine APA requires agencies engaged in rulemaking to publish a written statement explaining the factual and policy basis for

the proposed rule.[9]  *Id.* ¶ 48 (citing 5 M.R.S. § 8052(5)).  They assert that the MDMR Rule violates 5 M.R.S. § 8052(5) by failing to "specify the operation, fiscal impact, or information considered by MDMR in its promulgation of the Rule," in particular regarding the MDMR Rule's 1) specific enforcement provisions or data governance policy, 2) "specification of the fiscal implications to fisherm[e]n once the grant funding for the trackers expires," and 3) "specification as to how MDMR arrived at a required ping rate or determined a need for the tracking of licensees beyond the scope of their lobster fishing activity."  *Id.* ¶ 97.

Second, Plaintiffs contend that the MDMR Rule also violates the Maine APA because it is arbitrary and capricious for being "inconsistent with the goals of the MSA," offering the following examples of the MDMR Rule's failures:

1. Does not contain an adequate explanation for why minute-by-minute surveillance (as opposed to the hourly surveillance called for by the scallop tracking program) of federally permitted lobster fishing vessels is required to protect, conserve, grow or manage the American lobster fishery;

2. Authorizes the tracking of lobster vessels in state waters, when the vessel is being used for other commercial purposes unrelated to lobster fishing, and/or when the vessel is being used recreationally;

3. Calls for a substantial increase in surveillance without an explanation as to why the self-reported spatial information that fishermen have gathered since 2018 under [the Addendum] is insufficient information for purposes of [Magnuson-Stevens Act] compliance and/or does not violate National Standard 7, which

---

[9]    Plaintiffs note that Maine APA § 8052(5) further requires the written statement include information identifying persons who commented on the proposed rule, including the organizations they represent and a summary of their comments.  *Compl.* ¶ 48 (citing 5 M.R.S. § 8052(5)).  They note that the same section mandates agencies publish "their rationales for adopting, or failing to adopt, any changes to proposed rules, or when they draw findings and recommendations different from those expressed by commentators."  *Id.* (citing 5 M.R.S. § 8052(5)).

specifically states that any fishery plan shall "avoid unnecessary duplication";

4. Risks exposing the Plaintiffs' trade secrets to third-parties without any explanation of what efforts, if any, are being taken to encrypt and protect that information from third parties, including whether third parties will be able to subpoena this information or whether this information will be available as part of the administrative record in challenges to other agency actions;

5. States that the information collected will be shared with "appropriate state or federal agencies" without defining those agencies that MDMR deems to be appropriate, limit what these agencies can subsequently do with that information, or state whether this information will be available to other agencies or private parties interested in developing wind energy projects in lobster fishing grounds;

6. Has a stated purpose of furthering renewable energy projects, including wind energy, that is well beyond the goals of FMPs authorized by the [Magnuson-Stevens Act];

7. Requires a tracker that can be Bluetooth enabled and is capable of collecting nonspatial data; and

8. Is more expensive and intrusive than necessary to achieve the Addendum's stated goals.

*Id.* ¶ 98.

Third, Plaintiffs argue that the MDMR Rule violates the Maine APA by being contrary to law. *Id.* ¶¶ 12, 99. They specifically assert that the MDMR Rule is contrary to the Consolidated Appropriations Act, 2023 Pub. L. No. 117-328, Div. JJ, 136 Stat. 4459, 6089-92 (2022) (CAA), which includes a provision specifying that the Take Reduction Plan is "sufficient to ensure that the continued Federal and State authorizations of the American Lobster . . . fisher[y] are in full compliance with both

the Marine Mammal Protection Act [MMPA] and the Endangered Species Act [ESA] until December 31, 2028." *Id.* ¶ 12 (internal quotation marks omitted).

Plaintiffs assert that the MDMR Rule is contrary to the CAA because the former is not an extension of an emergency rule existing at the time of the CAA's passage, but rather is a new regulation or administrative action designed to bring the lobster industry into compliance with the ESA and MMPA in violation of the CAA's express provision that the existing amendments to the Take Reduction Plan are to be deemed sufficient for compliance until December 2028. *Id.* ¶ 99. Plaintiffs further claim that the MDMR Rule is contrary to law because "Section . . . 101 creates field preemption over regulations of federally licensed lobster and Jonah Crab fisheries such that MDMR has no authority to create state regulations affecting them." *Id.* Finally, Plaintiffs argue that the Addendum and the MDMR Rule are both inconsistent with the mandatory National Standards articulated in the MSA. *Id.*

After acknowledging that federal review of state administrative action or rules is "generally inappropriate when a federal court is asked to answer questions specific to state law concerns and administration," *id.* ¶ 50, Plaintiffs insist that their challenge to the MDMR Rule "does not involve questions specific to Maine state law because the MDMR Rule adopts the federal policy contained in the . . . Addendum that Maine is required to adopt under federal law." *Id.* ¶ 100. Plaintiffs suggest that their challenge thus survives the narrowly tailored *Burford*[10] abstention doctrine, which requires federal courts to show deference to state administrative processes

---

[10]    *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

when "the rule or action involved pertains *only* to state-law issues that serve a significant local interest." *Id.* ¶ 51 (citing *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 29 (1st Cir. 2011) (emphasis added by Plaintiffs).

**B.    Commissioner Keliher's Motion to Dismiss**

Commissioner Keliher moves to dismiss Counts One and Two in Plaintiffs' complaint for failure to state a claim upon which relief can be granted and Count Three for lack of subject matter jurisdiction. *Mot. to Dismiss* at 9-24.

**1.    Federal Rule of Civil Procedure 12(b)(1)**

**a.    Count Three: The Maine APA**

Commissioner Keliher begins by moving to dismiss Count Three against him on jurisdictional grounds pursuant to Federal Rule of Civil Procedure 12(b)(1). *Id* at 9-10. Commissioner Keliher argues that "[t]he Complaint on its face . . . establishes that the Court does not have jurisdiction over [Count Three] because the Eleventh Amendment to the U.S. Constitution 'denies federal courts jurisdiction to award . . . relief against state officials based upon violations of state law." *Id.* at 9 (quoting *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 (1st Cir. 2009) (collecting cases). When a plaintiff asks a federal court to compel state officers to comply with state law, Commissioner Keliher says that "the only appropriate response is to dismiss the state law claims," "even in a suit also bringing claims grounded in federal law." *Id.* (citing *Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option"); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984)

29

("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment")).

In response to Plaintiffs' argument that "[a] challenge to the [MDMR] Rule does not involve questions specific to Maine state law because the [MDMR] Rule adopts . . . federal policy," *Compl.* ¶ 100, Commissioner Keliher says this "does not help them for two reasons." *Mot. to Dismiss* at 9. First, Commissioner Keliher says, Plaintiffs' suggestion that the MDMR Rule "is a creature of state law is simply incorrect" because the MDMR Rule arises from the Addendum, "which is itself a creation of the multistate [ASMFC] and not of any federal entity." *Id.* (citing *Mot. to Dismiss, supra*, sect. II). On this point, Commissioner Keliher also avers that the MDMR Rule does not have to be consistent with the MSA's National Standards. *Id.* (citing *Mot. to Dismiss, supra*, n. 5).

"Second, and most importantly," he says, the relevant issue is whether Count Three seeks relief against a state official based on violations of state law, not whether the count involves "questions specific to Maine law." *Id.* at 9-10 (citing *Guillemard-Ginorio*, 585 F.3d at 529). In other words, Commissioner Keliher opines, "the major problem with Count III is this Court's lack of jurisdiction under the Eleventh Amendment, not the principles underlying *Burford* abstention." *Id.* at 10 (citing *Compl.* ¶¶ 50-52; *Chico Serv. Station, Inc.*, 633 F.3d at 29 ("the fundamental concern in *Burford* is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution"); *Burford*, 319 U.S. 315).

Concluding that the complaint, on its face, shows that the Court lacks jurisdiction over Plaintiffs' third count because of Defendant's sovereign immunity, Commissioner Keliher accordingly asks the Court to dismiss Count Three pursuant to Federal Rule of Civil Procedure 12(b)(1).  *Id.*

### 2.    Federal Rule of Civil Procedure 12(b)(6)

### a.    Count One: The Fourth Amendment

Commissioner Keliher next argues the facts alleged in Count One of Plaintiffs' complaint, "even drawing all reasonable inferences in Plaintiffs' favor, show no plausible path to relief because the [MDMR] Rule unquestionably meets the requirements for a lawful 'administrative search'" and thus does not violate the Fourth Amendment.  *Id.* at 10-11.

The Fourth Amendment's prohibition on "unreasonable searches and seizures," Commissioner Keliher admits, has long established that "warrantless searches of private premises are presumptively unreasonable."  *Id.* at 11 (quoting *United States v. Almonte-Baez*, 857 F.3d 27, 31 (1st Cir. 2017)) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)).  However, Commissioner Keliher continues, courts have recognized several exceptions to this presumption of unreasonableness.  *Id.*  "Of relevance here," he says, the United States Supreme Court has found that "an 'administrative search' is a warrantless search that 'serve[s] a "special need" other than conducting criminal investigations.'"  *Id.* (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015)).  Commissioner Keliher asserts that, generally, these warrantless searches do not run afoul of the Fourth Amendment if the subject of the

search is afforded an opportunity for pre-compliance review before a neutral arbiter. *Id.* (citing *Patel*, 576 U.S. at 420).

When the search involves commercial premises in a "closely regulated" industry, Commissioner Keliher continues, "an even 'more relaxed standard' applies." *Id.* (citing *Patel*, 576 U.S. at 424).   These searches do not violate the Fourth Amendment so long as (1) there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; (2) the search is necessary to furthering that interest; and (3) the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *Id.* (citing *Burger*, 482 U.S. 691, 702-03 (1987); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216-17 (1st Cir. 2015) (articulating the "*Burger* test"); *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (same)).

Commissioner Keliher explains that this "more relaxed standard" is applied to administrative searches of closely regulated industries because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home [and] is particularly attenuated in commercial property employed in 'closely regulated' industries."  *Id.* at 11-12 (citing *Burger*, 482 U.S. at 700; *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) ("[T]he owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises")).  Commissioner Keliher notes that this diminished

expectation of privacy also applies when the "premises" being searched is a vehicle. *Id.* at 12, n. 14 (citing *United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) ("For purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles")).

Turning to the instant case, Commissioner Keliher concedes that the electronic tracking requirement in the MDMR Rule constitutes a Fourth Amendment search. *Id.* at 12 n.16.   However, he contests Plaintiffs' contention that the MDMR Rule amounts to an unreasonable search in violation of the Fourth Amendment.   *Id.* at 12. Commissioner Keliher argues that by requiring the installation of devices on commercial lobster fishing vessels that transmit vessel location data while the vessel is lobstering in federal and state waters, "the [M]DMR Rule constitutes an administrative search of a commercial premises engaged in a closely regulated industry."   *Id.* at 12.

Commissioner Keliher first argues that the American lobster fishery is a closely regulated industry, and then, by analyzing the MDMR Rule under the three elements of the *Burger* test, submits the MDMR Rule "complies with the well-established requirements for such a search, . . . is consistent with reasonable expectations of privacy[,] and does not violate the Fourth Amendment."[11]   *Id.*

---

[11]   In a footnote, Commissioner Keliher says that his motion to dismiss, "like Plaintiffs' Complaint," focuses on Plaintiffs' privacy expectations in their movements while engaged in the lobster fishery, and in the location of their lobster traps.   *Mot. to Dismiss* at 12 n.17 (citing *Compl.* ¶¶ 81-83).

He notes that "Plaintiffs assert in passing that fishing vessels covered by the [M]DMR Rule are also occasionally used for other purposes . . . . [b]ut these allegations do not support a plausible inference that they have a reasonable expectation of privacy in their movements while fishing for non-lobster species – activity within the scope of the pervasively regulated commercial fishing industry – or engaging in search-and-rescue operations at sea."   *Id.* at 12-13 n.17.

###### i.      Closely Regulated Industry

An industry is "closely regulated" when it is subject to pervasive regulation and inspection, says Commissioner Keliher.  *Id.* at 13 (citing *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 734 (1st Cir. 2022).  Commissioner Keliher contends that courts have recognized commercial fishing as a closely regulated industry.  *Id.* at 13 (citing *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry"); *Lovgren v. Byrne*, 787 F.2d 857, 865 & n.8 (3d Cir. 1986) ("the fishing industry has been the subject of pervasive governmental regulation since the founding of the Republic").

While he acknowledges that the Supreme Court has not deemed commercial fishing to be closely regulated, Commissioner Keliher opines that "a comparison with other closely regulated industries demonstrates that commercial fishing is closely regulated."[12]    *Id.* at 13.  In *Burger*, he says, the Supreme Court concluded that automobile junkyards were closely regulated because operators must obtain a license, must maintain records and make them available for government inspection, must

---

Commissioner Keliher continues, "To the extent Plaintiffs have a reasonable expectation of privacy in their commercial fishing vessels' movements while using these vessels for personal travel, Plaintiffs' allegations do not support a plausible inference the collection of location data from these trips as occasional incident to the lawful administrative search regime falls outside the de minimis exception to the Fourth Amendment's warrant requirement."  *Id.* at 13 n.17 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Taylor v. City of Saginaw*, 620 F. Supp. 3d 655, 664 (E.D. Mich. 2022); *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)).

[12]      Commissioner Keliher acknowledges in a footnote that the U.S. Supreme Court in *Patel*, 576 U.S. at 424, questioned the scope of the closely regulated industry doctrine and noted that it had only recognized four industries (liquor sales, firearms dealing, mining, and automobile junkyards) as "closely regulated."  *Mot. to Dismiss* at 13 n.18.  However, Commissioner Keliher says, "the Court's actual holding in *Patel* was only that 'hotels' … do not constitute a closely regulated industry," *id.* citing *Patel*, 576 U.S. at 425-26, and, "post-*Patel*, courts have continued to recognize various industries as closely regulated."  *Id.* (collecting cases).

display their registration number in various ways, and are subject to criminal penalties, loss of license, or civil fees for failure to comply. *Id.* at 13-14 (citing *Burger*, 482 U.S. at 704-05). Commissioner Keliher argues that "[a] sample of the federal and state laws and regulations governing commercial lobster fishing in Maine, of which this Court may take judicial notice, . . . demonstrates requirements that are just as stringent and wide-ranging as those in *Burger*, if not more so."[13]  *Id.* at 14. He includes examples of lobster fishery regulations which, he says, support finding the industry to be "closely regulated":

1. The ACFCMA, 16 U.S.C. §§ 5101-5108, requires the [ASMFC] to adopt [FMPs] and, should a member state fail to comply with a [FMP], gives the U.S. Secretary of Commerce authority to declare a moratorium on that state's fishery;

2. 50 C.F.R. Part 697 manages lobster fisheries by, among other things, requiring vessel permits, trap limits and tags, restricting gear in certain areas, and providing for at-sea sampler/observer coverage.

3. Under 46 C.F.R. Chapter 1, the U.S. Coast Guard and the Department of Homeland Security require commercial fishing vessels to carry certain safety equipment.

4. Title 12, Chapter 619, of the Maine Revised Statutes and Chapter 25 of [M]DMR's rules, 13-188 C.M.R. ch. 25, manages the lobster fishery by, among other things, requiring licensure, limiting the size of lobsters that may be taken, requiring that certain lobsters be notched and thrown back, and managing how lobster gear is tagged and handled and how traps are constructed.

---

[13]     Commissioner Keliher argues that "[a] court may take judicially noticeable 'matters of public record' without converting a motion to dismiss to a motion for summary judgment."  *Mot. to Dismiss* at 14, n.19 (citing *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000)). "In general," he continues, "federal courts may take judicial notice of federal and state laws and regulations.  *Id.* (citing 21B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 5102.1 (2d ed.); *Greene v. Rhode Island*, 398 F.3d 45, 48-49 (1st Cir. 2005) (taking judicial notice of a federal statute at the motion to dismiss stage)).

> 5. Maine law provides that any person who "receives a [marine resources] license . . . has a duty to submit to inspection and search for violations related to the licensure activities by a marine patrol officer" and that "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . may be searched or inspected at any time." 12 M.R.S. § 6306(1).

*Mot. to Dismiss* at 14-15.

In addition to the above, Commissioner Keliher asserts that "people operating vessels at sea—whether or not they are engaging in commercial fishing—are subject to a network of regulations that allow officials to board and inspect vessels." *Id.* at 15. While reasonable suspicion is needed to stop a personal vehicle on a highway or a pedestrian on a public street, "a vessel at sea . . . can be stopped for document checks and safety inspections at any time even without reasonable suspicion." *Id.* (citing *United States v. Villamonte-Marquez*, 462 U.S. 579, 592-93 (1983); *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *State v. Giles*, 669 A.2d 192, 193 (Me. 1996)). He informs the Court that "Maine law specifically provides that '[m]arine patrol officers may stop and board any watercraft at any time to inspect its documents, licenses, and permits of the occupants of the watercraft and to conduct a safety inspection." *Id.* (citing 12 M.R.S. § 6133(1)).

Based on the foregoing, Commissioner Keliher concludes that commercial fishing is a closely regulated industry and Plaintiffs thus have a "greatly reduced expectation of privacy." *Id.* He further notes that Plaintiffs "have alleged no facts that would support a different conclusion," emphasizing that "in their Motion for Preliminary Injunction, Plaintiffs 'concede that commercial fishing is a closely[] regulated industry.'" *Id.; id.* at 15 n.20 (citing *Pls.' Mot. for Prelim. Inj.* at 12).

Commissioner Keliher proceeds to the first prong of the *Burger* test.

### ii.        Substantial Government Interest

Commissioner Keliher acknowledges that, to comply with the Fourth Amendment, "[a] lawful administrative search of a closely regulated industry must be necessary to furthering a substantial government interest." *Id.* at 15 (citing *Burger*, 482 U.S. at 702). He then avers that the MDMR "undoubtedly has a substantial interest in regulating the lobster fishery and ensuring its long-term viability as an economic and cultural pillar of Maine society." *Id.* (citing 12 M.R.S. § 6021 (establishing MDMR in part to "conserve and develop marine . . . resources"); *Tarabochia v. Adkins*, 766 F.3d 1115, 1123 (9th Cir. 2014) ("To be sure, protecting the fishery is an important governmental interest")).

### iii.       Necessary to Further Substantial Government Interest

Proceeding to the second prong of the *Burger* test, Commissioner Keliher argues that the MDMR Rule is necessary to further the government's substantial interest in the lobster fishery because, as stated in the Addendum, "the detailed data based on a one-ping-per-minute rate that will be collected from the electronic trackers is necessary to accurately characterizing activity in the fishery . . . which is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock assessment." *Id.* at 16 (citing *Mot. to Dismiss*, Attach 1., *Addendum XXIX to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum IV to the Jonah Crab Fishery Mgmt. Plan* § 2.1 (ECF No. 23-1) (*Addendum XXIX*)). Further, the "current system of self-reported data lacks the accuracy,

reliability, and precision that would all [M]DMR and other fishery managers to characterize a fishery occurring over vast areas and far from shore." *Id.* (citing *Addendum XXIX* § 2.1). He concludes by asserting that not only is MDMR required to implement the MDMR Rule pursuant to its obligations as a member of the ASMFC, but MDMR has also concluded, based on scientific evidence and its fishery management expertise, that the electronic tracking requirement is necessary to protect and manage the fishery. *Id.* Plaintiffs, he says, "have not alleged facts supporting a plausible inference to the contrary." *Id.*

### iv.     Functions as Warrant

Commissioner Keliher argues that the MDMR Rule also satisfies the third prong of the *Burger* test because it "perform[s] the two basic functions of a warrant" by "[1] advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and . . . [2] limit[ing] the discretion of the inspecting officers." *Id.* (citing *Burger*, 482 U.S. at 703). Regarding the first element, Commissioner Keliher avers that the MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the [MDMR] Rule's terms." *Id.* at 16-17 (citing *Tart v. Commonwealth of Mass.*, 949 F.2d 490, 498 (1st Cir. 1991) (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports")). Turning to the second element, Commissioner Keliher says that the MDMR Rule "properly limits government

discretion by tracking only location data of licensed commercial fishing vessels." *Id.* at 17. Citing cases in which courts found administrative searches to comply with this element, he asserts that the MDMR Rule is analogous to other administrative search regimes courts have deemed lawful. *Id.*

Acknowledging that the MDMR Rule requires vessel location data to be collected "around-the-clock whenever a vessel is in operation," Commissioner Keliher opines that this does not violate the *Burger* test: "the *Burger* [C]ourt . . . made clear that temporal limitations on administrative searches are only relevant to the extent they demonstrate that the administrative search regime 'place[s] appropriate restraints upon the discretion of the inspecting officers.'" *Id.* (citing *Burger*, 482 U.S. at 711). Commissioner Keliher interprets the Supreme Court's holding to mean that "timing restrictions for timing restrictions' sake are not necessary," and points to two cases where federal courts of appeal have approved administrative searches with no time limitations. *Id.* at 17-19 (citing *Tart*, 949 F.2d at 497-99; *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009)).

Commissioner Keliher argues that the MDMR Rule "presents the circumstances identified in *Tart* and *Ponce-Aldona*." *Id.* at 19. As in *Tart*, he asserts, the MDMR Rule's collection of location data is "minimally intrusive in the context of the 'entire regulatory scheme applicable to the commercial fishing industry,'" *id.* (citing *Tart*, 949 F.2d at 499), and is notably "less intrusive than the suspicionless boarding and search of a vessel, which is already authorized [in the lobster industry] under state and federal law." *Id.* (citing 16 U.S.C. §§ 5101-5108; 50 C.F.R. Part 697;

46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)).   In addition, he says, timing restrictions on the MDMR Rule's electronic data collection would not be feasible because, like the commercial trucking industry at issue in *Ponce-Aldona*, commercial lobstering does not follow regular business hours," *id.* (citing *Ponce-Aldona*, 579 F.3d at 1226), such that timing restrictions, or the ability of vessel owners to turn the tracker on and off at their discretion, would "seriously undermine the reliability and administrability of the entire data collection program." *Id.*

Further, Commissioner Keliher notes, the MDMR Rule takes steps to limit its data collection. *See id.* at 6-7.  The Particle TrackerOne collects the position of the vessel once per minute while the vessel is moving, but only once every six hours when the vessel is moored or docked.  *Id.* at 6 (citing *Vessel Tracking Requirements* at 1). In addition, he says, although the MDMR Rule makes it generally unlawful for license holders to fish for lobster without an installed and operating tracking device on their vessel, several exceptions apply: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from MDMR while the situation is addressed.  *Id.* at 6-7 (citing *Mot. to Dismiss*, Attach. 2, *Certificate of Authenticity §§ (B)-(D)* at § (C) (ECF No. 23-2) (*MDMR Rule*)).

Furthermore, Commissioner Keliher says, vessel location data is transmitted to the ACCSP, which maintains the SAFIS database. *Id.* at 7 (citing *Compl.* ¶ 62). Commissioner Keliher avers that "ACCSP has protected confidential information relating to fisheries—including self-reported Vessel Trip Report data—for years using the same electronic transmittal systems (approved by NMFS) and SAFIS database, as described in Addendum XXIX." *Id.* (citing *Addendum XXIX* § 3.2.3). Further, he says, "the vessel location data is 'designated as confidential through Maine law and regulation.'" *Id.* (quoting *Vessel Tracking Requirements* at 2). Specifically, Commissioner Keliher continues, "Maine law requires that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel." *Id.* (citing 12 M.R.S. § 6173). "[MDMR] regulations also require that publicly released data do not identify individual vessels or license holders." *Id.* (citing 13-188 C.M.R. ch. 5).

### v.     Reasonable Expectation of Privacy

Based on the foregoing, Commissioner Keliher argues that the Plaintiffs' contention that the MDMR Rule violates their reasonable expectation of privacy is "unavailing" because the administrative search doctrine holds that a warrantless search of commercial premises in a closely regulated industry is reasonable within the meaning of the Fourth Amendment so long as it meets the requirements for an administrative search. *Id.* at 19-20 (citing *Burger*, 482 U.S. at 700).

In response to Plaintiffs' citation of *Carpenter* in support of an individual's expectation of privacy "in the record of his physical movements" as captured through

cell-site location information, Commissioner Keliher responds "that case is entirely inapposite" because, first, *Carpenter* involved data collected as part of a criminal investigation and, second, the data at issue in *Carpenter* "provide[d] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 20 (citing *Carpenter*, 585 U.S. at 310-11).

Commissioner Keliher next responds to Plaintiffs' contention that the location of their lobster traps amounts to a "trade secret." *Id.* (citing *Compl.* ¶ 3). He argues, first, that Plaintiffs "have not pleaded any facts supporting [this] general assertion," and "it is difficult to comprehend how the location of Plaintiffs' lobster traps could constitute a 'secret' considering that (1) traps must be marked for identification . . . and (2) traps are placed in the open ocean, where marker buoys are subject to visual identification by anyone in the vicinity." *Id.* at 20-21 (citing *Oliver v. United States*, 466 U.S. 170, 179 (1984) (noting that so-called "open fields" "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance")). Second, Commissioner Keliher says that "every lawful administrative search may reveal to the government how an entity does business; the target of an administrative search is often precisely those documents and other materials containing such information." *Id.* at 21 (citing *Ricco Jonas*, 24 F.4th at 734). Third, he posits that Plaintiffs do not plausibly allege how the MDMR Rule, "which only exposes vessel-specific data to the government and keeps such data

confidential from the broader public, including fishing competitors," will violate their expectation of privacy in their "trade secrets." *Id.*

In a footnote, Commissioner Keliher responds to Plaintiffs' concern with the potential use of vessel location data in criminal or civil enforcement proceedings. *Id.* at 21 n. 22 (citing *Compl.* ¶ 86). He contends that "they have not pleaded any facts supporting a plausible claim to relief," and "[b]inding precedent forecloses any argument that the use of information collected through an administrative search in separate enforcement proceedings renders an otherwise lawful administrative search unconstitutional." *Id.* (citing *Burger*, 482 U.S. at 704-05 (discussing an administrative search regime where business owners were subject to criminal penalties, loss of license, or civil fines for violations of the regulations the searches were conducted to enforce); *Burger*, 482 U.S. at 716 ("Nor do we think this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself").

Commissioner Keliher concludes that Plaintiffs have failed to plausibly allege the MDMR Rule's tracking requirement exceeds a lawful administrative search of a closely regulated industry and asks the Court to dismiss Plaintiffs' Fourth Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. *Id.*

43

### b.    Count Two: Equal Protection

Commissioner Keliher next addresses Plaintiffs' contention that the MDMR Rule violates the equal protection clauses of the U.S. and Maine Constitutions because it is vague.  *Id.* at 22.  Noting first that a "void-for-vagueness" claim is usually analyzed under the Due Process Clause, *id.* at 22 n.23, Commissioner Keliher maintains that a rule is unconstitutionally vague "only when it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited[] or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Id.* at 22 (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)).  Further, he says, "the Supreme Court has applied a less strict vagueness test to commercial regulation . . . [a]nd vagueness review is less exacting still where the law at issue carries no criminal penalties."  *Id.* at 22 (citing *ACA Connects – Am.'s Commc'ns Assoc. v. Frey*, 471 F. Supp. 3d 318, 330 (D. Me. 2020)).

Turning to the case at hand, Commissioner Keliher contends that Plaintiffs' complaint does not identify "what terms of the [M]DMR Rule are unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement."  *Id.*  Rather, he says, Plaintiffs say that the rule is impermissibly vague because "the consequences of violating it are unclear."  *Id.* at 22-23.  To this, Commissioner Keliher responds that, "even assuming the precise penalties a person may incur from violating a rule are the subject of constitutional vagueness analysis, the consequences of violating this Rule are clearly

set out in State law." *Id.* at 23. "Like many civil violations," he says, the MDMR Rule "prohibits certain conduct, regardless of whether it is intentional." *Id.* (citing *MDMR Rule* § (C)). He notes that, under Maine law, a violation of the MDMR Rule is a "civil violation for which a fine of not less than $100 for each violation may be adjudged." *Id.* at 7 n.12 (citing 12 M.R.S. § 6174(3)). A violation of the MDMR Rule, Commissioner Keliher claims, is thus "subject to the same process and procedures—including appellate procedures—as a violation of any other [M]DMR Rule." *Id.* at 23. He further informs the Court that a civil violation of the M.R.S. "is subject to the due process provided through a court adjudication, and the [MDMR] may suspend a license after such adjudication." *Id.* at 7 n.12 (citing 12 M.R.S. § 6351(1)(D)). He says 12 M.R.S. § 6371(3)(A) alternatively provides that the MDMR may administratively suspend a license without a prior court adjudication based on the license holder's commission of a marine resource violation; an administrative suspension is subject to procedural requirements and judicial review on appeal. *Id.* (citing 12 M.R.S. §§ 6371(3)(A), 6374). Commissioner Keliher concludes that "[i]t is simply not plausible that covered vessel owners are in the dark about the potential consequences of their conduct, especially considering that they operate in a highly regulated industry and can be expected to know the applicable regulations." *Id.* at 23 (citing *United States v. Facteau*, 89 F.4th 1, 33 (1st Cir. 2023)).

Based on the foregoing, Commissioner Keliher opines that the complaint "simply does not contain factual allegations that support a plausible void-for-

vagueness claim" and the Court should thus dismiss Count Two pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Id.* at 24.

### C. Amicus Curiae Atlantic States Marine Fisheries Commission's Memorandum in Support of Defendant's Motion to Dismiss

The ASMFC submitted an amicus curiae memorandum in support of Commissioner Keliher's motion to dismiss Count One. *Amicus Mem. in Support of Mot. to Dismiss* at 1.

### 1. Count One: The Fourth Amendment

The ASMFC asserts that Plaintiffs' Fourth Amendment argument, if accepted by the Court, "would severely hamper governments' ability to manage fisheries in the public interest and to respond in an informed manner to the serious challenges and conflicts that often mark modern marine fishery management—and would cause that harm without sound support in Fourth Amendment precedent or principle." *Id.*

The ASMFC argues, first, that commercial fishing in marine waters "is, and has long been, a highly regulated activity" and "a privilege that comes with conditions and limitations to protect the public's interests in maintaining sustainable fisheries, the marine environment, and other resources that could be affected by commercial fishing." *Id.* at 1-2. Commercial permit holders, it continues, "reasonably understand that their activities on the water are subject to observation (including by law enforcement)," are typically required to "carry conspicuous markings on their vessels and on their gear," and may also be required to allow a governmental agent or third-party observer onboard throughout a fishing trip to monitor catch and bycatch,

46

document marine mammal interactions, and ensure regulations compliance. *Id.* at 2.

Second, the ASMFC asserts that the Addendum's requirement of licensees does not conform to the traditional premise of Fourth Amendment search cases, which is that the government will gain "access to 'private' things," because the location of a vessel "required to be marked prominently with various identifiers" is not private. *Id.* In contrast with the "constant video surveillance continually ongoing in myriad workplaces (mass transit locations, banks, building lobbies, etc.)," the Addendum's tracking requirement amounts to a limited intrusion which "matches the legitimate management needs but does not intrude unreasonably on any limited privacy interests." *Id.*

The ASMFC next emphasizes that it "did not establish this minimally intrusive requirement lightly or arbitrarily"; rather, it "had compelling reasons for wanting to correct a long-recognized gap in information about lobster fishing activity," as "the [ASMFC] repeatedly explained in the lengthy public process that led to the Addendum's adoption." *Id.* at 3. Plaintiffs "barely acknowledge and never seriously try to refute the legitimacy or importance of the ASMFC's purposes in establishing the monitoring requirement—or the direct way in which the monitoring program will serve those purposes," the ASMFC avers. *Id.*

Turning to Plaintiffs' concerns as to data collection, the ASMFC points out that Plaintiffs bring a facial challenge against the MDMR Rule, despite "hav[ing] not

shown there is an imminent risk it will be unreasonable in *any* case, even their own."

*Id.* at 4 (emphasis in original).  The ASMFC says:

> The theoretical harms that [Plaintiffs] raise are speculative and only arise based upon speculations about someone other than the Defendant doing something improper.  For example, their concerns that – despite being kept in accord with procedures and by institutions that have handled such data successfully – data could be accidentally disclosed or misused, is entirely conjectural and disregards the robust and proven confidentiality regime that governs the data collecting already taking place in the program.  Plaintiffs fail to adduce any real-world examples – whether from the pilot version of the program, from other jurisdictions where electronic tracking is in effect, or even from more intrusive fishery monitoring programs – to support their speculative, theoretical fears.

*Id.* at 4-5.

Based on the foregoing, the ASMFC urges the Court to reject the Plaintiffs' Fourth Amendment claim and grant Commissioner Keliher's motion to dismiss.  *Id.* at 5.

### D.    The Plaintiffs' Opposition

The Plaintiffs oppose Commissioner Keliher's motion to dismiss and the ASMFC's amicus curiae memorandum in support of dismissal.  *Pls.' Opp'n* at 1.

Before addressing the Defendant's arguments for dismissal of the three counts included in their complaint, the Plaintiffs first reassert their position that "[t]he constant monitoring required by the MDMR Rule is what can only be characterized as a drastic departure from past reporting requirements."  *Id.* at 2.  The data collected pursuant to the MDMR Rule, they say, "will be uploaded into a digital map interface that then can be queried by any number of 'authorized federal and state administrators,' as well as other 'state or federal entities with confidential data

access,' to 'query and visualize trip locations' indiscriminately and apparently for any purpose." *Id.* (citing *Addendum XXIX* § 3.2.3). Indeed, they say, recent reports "suggest that this data has already been provided to students at Maine's public universities studying the fishery, as well as to the U.S. Department of Energy's National Renewable Energy Laboratory as part of its efforts to develop floating wind energy projects in the Gulf of Maine." *Id.* (citing *Pls.' Opp'n*, Attach. 1, *Considerations for Floating Wind Energy Dev. in the Gulf of Me.* at 10 (ECF No. 24-1) (*NREL Rep.*) (describing how "[e]fforts are being made to gain more knowledge around commercial fishing activities in federal waters including through a new reporting requirement for lobstering in federal waters.")).

With this preface, the Plaintiffs turn to the arguments made by Commissioner Keliher in his motion to dismiss.

### 1.     Federal Rule of Civil Procedure 12(b)(1)

#### a.     Count Three: The Maine APA

In response to Commissioner Keliher's argument that Count Three must be dismissed for lack of subject matter jurisdiction pursuant to the Eleventh Amendment's bar on federal courts granting relief against state officials for violations of purely state law, the Plaintiffs assert that Commissioner Keliher "cites no authority for [its] proposition" that the MDMR Rule "does not arise under federal law." *Id.* at 4 (citing *Mot. to Dismiss* at 9). Plaintiffs contend that "[t]he MDMR Rule specifically incorporates the requirements of federal Addendum XXIX," and "specifies that it will apply to all 'federally permitted' lobster license holders regardless of

whether or not they are fishing within MDMR's jurisdiction." *Id.* (citing 13 C.M.R. 188, ch. 25, § 98). Thus, Plaintiffs contend, their challenge to the MDMR Rule "necessarily and obviously exceeds the scope of a simple challenge to a state action under a purely state regulatory scheme," because it concerns "the adoption of a federal policy, promulgated under a federal rule, that is aimed solely at *federally* permitted fishing vessels for the purpose of protecting a *federal* fishery." *Id.* at 4-5 (emphasis in original).

Finally, Plaintiffs remind the Court that "[w]hile the Eleventh Amendment prohibits a party from bringing suit against a state in federal court, it does not prohibit a party from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law." *Id.* (quoting *Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 24 (1st Cir. 2007) (internal citations omitted)).

## 2. Federal Rule of Civil Procedure 12(b)(6)

### a. Count One: The Fourth Amendment

Plaintiffs contend the Court should deny Commissioner Keliher's motion to dismiss as to Count One because their complaint "properly pleads a violation of the Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures." *Id.* at 5 (capitalization altered). The Plaintiffs argue that "viewing the [MDMR] Rule in [its] full context reveals it as both unnecessary to achieve its overarching purpose and as having a scope greatly exceeding that permitted for a constitutional administrative search." *Id.* at 6.

Plaintiffs first address Commissioner Keliher's argument that they have a "greatly reduced expectation of privacy when engaging in an industry that is subject to such pervasive regulation." *Id.* (quoting *Mot. to Dismiss* at 15). To this, they argue that "[w]hile an expectation of privacy may admittedly be *reduced* in a closely regulated industry, this does not equate to a non-existent expectation of privacy." *Id.* (citing *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016)) (emphasis added by Plaintiffs). In addition, they argue their reasonable expectation of privacy is heightened in the present case because the scope of MDMR's search extends beyond commercial vessels fishing for lobsters in federal waters, "the only closely-regulated industry the [MDMR] Rule seeks to govern," to encompass the tracking of vessels "while they are docked or used for any number of other utterly unregulated purposes." *Id.*

Turning to the *Burger* test, the Plaintiffs argue that the MDMR Rule is invalid because the "administrative search" the rule authorizes is not necessary to further a substantial government interest. *Id.* at 6-7. While Plaintiffs concede that MDMR has a substantial interest in "regulating the lobster fishery and ensuring its long-term viability," *Mot. to Dismiss* at 15, they aver that the MDMR Rule fails for lack of necessity to protect the long-term health of the lobster fishery. *Pls.' Opp'n* at 7. In response to MDMR's assertion that the one-ping-per-minute rate "is necessary to accurately characterize[e] activity in the fishery, including the locations and density of commercial fishing gear, which 'is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock

assessment,'" *id.* (citing *Mot. to Dismiss* at 16), Plaintiffs insist that "[t]he ASMFC's own statistics . . . reveal that the lobster fishery currently is not in danger of being overfished." *Id.* at 7. Plaintiffs characterize MDMR's description of "future threats" as an "inherently vague allegation" for which MDMR "has made no effort to identify . . . , let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats.'" *Id.*

Plaintiffs also assert that the MDMR Rule fails the *Burger* standard for a reasonable search because it is not sufficiently limited in scope. *Id.* It is unclear, Plaintiffs assert, what "current threats" exist that "could justify the near-constant surveillance of Maine lobstermen and women that could not be addressed through less intrusive means (such as limiting tracking to vessels fishing for lobsters in federal waters or to the lesser 'ping rates' employed by trackers in other fisheries like the scallop fishery)." *Id.* at 8. Acknowledging MDMR's argument that its rule is necessary because "common sense" supports that a less-intrusive method "would compromise reliability and increase the chances of operator error or intentional evasion," *Mot. to Dismiss* at 16, the Plaintiffs say this "flies in the face of evidence that Maine lobster fishermen have a history of regulatory compliance." *Pls.' Opp'n* at 8.

Relatedly, Plaintiffs argue the "indefinite" "duration of the search" shows that the MDMR Rule "does not serve the same functions as a warrant." *Id.* at 9 (capitalization altered). "Unlike traditional warrants," they say, "the scope of the 'warrant' authorized by the [MDMR] Rule is almost limitless." *Id.* Plaintiffs

52

distinguish the MDMR Rule from the cases cited by MDMR on this basis, submitting (1) "the searches undertaken in those cases are best described as 'spot checks' narrowly designed to enforce specific regulations, and each search was only approved when the premises searched were actually engaged in the regulated activity," *id.* at 10 (citing *Burger*, 482 U.S. 691), and (2) the agencies permitted to conduct the search in the cases cited by MDMR were limited to those authorized to regulate the industry itself. *Id.* at 10.

### b.    Count Two: Equal Protection

Plaintiffs reassert that "questions remain about how and to what extent MDMR will enforce the [MDMR] Rule." *Id.* at 11.  Amendment 3 underlying the Addendum allows MDMR and other agencies to use the data collected pursuant to the MDMR Rule for "offshore enforcement" purposes; however, Plaintiffs say, "despite all of the ink spilled in defense of the [MDMR] Rule, MDMR still fails to define what it means by 'offshore enforcement' and whether this [two]-word phrase is limited to regulations that MDMR is tasked with enforcing or whether it extends to regulations promulgated by other agencies." *Id.*  "Because the permutations are endless," Plaintiffs contend, the MDMR Rule is "'so standardless as to encourage discriminatory enforcement' because it lacks articulated standards and 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* (quoting *Mot. to Dismiss* at 24).

Based on the foregoing, Plaintiffs request that the Court deny Commissioner Keliher's motion to dismiss as to all three counts in their complaint. *Id.*

### E.      Commissioner Keliher's Reply[14]

As a preliminary matter, Commissioner Keliher asserts that Plaintiffs' complaint and opposition to his motion to dismiss "blatantly misquote" the Addendum and "thus mischaracterize" its purpose and the purpose of the MDMR Rule.   *Def.'s Reply.* at 2.   He continues to say that the Addendum explains that collection of high-resolution data regarding activities in the American lobster fishery is necessary to respond to various challenges facing the industry, "including, but not limited to, the development of offshore renewable energy and the inevitable imposition on the industry of further whale risk reduction measures."   *Id.* (citing *Addendum XXIX* § 2.1).   However, he says, the Addendum and the MDMR Rule "in no way purport to promote the development of offshore renewable energy development or the implementation of whale risk reduction efforts."   *Id.* Commissioner Keliher says, "Plaintiffs take one section of the Addendum out of context to assert that data collected pursuant to the [M]DMR Rule will be accessed 'indiscriminately and apparently for any purpose',"  and argues this "assertion is squarely contradicted by the Addendum itself."   *Id.* (quoting *Pls.' Opp'n* at 2) (citing *Addendum XXIX* §§ 1.0, 2.1).

---

[14]      Commissioner Keliher informs the Court that his reply incorporates his opposition to the motion for preliminary injunction (ECF No. 16) and "limits [itself] to addressing Plaintiffs' few new substantive arguments and correcting misstatements presented in their Opposition [to dismissal]." *Def.'s Reply* at 1.

The Court accordingly compared Commissioner Keliher's reply to the Plaintiffs' opposition to the motion to dismiss with Commissioner Keliher's opposition to the motion for preliminary injunction. However, the Court did not find any arguments in Commissioner Keliher's opposition to injunctive relief that did not also appear in his reply in the motion to dismiss sequence.  Thus, the Court confines its restatement of Defendant's Reply to the assertions raised in that submission.

Commissioner Keliher similarly asserts that the NREL Report attached by Plaintiffs to their opposition to the motion to dismiss is "entirely inapposite," arguing it "has no bearing on Defendant's Motion to Dismiss," "was produced by two entities not involved with [the Addendum] or the [M]DMR Rule," and its "distinct purpose" is to discuss considerations for developing offshore wind energy. *Id.* at 3 (citing *NREL Rep.* at iv, vii). To the extent the NREL Report discusses the Addendum, he avers, it is as an example of "investments in data collection for lobster and other commercial fishing activities [to] begin to close important ocean-use knowledge gaps," *id.* (citing *NREL Rep.* at 40); this "does not in any way support Plaintiffs' suggestion that data collected pursuant to the [M]DMR Rule is being shared with 'students.'" *Id.* (citing *Pls.' Opp'n* at 2).

### 1.    Federal Rule of Civil Procedure 12(b)(1)

#### a.    Count Three: The Maine APA

Turning to Plaintiffs' response to the motion to dismiss Count Three for lack of subject matter jurisdiction, Commissioner Keliher argues that "Plaintiffs continue to fail to grapple with the fact that Count Three alleges that Defendant has violated *state law*, Maine's [APA]." *Id.* at 4 (emphasis in original). Commissioner Keliher argues that "[o]n its face, Count III asks a federal court to order a state agency to comply with state law."[15] *Id.* Precedent is clear that the Court lacks jurisdiction over

---

[15]    Commissioner Keliher additionally opines that Plaintiffs' argument is inconsistent with their characterization of the MDMR Rule as "involve[ing] the adoption of a federal policy, promulgated under a federal rule." *Def.'s Reply* at 4 (citing *Pls.' Opp'n* at 4-5).

this claim, he says, and "Plaintiffs have not cited a single case supporting abrogation here of this principle of black letter law."[16]  *Id.*

## 2.     Federal Rule of Civil Procedure 12(b)(6)

### a.     Count One: The Fourth Amendment

Addressing Plaintiffs' response in opposition to his motion to dismiss Count One, Commissioner Keliher argues the Plaintiffs "substantively shift away from the Fourth Amendment theory pleaded in their complaint, to no avail." *Id.* (capitalization altered).  He opines that while Plaintiffs' complaint focused on their privacy interests in the location of their lobster traps ("that is, their privacy interests while engaging in commercial lobstering"), their opposition to the motion to dismiss instead focuses on the implications of the tracking requirement when their vessels are being used for purposes other than commercial lobstering.  *Id.* at 4-5.  This shift, he says, "does not help Plaintiffs, for two reasons": first, in assessing a Rule 12(b)(6) motion, a court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences *that fit the plaintiff's stated theory of liability.*"  *Id.* at 5 (quoting *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 5 (1st Cir. 2005) (emphasis added by Defendant).  "This Court therefore must assess the plausibility of the theory *pleaded in Plaintiffs' Complaint,*" which is that "the [M]DMR Rule violates the Fourth

---

[16]     Commissioner Keliher asserts that Plaintiffs' citation to cases involving *Burford* abstention, including *Chico Serv. Station, Inc.*, 633 F.3d 20, are inapposite.  *Def.'s Reply* at 4, n.4.  Plaintiffs' citation to *Flores Galarza*, 484 F.3d 1, he says, "also is inapposite because that case dealt with a federal court's jurisdiction to order relief 'against a state officer … *under federal law.*"  *Id.* (citing *Flores Galarza*, 484 F.3d at 24) (emphasis added by Defendant).

Amendment because it impinges on Plaintiffs' reasonable expectation of privacy while engaging in commercial lobstering." *Id.* (emphasis added by Defendant).

Second, he says the arguments Plaintiffs advance in their opposition "have failed to plausibly *plead*" that either Plaintiffs specifically, or federally permitted commercial lobstering vessels generally, typically use their licensed lobstering vessels for non-lobstering purposes such that the MDMR Rule raises either "accuracy concerns (when a vessel is used for commercial fishing purposes other than lobstering)" or "non-incidental privacy concerns when a vessel is used for non-commercial fishing purposes)." *Id.* (emphasis in original).  On the issue of accuracy, Commissioner Keliher says that Plaintiffs have not, for example, pleaded that scallop fishing by commercial lobstering vessels is so prevalent, and that the movement patterns of vessels while scalloping is so indistinguishable from the patterns of vessels while lobstering, that the American lobster fishery data "will be substantially inaccurate." *Id.*  Regarding non-incidental privacy concerns, he contends "it is simply not plausible that grocery runs or a family picnic in a cove would be misinterpreted as lobstering." *Id.* (citing *Pls.' Opp'n* at 8).  Commissioner Keliher adds that the MDMR adopted the ping-per-minute data collection rate "precisely because it best allows for distinguishing between the distinctive movement pattern of setting and hauling lobster traps and other activities, such as 'steaming' (transitioning) and remaining stationary." *Id.* at 5-6 (citing *Addendum XXIX* at §§ 2.2.1, 2.2.5; 15-16, 36-37).

Commissioner Keliher further contends privacy concerns miss the point, arguing that "Plaintiffs' newfound emphasis on their purported privacy interests while not engaging in commercial fishing is misplaced because the premises in question—commercial fishing vessels—already may be boarded and inspected *at any time* by government authorities without reasonable suspicion of a violation." *Id.* at 6 (citing *Mot. to Dismiss* at 15) (emphasis added by Defendant).  Commissioner Keliher characterizes the Plaintiffs' insistence of their right to a heightened expectation of privacy when using their vessels for non-commercial purposes as "simply false." *Id.*

Responding to Plaintiffs' argument that active management of the American lobster fishery is unnecessary because the fishery "currently is not in danger of being overfished," *id.* (citing *Pls.' Opp'n* at 7), Commissioner Keliher says Plaintiffs' citation in support is a 2020 stock assessment, and "it is axiomatic that the state of a fishery changes over time due to harvesting practices, natural conditions, and anthropogenic environmental impacts, like climate change." *Id.*  In addition, he says, Plaintiffs "are entirely off-base in suggesting that the future imposition of regulations concerning right whales is not a legitimate concern." *Id.* (citing *Pls.' Opp'n* at 8).

### b.    Count Two: Equal Protection

Turning to Count Two, Commissioner Keliher says that although Plaintiffs "speculate about future uses of the location data collected pursuant to the [M]DMR Rule," they "have not pleaded that the [M]DMR fails to provide affected lobstermen with fair notice of *what the Rule itself requires*." *Id.* at 6-7 (emphasis in original).  The MDMR Rule, he states, "plainly requires installation of tracking devices on certain

licensed lobster vessels and prohibits disabling those devices while the vessels are in operation." *Id.* at 7 (citing *MDMR Rule* §§ (B)-(D)). Thus, Plaintiffs' "[s]peculation about future uses of the location data collected by the tracking devices is not properly a part of the constitutional vagueness analysis regarding the [M]DMR Rule." *Id.*

Based on the foregoing, Commissioner Keliher requests that the Court grant his motion and order the dismissal of the Plaintiffs' complaint.

## IV.    MOTION TO DISMISS LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (internal citation omitted). "The burden falls on the plaintiff to clearly allege facts demonstrating that he is a proper party to invoke federal jurisdiction." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996) (citation and internal quotation marks omitted); *see also Me. Council of the Alt. Salmon Fed'n v. Nat'l Marine Fisheries Serv. of the Nat'l Oceanic Atmospheric Admin.*, 203 F. Supp. 3d 58, 75 (D. Me. 2016) ("The plaintiff, as the party asserting subject matter jurisdiction, has the burden of demonstrating its existence"); *Fábrica de Muebles J.J. Álvarez, Incorporado v. Inversiones Mendoza, Inc.*, 682 F.3d 26, 33-34 (1st Cir. 2012) ("The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction"). In ruling on a Rule 12(b)(1) motion, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all

59

reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996). "If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3).

### B.       Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz*, 669 F.3d at 55); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual

allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán*, 734 F.3d at 103 (quoting *Morales-Cruz*, 676 F.3d at 224; *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   MOTION TO DISMISS DISCUSSION

### A.   Federal Rule of Civil Procedure 12(b)(1)

#### 1.   Count Three: The Maine APA

In its entirety, the Eleventh Amendment to the U.S. Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

In *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court "determined that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1983) (internal citations omitted) (quoting *Hans*, 134 U.S. at 1); *see*

*also Alden v. Maine*, 527 U.S. 706, 728-29 (1999) ("The Eleventh Amendment confirmed, rather than established sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not only by the text of the Amendment alone but by fundamental postulates implicit in constitutional design").   The Supreme Court's "decisions [] establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'" *Pennhurst*, 465 U.S. at 100 (quoting *Emps. v. Missouri Pub. Health Dep't*, 411 U.S. 279, 280 (1973)).   "This jurisdictional bar applies regardless of the nature of the relief sought."   *Id.*

Given the "vital role of the doctrine of sovereign immunity in our federal system," the Supreme Court has "required an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Id.* at 99 (quoting *Quern v. Jordan*, 440 U.S. 332, 342 (1979)).   Otherwise, "a State may at its pleasure waive its sovereign immunity by consenting to suit." *Coll. Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

The Maine Department of Marine Resources is not named in the complaint, but Commissioner Keliher is sued in his official capacity as Commissioner of the department.   "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."   *Id.* at 101 (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (official capacity suits are "another way of pleading an action against an entity of which an officer is an agent").

"The doctrine of *Ex parte Young,* which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (discussing *Ex parte Young*, 209 U.S. 123 (1908)).   But this "exception is narrow." *Id.* (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985); *Cory v. White*, 457 U.S. 85, 90-91 (1982)).

The Supreme Court explained, "[t]he theory of [*Ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" *Pennhurst*, 465 U.S. at 102 (third alteration in original) (quoting *Ex parte Young*, 209 U.S. at 160).  The *Pennhurst* Court continued, "[s]ince the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected to the consequences of his official conduct'" in *Ex parte Young*.  *Id.* (quoting *Ex parte Young*, 209 U.S. at 160).

Following the reasoning in *Ex parte Young*, the Supreme Court held in *Edelman v. Jordan*, 415 U.S. 651 (1974) "that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct." *Pennhurst*, 465 U.S. at 103.  This is the doctrine pursuant to which the Plaintiffs bring Count Three.

In *Pennhurst*, the Supreme Court was faced with "the question [of] whether a federal court may award injunctive relief against state officials on the basis of state law." 465 U.S. at 91. It answered no. The *Pennhurst* Court wrote:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106. The Supreme Court continued, "*Larson* thus made clear that, at least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it." *Pennhurst*, 465 U.S. at 113 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690, 695 (1949)).

On this preliminary point, the parties disagree as to whether the Plaintiffs seek relief under state or federal law. Commissioner Keliher asserts that Plaintiffs seek relief for a violation of state law, and the Court must dismiss Count Three pursuant to Federal Rule of Civil Procedure 12(b)(1) because the Eleventh Amendment to the U.S. Constitution grants sovereign immunity to the MDMR as a state entity. *Mot. to Dismiss* at 9-10. The Eleventh Amendment, Commissioner Keliher says, "denies federal courts jurisdiction to award relief against state officials based upon violations of state law." *Id.* at 9 (citing *Guillemard-Ginorio*, 585 F.3d at 529). When a plaintiff asks a federal court to compel state officers to comply with

64

state law, Commissioner Keliher says that "the only appropriate response is to dismiss the state law claims . . . even in a suit also bringing claims grounded in federal law." *Id.* (citing *Cuesnongle*, 835 F.2d at 1497) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option."); *Pennhurst*, 465 U.S. at 121 ("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment")).

Plaintiffs, for their part, respond that their challenge to the MDMR Rule "necessarily and obviously exceeds the scope of a simple challenge to a state action under a purely state regulatory scheme because it involves the adoption of a federal policy, promulgated under a federal rule, that is aimed solely at *federally* permitted fishing vessels for the purpose of protecting a *federal* fishery." *Pls.' Opp'n* at 4-5 (emphasis in original). Commissioner Keliher replies that "Plaintiffs continue to fail to grapple with the fact that Count [Three] alleges that Defendant has violated *state law*, Maine's [APA]." *Def.'s Reply* at 4 (emphasis in original).

The Court agrees with Commissioner Keliher. Although a court considering a Rule 12(b)(1) motion "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff," *Aversa*, 99 F.3d at 1209-10, the Court sees it as decisive that Plaintiffs themselves, in their Complaint, classify Count Three as a "violation of the Maine Administrative Procedure Act (5 M.R.S. 8058)." *Compl.* at 26. The Maine APA is a Maine state law. *Larson* and *Pennhurst* thus make clear that Commissioner Keliher, in his official capacity, insofar as the Plaintiffs are suing for injunctive relief pursuant to a

challenge to state law, has sovereign immunity; thus, Commissioner Keliher cannot be sued absent the state consenting to suit or Congress unequivocally expressing their congressional intent to abrogate the State's immunity.

14 M.R.S. § 8818 states "[n]othing in this chapter or any other provision of state law shall be construed to waive the rights and protections of the State under the Eleventh Amendment to the United States Constitution, except where such waiver is explicitly stated by law." In the case at bar, the Plaintiffs do "not direct us to any law to the contrary, nor do they argue that the [State] has waived its immunity by any other means." *See Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 34 (1st Cir. 2006). The Plaintiffs also have not provided any evidence of an unequivocal congressional intent to overturn the state of Maine's immunity.

Accordingly, the Court concludes Count Three is barred by state sovereign immunity and the Court therefore lacks jurisdiction to enjoin Commissioner Keliher acting in his official capacity based on an alleged misinterpretation of *state* law.[17] Thus, the Court grants the Defendant's motion to dismiss Count Three.

---

[17]   The Court is aware of the United States Supreme Court's recent holding in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (June 28, 2024), which similarly concerned a rule promulgated pursuant to the MSA. *See Loper Bright*, 144 S. Ct. at 2254-57. Although the parties do not raise *Loper Bright* in their motions to this Court (understandably, as the Supreme Court published its decision after parties submitted the two present motions) and also chose to not amend their motions to incorporate *Loper Bright*, the Court nonetheless considered whether *Loper Bright* may be decisive in this case, as the Court is, of course, bound by the holdings of the United States Supreme Court.

In *Loper Bright*, Atlantic herring fishermen argued that a rule promulgated by the National Marine Fisheries Service (NMFS) pursuant to the MSA unconstitutionally exceeded the bounds of what the MSA empowers the NMFS to do. *Id.* at 2255-56. The District Court granted summary judgment to the Government, concluding that the MSA authorized the Rule, but noting that "even if these petitioners' 'arguments were not enough to raise an ambiguity in the statutory text,' deference to the agency's interpretation would be warranted under *Chevron*," *id.* at 2256 (quoting *Loper Bright Enters. v. Raimondo*, 544 F. Supp. 3d 82, 107 (D.D.C. 2021) (citing *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); the Court of Appeals for the D.C. Circuit

### B.    Federal Rule of Civil Procedure 12(b)(6)

The Court begins with a preliminary statement on the scope of the record.  "[A]

motion to dismiss under Rule 12(b)(6) generally provides no occasion upon which to

consider documents other than the complaint."  *Doe v. Pawtucket Sch. Dep't*, 969 F.3d

1, 8 (1st Cir. 2020); *see also James D. Julia, Inc. v. Dan Murphy Auctions, LLC*, No.

1:21-cv-00025-JAW, 2021 U.S. Dist. LEXIS 115124, at *21 (D. Me. June 21, 2021)

("Ordinarily, a court ruling on a motion to dismiss may only consider whether the

factual allegations within the four corners of the plaintiff's complaint state a plausible

claim for relief").  Here, the Plaintiffs attach the Addendum as an exhibit to the

complaint, *Addendum XXIX*, and refer to, but do not attach, the MDMR Rule.  *See*

*Compl.*  Commissioner Keliher did, however, attach the MDMR Rule to his motion to

dismiss.  *MDMR Rule.*    The parties have submitted arguments about the language

of the Addendum and the MDMR Rule in favor of and against the pending motion to

dismiss, and the Court has accepted the authenticity of those documents for purposes

of ruling on the motion.  *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st

Cir. 1998) (when, as now, "a complaint's factual allegations are expressly linked to—

---

affirmed.  *Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 370 (D.C. Cir. 2022).  The Supreme Court
reversed, overturning the doctrine of *Chevron* deference.  *Loper Bright*, 144 S. Ct. at 2273 ("*Chevron*
is overruled").

    This Court concludes that *Loper Bright* is distinguishable from the claims the parties raised
in their motions, and it does not rely on *Loper Bright* in ruling on Commissioner Keliher's motion to
dismiss.  *Loper Bright* involved a question of statutory interpretation; more specifically, whether an
agency's rulemaking was lawful, pursuant to the agency's understanding of the authority granted to
it by the Magnuson-Stevens Act – a federal law.  While Plaintiffs in the present case argue that the
MDMR Rule violates the Maine APA for being both arbitrary and capricious and contrary to law, the
Maine APA is a state law, not a federal one.  Because the Court concludes that it does not have subject
matter jurisdiction over Count Three pursuant to the Eleventh Amendment, it does need to (and, in
fact, cannot) consider whether MDMR's interpretation of their authority in promulgating the MDMR
Rule was unlawful in violation of the Maine APA.

and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)").

The claims currently before the Court turn on the terms of the Addendum and the MDMR; thus, the Court considers the Addendum attached by the Plaintiffs and the MDMR Rule attached by the Defendant, both of which the parties agree are authentic without challenge.

### 1.    Count One: The Fourth Amendment[18]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. The Supreme Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Arizona v. Grant*, 556 U.S. 332, 338 (2009) (quoting *Katz v.*

---

[18]    Any analysis of whether Government conduct violates the Fourth Amendment must first determine that the conduct at issue is a search or seizure, and thus within the bounds of Fourth Amendment protections.  It is only after determining that conduct constitutes a search or seizure that the next question is considered: is the search or seizure reasonable? *See, e.g., Terry v. Ohio*, 392 U.S. 1, 26, 27-28 (1968) (first finding an officer's "brief, though far from inconsiderable intrusion" in patting down two men to be a search, and then finding the officer's search to be reasonable where he reasonably feared for his safety); *Torres v. Madrid*, 592 U.S. 306, 309, 325 (2012) (finding officers' application of force to the defendant's body with the intent to restrain to constitute a seizure; remanding the question of whether the seizure was unreasonable in violation of the Fourth Amendment).

As Commissioner Keliher explicitly conceded in a footnote that the electronic tracking requirements in the MDMR Rule in fact constitutes a search, the Court proceeds as the parties do, and begins with the analysis of whether the search is reasonable. *See Mot. to Dismiss* at 12 n.16. Commissioner Keliher confirmed this concession at oral argument.

*United States*, 389 U.S. 347, 357 (1967)).  This rule "applies to commercial premises as well as to homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978).

The Supreme Court has also held that "[s]earch regimes where no warrant is ever required may be reasonable where 'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Patel*, 576 U.S. at 420 (citing *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)), and "where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *Id.* (citing *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)).  The Supreme Court treats this kind of search as an "administrative search." *See id.*; *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 534 (1967).  "Absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420.

Here, the MDMR Rule's electronic tracking device requirement serves a "special need" other than conducting criminal investigations, *see Patel*, 576 U.S. at 420, and the parties accordingly agree it is an administrative search. *Mot. to Dismiss* at 11 ("the [MDMR] Rule unquestionably meets the requirements for a lawful 'administrative search'"); *Compl.* ¶ 85 (arguing that "neither the ASMC nor MDMR have articulated the limited scope, relevant purpose, and specificity required to otherwise obtain this satellite tracking data through a constitutional administrative search").  The parties also seem to agree that the lobster fishery is a "closely

regulated" industry.[19]  *See Mot. to Dismiss* at 13-15; *Pls.' Opp'n.* at 5-6.  The Court thus proceeds to analyze the MDMR Rule from this premise.

The Supreme Court has adopted a "more relaxed standard" for "closely regulated" industries.  *Patel*, 576 U.S. at 424.  The Supreme Court held that administrative searches of closely regulated industries do not violate the Fourth Amendment so long as (1) there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; (2) the search is necessary to furthering that interest; and (3) the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *Id.* (citing *Burger*, 482 U.S. at 702-03).

---

[19]    In their response in opposition to the motion to dismiss, Plaintiffs say:

> At bottom, MDMR argues that, under . . . *Patel* … and *New York v. Burger* . . . , its Rule is a valid administrative search of a closely regulated industry because the Rule is necessary to further a substantial government interest and is sufficiently limited in scope. . . .  Contrary to MDMR's argument, however, viewing the Rule in full context reveals it as both unnecessary to achieve its overarching purpose and as having a scope greatly exceeding that permitted for a constitutional administrative search."

*Pls.' Opp'n* at 5-6.  Plaintiffs then proceed to analyze the MDMR Rule under the *Burger* test.  *Id.* at 5-11.

The Court reads Plaintiffs' assertion as rejecting Commissioner Keliher's conclusion that the MDMR Rule's electronic tracking device requirement is a lawful administrative search; however, Plaintiffs do not reject Commissioner Keliher's conclusion that the MDMR Rule should be analyzed pursuant to the Fourth Amendment test for "closely regulated" industries.  The Court reads Plaintiffs' analysis of the MDMR Rule pursuant to the *Burger* test as further indication that Plaintiffs concede the MDMR Rule should be analyzed as a closely regulated industry.  The Plaintiffs confirmed their understanding of the lobster fishery as a "closely regulated" industry at oral argument.

The Court now proceeds to analyze the MDMR using the *Burger* test.  *See id.*; *Burger*, 482 U.S. at 702-03.

### a.   Substantial Government Interest

The Plaintiffs do not dispute Commissioner Keliher's assertion that MDMR has a substantial interest in regulating the lobster fishery and ensuring its long-term viability.  *Pls.' Opp'n* at 6-7.  They say, "MDMR argues that its interest in 'regulating the lobster fishery and ensuring its long-term viability' supports the scope of the Rule . . . . While there is no dispute that this interest is substantial—the long-term health of the fishery is essential to the livelihoods of Maine's lobster fleet—the real issue is whether the Rule as applied is indeed necessary to protect the long-term health of the fishery."  *Id.* at 7.

The Court proceeds to the second prong of the *Burger* test.

### b.   Necessary to Further a Substantial Government Interest

As noted, the Plaintiffs disagree with Commissioner Keliher that the MDMR Rule is necessary to furthering a substantial government interest.  *Id.*  Plaintiffs say that "the lobster fishery currently is not in danger of being overfished," and thus that the "future threats" MDMR warns of are "inherently vague."  *Id.*  Beyond the "alleged dangers to the North Atlantic right whale population," which Plaintiffs say Congress has already addressed through the Consolidated Appropriations Act, *id.* at 8, "MDMR has made no effort to identify these 'future harms,' let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats.'"  *Id.* at 7 (citing *Compl.* ¶ 55).

In determining the Rule's necessity, it is helpful to return to the text of the MDMR Rule and the Addendum on which it is based. As Plaintiffs explain in their complaint, once the ASMFC drafts an FMP containing regulations and enforcement guidelines, it specifies the requirements for state compliance. *Compl.* ¶ 6. The states then draft their own rules to meet these requirements; in Maine, the rules are drafted by the MDMR. *Id.* If a member state fails to implement an essential element of an ASMFC plan for a particular fishery, the Secretary of Commerce has the authority to declare a moratorium on that fishery in that state's waters. *Keliher Decl.* ¶ 6; *Compl.* ¶ 6 (citing 16 U.S.C. § 5106).

While the MDMR Rule does not include a statement of the problem the rule sets out to address, the Addendum does. *See Addendum XXIX* at 1-5. Because the MDMR Rule is legally required to be consistent with the Addendum, the Court looks to the text of the Addendum to determine whether the MDMR Rule is necessary to further the substantial government interest articulated in the Addendum. The Addendum begins with Section 2.1 (Statement of the Problem) which discusses the four problems the FMP seeks to address. *Addendum XXIX* at 1-2. Section 2.1 begins:

> To date, the majority of spatial analyses of lobster . . . fishery data have been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transmit routes and fishing grounds. The application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists.

*Id.* Section 2.1 goes on to identify "a number of challenges the fishery is currently facing [that] pose a critical need for electronic tracking data in the offshore fishery":

1. The stock assessment is currently limited by the coarse spatial scale of available harvest data for American lobster. NOAA Fisheries statistical areas and latitude/longitude coordinates are collected on the NOAA Fisheries Greater Atlantic Regional Fisheries Office (GARFO) Vessel Trip Report (VTR)[;] however, the collected spatial data represent the location of where the majority of the fishing effort occurred. The nature of the coarse spatial data is insufficient for management and scientific purposes. Though harvester reporting at the 10-minute square level was adopted for federally-permitted lobster vessels reporting to the states and the federal VTR continued to collect latitude and longitude data for each trip, the precision of spatial information is not consistent across federal permit holders. This finer scale does not provide the precision to accurately apportion effort within the stock units.

2. Due to interactions between protected marine resources and the lobster … fisher[y], the fisher[y] will be required to implement significant risk reduction efforts under the . . . Take Reduction Plan. These risk reduction efforts are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution.

3. Recent executive orders have prioritized the development of offshore renewable energy and the conservation of US waters. The development of emerging ocean uses such as wind energy, aquaculture, and marine protected areas may all create marine spatial planning challenges for the lobster … fisher[y].

4. The large geographic footprint and low density of lobster gear in the offshore federal management area makes it difficult to locate gear for compliance checks, reducing the efficiency and efficacy of offshore enforcement efforts.

*Id.* at 2. "Each of these issues," Section 2.1 continues, "pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs. Electronic tracking requirements in the federal fishery would fill this information gap and support fishery managers in addressing the aforementioned challenges." *Id.*

Regarding the issue of stock assessment, enumerated at § 2.1(1), the Addendum proceeds to explain that "[a] complicating factor in the management of lobster is that the boundaries of the [Lobster Conservation Management Areas] do

73

not align with the biological boundaries of the stocks ([Gulf of Maine/Georges Bank v. Southern New England])." *Id.* at 3. This is particularly problematic in LCMAS 2 and 3 which span both stocks, the Addendum continues. *Id.* "To date," the Addendum says, "the stock assessment has only been able to analyze stock composition data at the spatial resolution of the NOAA statistical area." *Id.* This is because not all lobster permit holders report at a more granular level than the NOAA statistical area; for each trip, some provide a single latitude and longitude point meant to represent where the majority of fishing occurred, some provide 10-minute squares fished, and others provide only the statistical area fished. *Id.* The Addendum explains,

> This creates challenges for the assessment because some parameters in the stock assessment model vary at a finer spatial scale than statistical area . . . . Improved spatial resolution of total harvest data from vessel tracking will improve size composition data used in the stock assessment models to improve the accuracy of exploitation and reference abundance estimates.

*Id.* at 3-4.

As to § 2.1(2), the Addendum says that one of its aims is to comply with the goals of the Marine Mammal Protection Act, the Endangered Species Act, and the Take Reduction Plan. *Id.* at 4. The Take Reduction Plan, which sets out to reduce the risks to endangered North Atlantic right whales and other large whales associated with the presence of fishing gear in waters where these animals occur, includes a significant reduction in the number of vertical buoy lines in the fishery in order to reduce right whale encounters with such buoy lines, weak-link rope requirements to reduce mortalities and serious injuries when entanglements do occur, and changes to seasonal restricted areas closed to pot/trap gear that use

74

stationary vertical buoy lines. *Id.* These risk reduction approaches in the Take Reduction Plan, the Addendum explains, "are informed by the co-occurrence model, which pairs information regarding the distribution of whales and commercial fishing gear to predict areas where whales may be prone to entanglement." *Id.* The Addendum asserts that "[e]lectronic vessel tracking data would significantly improve the models used to assess the location of vertical lines in the fishery and their associated risk to right whales in the [Take Reduction Plan]." *Id.* The Addendum describes the need as "critical" to "gather and provide updated and enhanced spatial effort data to improve the associated risk reduction models" ahead of the timeline mandated by the May 2021 Biological Opinion's Conservation Framework.[20] *Id.*

On § 2.1(3), the Addendum says that "[i]t is critically important to record the footprint of the U.S. lobster fishery as spatial allocation discussions occur as a result of emerging ocean uses such as aquaculture, marine protected areas, and offshore energy development." *Id.* The Addendum gives the example of the New England Fishery Management Council's (NEFMC) Omnibus Deep-Sea Coral Amendment, which looked to provide protection to corals in the northwest Atlantic Ocean through the creation of discrete regions and/or broad depth zones. *Id.* When NEFMC "took action" on the amendment in 2016, it asked the Commission to provide information on the magnitude of lobster catch in specific regions in order to understand potential economic impacts. *Id.* At the time, the Addendum explains, the lobster FMPs

---

[20]     The Addendum cites the Biological Opinion issued on May 27, 2021, which "outlines a Conservation Framework that intends to reduce morality and serious injury to North Atlantic Right Whales by 95% over ten years.  Within this Framework, additional risk reductions could be required in the US lobster fishery starting in 2025." *Addendum XXIX* at 4.

required harvesters to report landings via NOAA statistical areas, regions much larger than those being considered for coral protection. *Id.* at 4-5. The spatial resolution of catch and effort data for the lobster fishery "proved too coarse; without fine scale spatial information, impacts to the lobster . . . fisher[y] had to be estimated by piecing together information from harvester reports, industry surveys, and fishermen interviews." *Id.* at 5. The Addendum says that similar challenges occurred when the Northeast Canyons and Seamounts Marine National Monument was established in 2016, and that "it is expected that these challenges will continue given increased activity surrounding offshore wind, aquaculture, and oil and gas exploration." *Id.* The Addendum adds that "documentation of the US lobster fishery footprint" is also essential for compliance with recent executive action taken towards addressing climate change. *Id.*

On § 2.1(4), the Addendum says that a "potential benefit" of collecting electronic vessel tracking data is the ability to improve enforcement in the offshore area, as "[i]t has long been recognized that enforcement efforts in the offshore federal lobster fishery need to be improved." *Id.* The Addendum says that enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when lobstermen are using illegal gear. *Id.* Once a fishing location can be identified using vessel tracking data, the Addendum says, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. *Id.* "Given finite enforcement resources, information on distinct fishing

locations would improve the efficiency and capability of offshore enforcement efforts." *Id.*

The Addendum continues to state that "[f]ederal lobster . . . vessels issued commercial trap gear permits are required to install an approved electronic tracking device to collect and transmit spatial data in order to participate in the trap gear fishery." *Id.* It continues to say that the installation and activation of an approved device must happen prior to beginning a lobster trip with trap gear, and the device must then remain on board the vessel and powered at all times when the vessel is in the water, "unless the device is authorized to power down by the principal port state." *Id.* at 5-6. The Addendum then proceeds to discuss exceptions, which the Court addresses below.

In *Burger*, the Supreme Court explained that warrantless inspections are permitted only as "necessary to further [the] regulatory scheme." *Burger*, 482 U.S. at 702 (quoting *Donovan v. Dewey*, 452 U.S. 594, 600 (1980)). In *Dewey*, the Court deemed warrantless inspections "necessary to further [the] regulatory scheme" when it found that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to impending inspection, thus frustrating the Mine Safety and Health Act's purposes of detecting and deterring safety and health violations. *Dewey*, 452 U.S. at 603. And in *Burger* itself, the Court found the second prong satisfied upon concluding that "regulation of the vehicle-dismantling industry reasonably serves the State's substantial interest in eradicating automobile theft." *Burger*, 482 U.S. at 709.

The *Burger* Court applied a standard akin to rational basis review to analyze this second prong, saying that, because it is well established that vehicle theft can be effectively addressed by controlling the receiver of, or market in, stolen property, "the State rationally may believe that it will reduce car theft by regulations that prevent automobile junkyards from becoming markets for stolen vehicles and that help trace the origin and detention of vehicle parts." *Id.* The First Circuit took a similar approach in *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 220 (1st Cir. 2015), finding the second prong of the *Burger* test satisfied when "Plaintiffs . . . do not say how reasonable officials . . . would have reasonably thought that warrantless inspections do not advance the just-described state interest." The *Rivera-Corraliza* Court concluded that the second prong was satisfied by "administrative searches that advance this [substantial government] interest." *Id.* at 216-17.

Applying these precedents to the present case, the Court concludes that the electronic tracker requirement articulated in the MDMR Rule and the Addendum on which it is based are "necessary" to advance the long-term health and stability of the Maine lobster fishery. It agrees with Commissioner Keliher that the Addendum clearly outlines four reasons why it, and the MDMR Rule which adopts it, are necessary means to protect its substantial interest in the lobster fishery. *Mot. to Dismiss* at 4-5. The ALMB wrote and implemented the Addendum to address four "challenges the fishery is currently facing [that] pose a critical need for electronic tracking data." *Addendum XXIX* § 2.1. First, the ALMB explained that currently available data is insufficiently detailed for management and scientific purposes,

including stock assessments. *Id.* §§ 2.1, 2.2.2. Second, the ALMB noted that the current data's limitations make it difficult to contribute valuable information about commercial lobster fishing to the NMFS's whale reduction efforts pursuant to the Take Reduction Plan. *Id.* §§ 2.1, 2.2.3. Third, the ALMB explained that better data will improve assessment of the potential effects on the lobster fishery of competing uses, including aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration. *Id.* §§ 2.1, 2.2.4. The ALMB noted that the lack of sufficiently detailed fishery activity data currently hinders analysis of the potential effects of proposed projects on the lobster fishery. *Id.* Fourth, the Addendum says that better fishery activity data will improve the efficiency and effectiveness of limited enforcement resources in federal waters, with their "large geographic footprint and low density of lobster gear," thus conserving the lobster resource and ensuring the ongoing viability of the commercial fishery. *Mot. to Dismiss* at 5 (quoting *Addendum XXIX* § § 2.1, 2.2.5).

Plaintiffs have failed to plead plausible facts sufficient for the Court to conclude the MDMR Rule is unnecessary to respond to these regulatory needs as Supreme Court and First Circuit precedent requires.

The Court is not persuaded this bar is met by Plaintiffs' argument that the "future threats" the MDMR Rule seeks to address are "inherently vague" and that the MDMR "has made no effort to identify . . . , let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats'." *See Pls.' Opp'n*

at 7.  The Addendum, with which the MDMR Rule is legally required to comply, addresses each of these concerns in detail, as discussed above.  *See Addendum XXIX*.

Having found the second prong of the *Burger* test satisfied, the Court continues to prong three.

### c.      Functions as Warrant

The third prong of the *Burger* test for an administrative search of a closely regulated industry is that the challenged regulation must "perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *Burger*, 482 U.S. at 702-03; *Rivera-Corraliza*, 794 F.3d at 216-17.  To satisfy this first function, the *Burger* Court explained that "the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'"  *Burger*, 482 U.S. at 703 (quoting *Dewey*, 452 U.S. at 600).  As to the second function, "in defining how a statute limits the discretion of the inspectors . . . it must be 'carefully limited in time, place, and scope.'"  *Id.* (citing *United States v. Biswell*, 406 U.S. 311, 315 (1987)).

Both the Plaintiffs and the Defendant treat these two functions together in their respective motion and responsive filings; thus, the Court follows their approach. The Plaintiffs on this point essentially argue that the MDMR Rule fails because it is not sufficiently limited.  *Pls.' Opp'n* at 7.  Plaintiffs question why the Government could not have limited tracking to vessels fishing for lobster in federal waters or

adopted "the lesser 'ping rates' employed by trackers in other industries like the scallop fishery." *Id.* at 8.  The MDMR Rule, they say, "requires constant surveillance of vessels while they are fishing for other species, or even when they are not fishing at all"; the "indefinite . . . duration of the search" shows that the MDMR Rule "does not serve the same functions as a warrant." *Id.* at 8-9 (capitalization altered).

Commissioner Keliher, in contrast, avers that the MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms." *Mot. to Dismiss* at 16-17 (citing *Tart,* 949 F.2d at 498 (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports").

Commissioner Keliher also argues that the MDMR Rule functions as a warrant because it "properly limits government discretion." *Id.* at 17.  He argues that the MDMR Rule is limited, first, because it "track[s] only location data of licensed commercial fishing vessels." *Id.*  Although he acknowledges that the MDMR Rule requires vessel location data to be collected whenever a vessel is in operation, he argues that the rule still complies with *Burger* because its collection of location data is "minimally intrusive in the context of the 'entire regulatory scheme applicable to the commercial fishing industry,'" *id.* at 19 (citing *Tart*, 949 F.2d at 499), and is particularly "less intrusive than the suspicionless boarding and search of a vessel, which is already authorized under state and federal law." *Id.* (citing 16 U.S.C. §§

5101-5108; 50 C.F.R. Part 697; 46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)).  In addition, he says, timing restrictions on the MDMR Rule's electronic data collection would not be feasible because "commercial lobstering does not follow regular business hours" and timing restrictions would thus "seriously undermine the reliability and administrability of the entire data collection program." *Id.* (citing *Ponce-Aldona*, 579 F.3d at 1226).

Commissioner Keliher also avers that the MDMR Rule functions as a warrant because it takes steps to limit the collection of data.  *See id.* at 6-7.  First, the Particle TrackerOne collects the position of the vessel once per minute while the vessel is moving, but only once every six hours when the vessel is moored or docked.  *Id.* at 6 (citing *Vessel Tracking Requirements* at 1).  Second, although the MDMR Rule makes it generally unlawful for license holders to fish for lobster without an installed and operating tracking device on their vessel, the Rule enumerates specific exceptions.[21] *Id.* at 6-7 (citing *MDMR Rule* § (C)).

In response to Plaintiffs' argument that the MDMR Rule does not take sufficient care to protect the location data it collects, Commissioner Keliher explains that vessel location data is transmitted to the ACCSP which "has protected confidential information relating to fisheries—including self-reported Vessel Trip Report data—for years using the same electronic transmittal systems (approved by

---

[21]    As discussed above, Mr. Keliher notes that the MDMR Rule Section (C) enumerates the following exceptions: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from MDMR while the situation is addressed.  *Mot. to Dismiss* at 6-7 (citing *MDMR Rule* § (C)).

NMFS) and SAFIS database, as described in Addendum XXIX." *Id.* at 7 (citing *Addendum XXIX* § 3.2.3).  Further, he says, "the vessel location data is 'designated as confidential through Maine law and regulation,'" *id.* (quoting *Vessel Tracking Requirements* at 2); "Maine law requires that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel." *Id.* (citing 12 M.R.S. § 6173).  Commissioner Keliher avers that MDMR's own regulations also "require that publicly released data do not identify individual vessels or license holders." *Id.* (citing 13-188 C.M.R. ch. 5).

The Court is persuaded by Commissioner Keliher and the ASMFC's arguments and finds the MDMR Rule complies with the third prong of the *Burger* test.  First, the Court concurs with Commissioner Keliher that MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms." *Mot. to Dismiss* at 16-17.  When the MDMR sent Particle TrackerOne devices to federally licensed lobstermen, it included in these mailings a document entitled Federal Permit Holder Vessel Tracking Requirements, which Plaintiffs attached to their complaint, that clearly inform licensees of what the Addendum requires and that these requirements apply to them because of their license. *See Fed. Permit Holder Vessel Tracking Requirements.*  The mailing includes information on the kind of data the tracker will collect, who will pay for the tracking device and the data program (the latter, for the first three years), why ASMFC established the tracker requirement, whether the collected data will be kept confidential, and whether tracking is mandatory. *See id.* at 1-2.  The mailing also

includes a link to a form for lobstermen who believe the MDMR Rule should not apply to them because their vessel is powered down, instructions on how the tracker can be connected and installed, and ways to tell if the tracker is operating correctly. *See id.* at 1-5. The mailing also contains a phone number and email address that lobstermen may use to contact the MDMR for troubleshooting or additional support. *Id.* at 5. Finally, the document provides a link to the full text of the Addendum. *Id.* at 5. Thus, the Court concludes that covered lobstermen were sufficiently on notice of the MDMR Rule.

The Court also agrees with Commissioner Keliher and the ASMFC that the MDMR Rule has "a properly defined scope" and "limit[s] the discretion of the inspecting officers." *Burger*, 482 U.S. at 702-03. As discussed above, the MDMR Rule complies with Maine's existing requirements for data collection which are designed to protect individual information, *see Fed. Permit Holder Vessel Tracking Requirements* at 2; *Addendum XXIX* § 3.2.3; 12 M.R.S. § 6173; 13-188 C.M.R. ch. 5; the rule includes exemptions for individuals not subject to its provisions, *MDMR Rule* § (C); and it only collects data on "the time and position" of fishing vessels, *Fed. Permit Holder Vessel Tracking Requirements* at 1, not "audio information" or a "predictive algorithm that can anticipate vessel movements" as Plaintiffs feared. *See Compl.* ¶ 77.

### d.   Other Privacy Concerns

The lobstermen have legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule. Lobstermen are not always fishing on

their boats. They have their own lives. Even though they use their boats to fish for lobsters, they also use these vessels to perform personal errands, to visit family and friends, and even in some cases to live on. In the ordinary case, the government, whether state or federal, would not have the right to track a citizen's location and to force a citizen to wear an electronic monitoring device or to attach one to a company car. The degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth Amendment but for the *Burger* exception for administrative searches of a closely regulated industry.

Despite this significant state intrusion, the state correctly rejoins that it has the legal authority to enter onto a lobster boat without a search warrant to inspect the boat for compliance with the numerous regulations that constrain lobster fishing. However, a MDMR search of a particular lobster boat must be limited to one boat at a single time. Here, the MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet. The data collection under the MDMR Rule is vastly different in kind and intensity to past MDMR practice.

The lobstermen's concern is not limited to data collection. It extends to the use of the data and who will have access to it. The Commissioner revealed at oral argument that the data would be available for others within federal and state government. The state could share this data with other governmental agencies, whose concerns are distinct from lobstering and could involve such areas as protections of the right whale and the siting of wind power facilities.

Moreover, although the Commissioner properly observed that Maine's privacy and confidentiality laws apply to the collected data, the data, including personal location data, remain vulnerable to potential revelation through the legal process. For example, if the location of a lobsterman's boat at a particular time became relevant to a criminal investigation or a civil action, such as a divorce or commercial dispute, the seeker of the information, such as a law enforcement agency or civil adversary, could make a case for its disclosure. Thus, unlike virtually any other businessperson, data exist for Maine lobstermen that can confirm his or her precise location at a particular time, which may be discoverable and held against the personal interests of the lobsterman.

In addition, although the state promises to place the collected data in secure information vaults so that lobstermen's personal information will not be available to the general public, it is apparent, given the magnitude of the hacking of data in other scenarios, including government-held data, that there can be no guarantee the collected information will be absolutely secure.

Lastly, the lobstermen fear that after three years, when state funding for the monitoring program runs dry, the state will not only cease its funding but will foist the cost of the monitoring onto the lobstermen themselves, essentially mandating the lobstermen pay the state to invade their privacy. The Commissioner acknowledged at oral argument that it could be that the state will look to the lobstermen to pay for monitoring, but the Commissioner sees this program in a fundamentally different way than the fishermen do. The Commissioner sees the program as assuring the

long-term viability of the lobster as a resource, whereas the lobstermen see the program as an unwarranted governmental restriction on their way of life.

### e.   The Lobstermen's Privacy Concerns and the Government's Necessity for the Information

As noted earlier, in *Burger*, the Supreme Court explained that warrantless inspections are permitted only as "necessary to further [the] regulatory scheme." *Burger*, 482 U.S. at 702.  From the Court's perspective, the closer the data are to lobstering, the clearer the state justification for its collection, and conversely, the further the data are from lobstering, the more attenuated the necessity "to further [the] regulatory scheme." *Id.*  Conceding that the MDMR Rule would fit comfortably within *Burger* for the collection of information on actual lobstering, the justification for collecting data about where lobster boats are when they are not lobstering in federal water is more difficult to square with the *Burger* Court's requirement of necessity.

What trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data.  For example, the Commissioner stated at oral argument that the MDMR considered a system whereby a lobsterman could turn on the system when fishing and turn it off when not fishing.  But because it is essential that the data be accurate, the fact that lobstermen could forget to turn on the device would skew the results.  Similarly, there is no indication in this record that the system could be altered so that it begins to collect data once a

lobster boat crosses the three-mile limit into federal waters and then stops collection when the vessel re-enters state waters.

In addition, the Plaintiffs have failed to allege that there are other available systems of data collection that would protect their personal privacy and satisfy the government's legitimate interest in the collection of accurate lobstering data.  At oral argument, the Plaintiffs asserted the Vessel Trip Reports lobstermen currently self-report are sufficient to provide the government with data on the lobster fishery while also intruding less into lobstermen's individual privacy.   The Government strenuously objects that the current data collection system captures sufficient data to meet the evolving needs of the lobster fishery.  For the reasons discussed elsewhere in this order, the Court accepts the Government's statement and additionally concludes that the Plaintiffs have not argued there is another available system of data collection would protect lobstermen's privacy while satisfying the Government's interest.

Thus, the Court cannot conclude that the MDMR Rule is gratuitously invasive of lobstermen's personal privacy.  The Court must instead conclude that the MDMR's data collection system cannot be designed without the overaccumulation of both relevant and irrelevant data.  Furthermore, the Commissioner has represented that the current level of data accumulation is scientifically inadequate to the task of lobster preservation.  As the lobstermen work in a closely regulated industry, the Court concludes that given the choice between the overaccumulation of data and the

accumulation of inadequate data, the law favors preservation of the resource over the lobstermen's rights of privacy.

The Court understands Plaintiffs' frustration with this additional requirement of licensure.  However, the First Circuit has explained that "'when an entrepreneur embarks upon such a business [in a closely regulated industry], he has voluntarily chosen to subject himself to a full arsenal of government regulation,' and thus a warrantless search to enforce that regulatory regime is not unreasonable." *Rivera-Corraliza*, 794 F.3d at 216 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)).  Commissioner Keliher points to the numerous regulatory regimes governing the federal lobster fishery, including mandates on licensure, trap limits and tags, limits on the size of lobsters that may be taken, requirements that certain lobsters be notched and thrown back, and requirements that licensees submit to inspection.  *Mot. to Dismiss* at 14-15. (citing 16 U.S.C. §§ 5101-5108; 50 C.F.R. Part 697; 46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)).  12 M.R.S. § 6306(1) specifically provides that any person who "receives a [marine resource] license . . . has a duty to submit to inspection and search for violations related to the licensed activities by a marine patrol officer" and that "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . maybe searched or inspected at any time." *Mot. to Dismiss* at 14-15.  In addition, Commissioner Keliher rightly reminds the Court that all people operating vessels at sea, independently of whether or not they are engaging in a commercial enterprise, "are subject to a network of regulations that allow officials to board and inspect vessel." *Id.* at 15.  "A vessel at

sea, unlike a personal vehicle on a highway or a pedestrian on a public street, can be stopped for document checks and safety inspections at any time even without reasonable suspicion." *Id.* (citing *Villamonte-Marquez*, 462 U.S. at 92-93; *United States v. Green*, 671 F.2d at 53; *Giles*, 669 A.2d at 193). These observations are instructive and accurate.

Consistent with this Supreme Court and First Circuit jurisprudence, the Court accordingly concludes that Plaintiffs in Count One have not pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its fact.'" *Iqbal*, 556 U.S. at 678. The Court believes this is an issue that should be presented to the First Circuit on review.

### 2. Count Two: Equal Protection

The crux of Plaintiffs' argument in their second count is that the MDMR Rule is void for vagueness "in that it is designed to enforce criminal and regulatory offenses without defining the contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[22]   *Compl.* ¶ 91. They

---

[22]     Plaintiffs bring Count Two, which they classify as an equal protection violation, pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, § 6-A of the Maine Constitution. *Compl.* ¶ 12. Section 6-A of the state constitution contains Maine's version of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; the state and federal clauses "provide co-extensive protection." *Bailey v. State*, 900 F. Supp. 2d 75, 87 n.20 (D. Me. 2012); *Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065 ("[T]he two clauses provide co-extensive protection"); *see* MARSHALL TRINKLE, THE MAINE STATE CONSTITUTION: A REFERENCE GUIDE at 38-40 (1992).

        Given this precedent, and that Plaintiffs presented no argument distinguishing these clauses, the Court analyzes the Plaintiffs' claims pursuant to the U.S. Constitution and the Maine Constitution as identical.

assert that the MDMR Rule specifically leaves unanswered the penalties for noncompliance, the offenses they might be prosecuted with based on the data collected, what penalties maybe imposed for unintentional violations, and whether non-compliance could affect their fishing licenses. *Id.* ¶¶ 92-93. Commissioner Keliher, in addition to reminding the Court that void for vagueness claims should be brought as due process violations rather than equal protection, argues that Plaintiffs' claim fails because they do not articulate what terms in the MDMR Rule are so unconstitutionally vague that "a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement." *Mot. to Dismiss* at 22, 22 n.23. Plaintiffs' response reasserts that "questions remain about how and to what extent MDMR will enforce the [MDMR] Rule." *Pls.' Opp'n* at 11.

As an initial matter, Commissioner Keliher is correct that void for vagueness claims are typically brought pursuant to the due process clause, not equal protection. At oral argument, the Plaintiffs explained the basis of their equal protection theory is that the MDMR Rule affects one group of lobstermen (those with federal permits) differently from another group of lobstermen (those with state permits).

The Equal Protection Clause of the Fourteenth Amendment "requires states to treat alike all persons similarly situated." *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such

selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)).

The Supreme Court has instructed that a heightened standard of review is proper for classifications based on characteristics "beyond the individual's control and bearing no relation to the individual's ability to participate in and contribute to society," such as gender and illegitimacy. *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985). However, "[u]nless state action burdens a suspect class or impinges upon a fundamental right [the First Circuit] review[s] equal protection claims for rational relationship between the disparity of treatment and a legitimate government purpose." *Toledo*, 454 F.3d at 33. In other words, "[i]n order to state a claim for discrimination that violates equal protection, [a plaintiff] must allege that he was intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment." *Pope v. Bernard*, No. 10-1443, 2011 U.S. App. LEXIS 2764, at *6 (1st Cir. Feb. 10, 2011) (quoting *Toledo* at 34).

Here, the Plaintiffs' equal protection claim does not get out of the starting gate. The Plaintiffs have not argued, pleaded facts, or cited caselaw finding that federally permitted lobstermen are a suspect class or that the MDMR Rule impinges upon a fundamental right. Absent a suspect class, which the distinctions between these classes of lobstermen certainly are not, there is an obvious rational basis for the

MDMR Rule to distinguish between lobstermen who fish close to shore in the waters of the state of Maine and those who fish in the territorial waters of the United States. The Court does not see an equal protection issue as the Plaintiffs have framed the lawsuit.

Nevertheless, viewing the complaint "in the light most favorable to the plaintiff," *Germanowski*, 854 F.3d at 71, the Court proceeds to analyze count two as a due process void-for-vagueness claim.

As count two turns on the terms of the MDMR Rule, the Court considers the rule attached to the motion to dismiss by Commissioner Keliher, which he introduces as authentic and Plaintiffs do not challenge. *See Beddall*, 137 F.3d at 17. Chapter 25.98 is titled "Electronic Tracking Requirements for Federally-Permitted Lobster and Jonah Crab License Holders." *MDMR Rule* at 3. The Rule says that "[e]ffective December 15, 2023, the following electronic tracking device requirements apply to all federally permitted lobster and crab license holders, as defined in Section A." *Id.* Section A (Definitions) includes two definitions:

1. Approved Tracking Device means any electronic device that meets all the specifications outlined in Section 3.1 of the [ASMFC] Addendum XXIX to the American Lobster Fishery Management Plan ....
2. Federally permitted lobster ... license holder means an individual who is eligible for a commercial Maine state license or who is licensed to fish commercially for lobster ... under 12 MRS 6421 or 12 MRS 6302-A who also holds a federal lobster ... commercial trap gear permit for any of the Lobster Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, or the Outer Cape Cod on the vessel identified on their lobster ... fishing license.

*Id.*

The MDMR Rule proceeds to Section B (Electronic Tracking Device Requirements), which states that, "1. [p]rior to their first lobster . . . fishing trip following December 15, 2023, federally permitted lobster and crab fishing license holders are required to install an approved tracking device." *Id.* Section B.2 informs federally permitted lobster . . . fishing license holders that they are required to certify to the MDMR when they have completed the installation of the approved tracking device; it also says that certification must be completed via an electronic form available through the MDMR's publicly accessible website. *Id.* at 4.

Section C (Prohibitions) says that the following prohibitions apply "[u]nless a federally permitted lobster and crab fishing license holder has made modification to the Department as provided in (E)." *Id.* Section C proceeds to list 5 enumerated prohibitions:

1. It is unlawful for a federally permitted lobster . . . license holder to fish for, take, possess, or land lobster or Jonah crab taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

2. It is unlawful for a federally permitted lobster . . . license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the [MDMR].

3. It is unlawful for a federally permitted lobster . . . license holder to allow the permitted vessel listed on their license to be operated in coastal waters of the State without the approved tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth.

4. The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The

license holder shall notify the [MDMR] prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

5. It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering . . . is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the [MDMR].

*Id.*

The MDMR Rule then lists, under Section D (Exceptions), two specific groups of federally permitted lobster and crab fishing license holders who are exempt from the electronic tracking requirement.[23]

Section E (Device Failure) says that "[i]n the event of an electronic tracking device failure, a violation of the prohibition in section (C) shall not exist when the federally permitted lobster . . . fishing license holder makes notification of the failure to the [MDMR] by phone, text message, or email prior to beginning a fishing trip with the inoperable device." *MDMR Rule* at 5. Section E further states that the license

---

[23]    Section D exempts:

1. A federally permitted license holder who holds a federal commercial trap gear permit that has been placed in confirmation of permit history (CPH), a permit status for when a vessel with limited access permits has sunk, been destroyed, or has been sold to another person without its permit history.

2. A federally permitted license holder who holds a federal lobster commercial trap gear permit that does not fish trap gear at any point in the fishing year (i.e., only fishes other gear under a federal lobster commercial/non-trap permit, charter/party non-trap permit, and/or does not fish any trap gear at any point in the fishing year.

*Certified MDMR Rule* at 4.

holder must work with the MDMR "in good faith and in a timely manner to restore device operability as soon as possible." *Id.* Section E also indicates that it is unlawful for a license holder to begin subsequent fishing trips with an inoperable device without written approval from MDMR. *Id.* In circumstances where a federally permitted lobster fishing license holder "has reported frequent or repeated tracking device failures aboard a permitted vessel, a Marine Patrol Officer, after having given notice to that license holder, may require that license holder to obtain written approval from the Department prior to beginning a fishing trip with an inoperable tracking device." *Id.* The Court notes that Section E directly addresses Plaintiffs' questions about how the MDMR Rule treats on "unintentional, as opposed to intentional, violations." *Compl.* ¶ 93.

After reviewing the MDMR Rule, the Court concurs with Commissioner Keliher's position that the Plaintiffs do not "identify what terms of the [M]DMR Rule are unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement." *Mot. to Dismiss* at 22.

On the issue of vague penalties, the Court sides with Commissioner Keliher. While Plaintiffs correctly note that the MDMR Rule itself does not list a penalty or cross-reference a penalty provision, Commissioner Keliher provides the Court with the general statutory provisions governing the penalties for civil violations. First, he informs the Court that a violation of the MDMR Rule, like violations of the other rules promulgated by the MDMR, is a "civil violation for which a fine of not less than $100

for each violation may be adjudged." *Mot. to Dismiss.* at 7 n.12 (citing 12 M.R.S. §
6174(3)).

He further informs the Court that a civil violation of the M.R.S. "is subject to
the due process provided through a court adjudication, and the [MDMR] may suspend
a license after such adjudication," *id.* (citing 12 M.R.S. § 6351(1)(D)); 12 M.R.S. §
6371(3)(A) alternatively provides that the MDMR may administratively suspend a
license without a prior court adjudication based on the license holder's commission of
a marine resource violation, and this administrative suspension is subject to
procedural requirements and judicial review on appeal. *Id.* (citing 12 M.R.S. §§
6371(3)(A), 6374). Commissioner Keliher argues that "[i]t is simply not plausible that
covered vessel owners," who operate in a highly regulated industry, "are in the dark
about the potential consequences of their conduct." *Id.* (citing *Facteau*, 89 F.4th at
33).

The Court concludes the MDMR Rule states what conduct is proscribed and,
further, concludes it is reasonable to believe that federally licensed lobstermen are
sufficiently on notice that violations of the MDMR Rule will be punished in the same
way as violations of MDMR's other regulations, as provided for in the general
statutory penalty provisions listed by Commissioner Keliher. The Court thus
concludes that the MDMR Rule states the "contours of offenses with sufficient
definiteness such that ordinary people can understand what conduct is prohibited."
*Compl.* ¶ 91.

The Court accordingly finds Count Two of Plaintiffs' Complaint has not pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## VI. CONCLUSION

The Court GRANTS Defendant Patrick Keliher's Motion to Dismiss (ECF No. 23) in its entirety and accordingly DISMISSES as moot Plaintiffs' Motion for Preliminary Injunction (ECF No. 7).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of November, 2024

98